## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL TILLMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No.** |
| | ) | |
| **vs.** | ) | **Judge** |
| | ) | |
| **Former CPD Commander JON BURGE; Mayor and former** | ) | **Magistrate** |
| **State's Attorney RICHARD M. DALEY; former CPD Sergeant** | ) | |
| **JOHN BYRNE; former CPD detectives PETER DIGNAN,** | ) | |
| **RONALD BOFFO, JACK HINES and GEORGE PATTON;** | ) | |
| **the Estate of former CPD detective JOHN YUCAITIS;** | ) | |
| **former Cook County ASA TIMOTHY FRENZER; former** | ) | |
| **CPD Superintendents LEROY MARTIN and TERRY** | ) | |
| **HILLARD; former OPS Director GAYLE SHINES; former** | ) | |
| **aide to the CPD Superintendent THOMAS NEEDHAM;** | ) | |
| **the CITY OF CHICAGO; COOK COUNTY, ILLINOIS;** | ) | |
| **and the COOK COUNTY STATE'S ATTORNEY'S OFFICE,** | ) | |
| | ) | |
| **Defendants.** | ) | **Jury Demand** |

## COMPLAINT

Plaintiff MICHAEL TILLMAN, for his complaint against former Chicago Police

Commander JON BURGE; Mayor of the City of Chicago and former State's Attorney of Cook

County RICHARD M. DALEY; former Superintendent of the Chicago Police Department

TERRY HILLARD; former Superintendent of the Chicago Police Department LEROY

MARTIN; former Director of the Chicago Police Office of Professional Standards GAYLE

SHINES; former Chicago Police Sergeant JOHN BYRNE; former Chicago Police Detectives

PETER DIGNAN, RONALD BOFFO, JOHN YUCAITIS, deceased, JACK HINES and

GEORGE PATTON; former Cook County Assistant State's Attorney TIMOTHY FRENZER;

former aide to the Chicago Police Superintendent THOMAS NEEDHAM; the CITY OF

CHICAGO; the COUNTY OF COOK, ILLINOIS; and the OFFICE OF THE COOK COUNTY

STATE'S ATTORNEY, alleges as follows:

## I.    INTRODUCTION

1.     Plaintiff Michael Tillman spent nearly 23 ½ years in maximum security prisons

because he was wrongfully charged with a murder, rape and kidnapping that he did not commit.

Plaintiff was charged with that crime after a team of Area 2 detectives, under the direct

supervision of disgraced former Chicago Police Commander Jon Burge, and his self admitted

right hand man, former Police Sergeant John Byrne, sadistically tortured him for several days

until he purportedly made admissions to the crime.

2.     The miscarriage of justice in Plaintiff's case was not an isolated occurrence.

Rather, it was part of a pattern of systemic torture and physical abuse of African American

suspects at the Area 2 and Area 3 police headquarters.  Plaintiff's torture, wrongful prosecution

and false imprisonment occurred and continued because command personnel in the Chicago

Police Department, successive Superintendents of Police and several Mayors of the City of

Chicago, most notably the current Mayor Richard M. Daley,  as well as Cook County, its State's

Attorney, and its State's Attorneys' Office all concealed and suppressed their knowledge of

ongoing torture and physical abuse under Burge, blocked and undercut all efforts to expose,

discipline, and prosecute offending officers, and refused to intervene to stop the continuing

egregious and criminally unconstitutional  misconduct.

3.     Plaintiff seeks damages for the massive injuries inflicted upon him from the persons responsible for this egregious miscarriage of justice.

## II.     JURISDICTION AND VENUE

4.     This is a civil rights action brought pursuant to 42 U.S.C. § 1983 *et seq.*; the Judicial Code, 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States; and supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

5.     This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391(b).  The parties reside, or, at the time the events took place, formerly resided in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

## III.     PARTIES

6.     Plaintiff Michael Tillman is an African-American man, and a citizen of the United States.

7.     Defendant Jon Burge was a duly appointed and sworn Chicago Police Lieutenant and was, from 1982 to August of 1986, the commanding officer of Chicago Police Area 2 Detective Violent Crimes Unit.  In 1988, Burge was appointed Commander of Area 3 Detective Division by Defendant Martin and held this assignment until 1991, when he was suspended and, ultimately, fired by the Chicago Police Department for the torture and abuse of Andrew Wilson. Defendant Burge engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives and supervisors, including, but not limited to, the police officer Defendants named

3

herein. Defendant Burge, who was the supervising Lieutenant of Defendants John Byrne, Peter

Dignan, Ronald Boffo, John Yucaitis, Jack Hines and George Patton on and before July 21,

1986, was, on June 28, 2010, convicted of perjury and obstruction of justice for falsely denying

that he participated in, was aware of, and supervised police torture. Burge engaged in the conduct

complained of in the course and scope of his employment; and is sued in his individual capacity.

8.      Defendant John Byrne was a duly appointed and sworn Chicago Police Sergeant

in the Chicago Police Area 2 Detective Violent Crimes Unit from 1982 to August of 1986, and

supervisor of the Unit's notorious midnight shift, also known as the A Team, and the direct

supervisor of Defendants Dignan, Boffo and Yucaitis, who also worked on the midnight shift of

the Area 2 Violent Crimes Unit. From 1988 to 1991, Byrne was a sergeant in the Violent Crimes

Unit of Area 3, also under Burge's command. He engaged in the conduct complained of in the

course and scope of his employment, and is sued in his individual capacity. Defendant Byrne,

like Defendant Burge, engaged in a pattern and practice of torture and brutality himself, and also

supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other

detectives, including, but not limited to, the police officer Defendants named herein.

9.      Unsued co-conspirator Rutherford Wilson was a duly appointed and sworn

Chicago Police Sergeant in the Area 2 Detective Violent Crimes Unit from 1982 to August of

1986, was a supervisor of the Unit's third shift and a direct supervisor of Defendants Hines and

Patton who worked on the third shift of the Area 2 Violent Crimes Unit.

10.     Defendants Peter Dignan, Ronald Boffo, John Yucaitis, Jack Hines, and George

Patton (referred to herein collectively, with Defendants Burge and Byrne, as "the Defendant

Officers") were duly appointed and sworn Chicago Police detectives who were assigned to the Detective Division at Area 2 Violent Crimes Unit under Defendant Burge's command; engaged in a pattern and practice of torture and brutality themselves; and engaged in the conduct complained of in the course and scope of their employment. The Defendant Officers are sued in their individual capacities.

11.     From 1987 to 1992, Defendant Leroy Martin was the Superintendent of Police for the City of Chicago, and as such was responsible for the policies, practices, and customs complained of herein. In 1983, he was Commander of the Area 2 Detective Division and was thereby Defendant Burge's direct supervisor, as well as the command supervisor of Defendants Byrne, Dignan, Yucaitis, Boffo, Hines, and Patton. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

12.     From 1998 to 2004, Defendant Terry Hillard was the Superintendent of Police for the City of Chicago, and as such was responsible for the policies, practices, and customs complained of herein. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

13.     From 1998 to 2002, Defendant Thomas Needham was counsel to, and administrative assistant for, Superintendent Terry Hillard, who was his direct supervisor. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

14.     From 1981 to 1989, Richard M. Daley was the State's Attorney of Cook County and during that period was responsible for the policies, practices and customs of that office.

From 1989 to the present, Defendant Daley has been and continues to be the Mayor of the City

of Chicago and as such is a chief policymaker for the City of Chicago, its Police Department,

City Council, and Police Board and was and is therefore responsible for the policies, practices,

and customs complained of herein. Defendant Daley was acting in the scope of his employment

at all times material to this complaint and is sued in his individual capacity.

15.     From 1990 to 1998, Defendant Gayle Shines was the Director of the Office of

Professional Standards of the Chicago Police Department. Her direct supervisor was the

Chicago Police Superintendent. She was appointed by Defendant Daley, engaged in the conduct

complained of in the course and scope of her employment, and is sued in her individual capacity.

16.     Defendant City of Chicago is an Illinois municipal corporation, and as such is

responsible for the policies, practices and customs of the Chicago Police Department, its Office

of Professional Standards, its Personnel Division, its Detective Division, and its Superintendent

of Police, as well as those of the Mayor, his office, and his City Council, the Corporation

Counsel and her Office, and the Chicago Police Board. The City of Chicago is and/or was the

employer of each of the Defendant Officers and Police and governmental officials. The City of

Chicago is responsible for the acts of the Defendant Officers and Defendant police and

governmental officials while employed by the City of Chicago and while acting within the scope

of their employment.

17.     Defendant Timothy Frenzer was an Assistant Cook County State's Attorney

assigned to the Felony Review Unit. He engaged in the conduct complained of in the course and

scope of his employment and is sued in his individual capacity.

6

18.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office (hereinafter referred to as the "SAO") and the Cook County Board.   At certain times relevant to this action, Cook County and the Cook County State's Attorney's Office were the employers of Defendants Daley and Frenzer, and are necessary parties to this lawsuit.

19.     At all times relevant to this action, each of the named Defendants acted in the scope of his employment, and under the color of the laws, regulations, and customs of the State of Illinois.  Each Defendant's actions constituted "state action" as defined under federal law.

## IV.     FACTUAL ALLEGATIONS

### Plaintiff Tillman's Arrest, Interrogation, Torture, and Wrongful Conviction

20.     The body of Betty Howard was found in the early morning hours of July 21, 1986, in a vacant apartment in the building in which Ms. Howard and Plaintiff both resided.  The cause of death was a gunshot wound to the head and a stab wound that penetrated the heart.

21.     Defendant Jon Burge immediately took charge of the investigation, monitored the progress of the investigation, and made statements to the press concerning its progress.

22.     On July 21, 1986, at approximately 6:30 a.m., Plaintiff and his girlfriend, Princess Williams, voluntarily went to Area 2 police headquarters for questioning.  Plaintiff was taken to an interview room by Midnight Shift Defendants Boffo and Dignan, under the supervision and direction of Defendants Byrne and Burge, and questioned about his whereabouts over the previous several days.

23.     Later that day Defendants Hines and Patton also joined in the investigation

and interrogation.

24.     From this point forward, Plaintiff's interrogation, under the supervision and with

the participation of Defendant Byrne, became violently abusive and coercive.  The abuse and

coercion to which Plaintiff was subjected over the course of the ensuing days included, but was

not limited to, the following acts:

      a.      Defendants Boffo and Dignan subjected Plaintiff to hostile questioning while he was handcuffed to a wall.  During this questioning, Boffo struck Plaintiff on the head.

      b.      During questioning by Defendant Hines, Hines struck Plaintiff in the head and violently punched him in the stomach, causing him to vomit on his clothes and on the floor of the interrogation room.

      c.      Defendant Hines drove Plaintiff to a secluded location where Hines forced Plaintiff to his knees, put a gun to his head, and threatened to kill him "like you killed that woman."

      d.      In an interview room, Defendant Hines struck Plaintiff on his back and hit him in the head with a telephone book, causing his nose to bleed.

      e.      Defendant Boffo kicked Plaintiff in the leg.

      f.      Defendants Boffo, Dignan, Hines and Yucaitis used their thumbs to push against Plaintiff's ears, forced Plaintiff's head back, and poured 7-Up into his nose.

      g.      Defendants Yucaitis and Dignan repeatedly placed a plastic bag over Plaintiff's head, thereby subjecting him to near suffocation.

      h.      Defendant Dignan hit Plaintiff on the leg with his flashlight, and waived the flame from a cigarette lighter under his arm.

25.     This beating and torture caused Plaintiff to bleed profusely from the nose, leaving

bloodstains on his pants, shirt, and the interrogation room floor, which Plaintiff's interrogators

ordered him to clean up with paper towels.

26.     Also on July 21, 1986, at approximately 4:00 p.m., Steven Bell voluntarily went to Area 2 to answer questions about the Howard murder.  Over the previous several days, Bell had helped Plaintiff paint an apartment in the building where Howard was murdered.

27.     Bell was placed in an interrogation room near to Plaintiff's at Area 2, and, at the same time the Defendants were torturing Plaintiff, Bell was also being physically abused and tortured in the course of questioning about the Howard murder.  Among other things, after Bell denied involvement in the murder, Defendants Dignan, Yucaitis, and Byrne, after telling him that his "black brothers" (*i.e.,* Defendant Hines and his partner, George Patton) had left, repeatedly hit Bell on the head with a telephone book, repeatedly kicked Bell in the ribs, and repeatedly struck him in the face and forehead.  Defendant Boffo was also present in the room during this abuse.

28.     As a result of this torture and abuse, Bell agreed to make a statement falsely implicating himself and Plaintiff in the Howard murder.

29.     The torture of Plaintiff continued after Bell agreed to cooperate and, as a result of his fear of death by suffocation and of further extreme brutality, Plaintiff also ultimately agreed to cooperate and, according to the testimony of Defendant Yucaitis, made oral admissions concerning his involvement in the crime.

30.     Throughout Plaintiff's and Bell's interrogations, lawyers and family members who called and came to Area 2 were not permitted to see them.

31.     The interrogation, torture, and abuse of Plaintiff spanned four days, and was monitored and supervised by Defendant Burge, who was present at Area 2 during most of this

9

time period, and who also received reports from Defendants Byrne, Dignan, Boffo, Yucaitis, Hines, and Patton concerning the interrogation of Tillman and Bell.

32.     Defendant Frenzer was also present at Area 2 for most of the time that Plaintiff and Bell were interrogated, was present with Plaintiff and Bell on several occasions during this time period, was aware that Plaintiff was bleeding from the nose during his interrogation and that Plaintiff and Bell were being subjected to torture and abuse, yet instead of intervening to prevent said torture and abuse, took a false and manufactured written statement from Bell, and unsuccessfully attempted to take a false written statement from Plaintiff.

33.     Formal charges of murder were subsequently filed against Plaintiff and Bell on July 25, 1986.

34.     Plaintiff, like his co-defendant Bell, was innocent of the Betty Howard murder. His purported inculpatory statements were false, coerced by torture, and manufactured by Defendants Boffo, Yucaitis, Dignan, and Hines, under the direct supervision and with the participation of Defendants Byrne and Burge.

### Clarence Trotter's Arrest and Interrogation

35.     On August 9, 1986, three weeks after Plaintiff and Bell were arrested, interrogated, and charged with the Howard murder, Chicago police stopped two men in Ms. Howard's vehicle, which was missing from her apartment building when her body was discovered. After a high speed chase, the men, Ronald Wise and Tracy Harrison, were apprehended, and a knife was found in the car.

36.     Wise and Harrison were subsequently taken to Area 2 where Wise was beaten by

Yucaitis.

37.    On August 10, 1986, a third man, Charles Coker, linked Clarence Trotter and Boris

Flowers to Ms. Howard's car.  At the residence of Boris Flowers, several items of personal

property that belonged to Ms. Howard, including her shoe, were recovered, along with a handgun

that was later determined to be the gun used in her murder.  Flowers told Area 2 detectives that

he obtained the property and the gun from Clarence Trotter.  When the detectives went to

Trotter's apartment, they found more of Ms. Howard's property.

38.    Trotter was taken to Area 2 where he was coercively interrogated for more than a

day.  During this interrogation, Area 2 detectives, including Defendants Dignan and Hines,

unsuccessfully attempted to get Trotter to identify pictures of Plaintiff and Bell as participants in

the Howard rape and murder.  Trotter later gave a written statement in which he admitted

participation in the crime, and possession of the knife, gun, car and the recovered fruits of the

crime, but he persisted in refusing to identify Plaintiff or Bell as having any involvement in the

crime.

39.    Evidence technicians matched Trotter's fingerprints to fingerprints that were left on

two Coca-Cola cans that were recovered from the apartment where Ms. Howard's body was

found.  None of the property recovered from either Flowers or Trotter was ever connected in any

way to Plaintiff or Bell, nor is there any other evidence linking Trotter, Flowers, Wise, and

Coker to either of them.

40.    In 1988, Trotter was convicted, following a jury trial, of murder, aggravated

criminal sexual assault, aggravated kidnapping, residential burglary, and theft in the Betty

Howard case, and was sentenced to a term of natural life imprisonment for the murder and 15 years' imprisonment for the residential burglary. His conviction was later reversed, *inter alia,* on the grounds that his statement was involuntary. He was subsequently re-convicted and re-sentenced.

### Plaintiff's Suppression Hearing and Trial

41.     In November of 1986, the Cook County Circuit Court trial judge conducted a simultaneous hearing on motions to suppress statements filed by Plaintiff and Bell.

42.     At that hearing, Defendants Boffo, Yucaitis, Dignan, Hines, Patton, Byrne, and Frenzer all testified, falsely denying that they had abused Plaintiff or Bell in any way and further asserting that they treated them humanely and with consideration. They admitted that Plaintiff had bled from the nose, but falsely testified that the bleeding came from a spontaneous nose bleed, rather than from their physical abuse of Plaintiff.

43.     None of the Defendants was confronted with other acts of similar torture and abuse that they had previously committed against other suspects while working in the Area 2 Violent Crimes Unit under Jon Burge's supervision because this evidence had been suppressed and covered up by the Defendants. Jon Burge was not called to testify. No evidence or findings of systemic Area 2 torture and abuse was available to, or offered by, Plaintiff or Bell.

44.     At the conclusion of the evidence, the trial judge denied, in pertinent part, Plaintiff's and Bell's motions to suppress. He unknowingly accepted the Defendants' false and perjured testimony and rejected Plaintiff's and Bell's testimony, finding that Plaintiff was "treated humanely and with consideration."

45. In December of 1986, Plaintiff and Bell were tried in simultaneous but severed bench trials in the Circuit Court of Cook County. Plaintiff was convicted of murder, aggravated criminal sexual assault, and aggravated kidnapping and sentenced to a term of natural life imprisonment for the murder, 15 years' imprisonment for the aggravated kidnapping, and 30 years' imprisonment for the aggravated criminal sexual assault. Bell was acquitted of all charges. The principal and determinative evidence connecting Plaintiff to the crime was his false, manufactured, and coerced oral admissions, which were presented to the Court in the false and perjured testimony of the Defendant Officers.

46. Plaintiff's false admissions, which were coerced, constructed and manufactured by the Defendant Officers and Defendant Frenzer, were memorialized in false official reports, and presented to prosecuting attorneys who relied upon and presented this false, coerced and manufactured evidence throughout Plaintiff's prosecution.

47. Defendants Burge, Byrne, Dignan, Boffo, Yucaitis, Hines, and Frenzer together with their co-conspirators, also suppressed from the prosecutors who prosecuted Plaintiff, from the judges and juries who heard his case, and from the prosecutors and judges who prosecuted and heard Plaintiff's appeals and motion to suppress, that the admissions they attributed to Plaintiff were false and totally unreliable, coerced through torture, constructed and manufactured by them, and were a product of a pattern and practice of torture and abuse which they commanded, supervised and implemented; additionally they suppressed, committed perjury about, and hid or destroyed the physical implements of this pattern and practice of torture, including the telephone book and plastic bag used against Plaintiff, as well as the cattle prods,

electric shock box, plastic bags, typewriter covers, blackjacks, telephone books, shotguns, and handguns used by them against numerous other victims of their pattern and practice of torture.

### The Conspiracy to Torture and Abuse Suspects at Area 2 and Area 3
### Police Headquarters and to Conceal and Cover Up the Torture and Abuse

48.     Plaintiff's torture and abuse was not an isolated incident of individual police officer brutality and misconduct. Rather, the interrogation and torture of Plaintiff in pursuit of a confession was part of a long-standing pattern and practice of similar acts of racially motivated torture, including electric shock, baggings, mock executions and Russian roulette, suspensions, telephone book beatings, and beatings committed against African American men under the supervision, and with the encouragement, participation and ratification of Defendants Burge and Byrne. Burge and Byrne supervised, encouraged, participated in, failed to prevent, and ratified the abuse of Plaintiff by the other Police Officer Defendants, as alleged above, as part of this pattern and practice.

49.     The earliest known torture in this pattern occurred on or about May 29, 1973, when Defendant Burge, then a detective on the Area 2 midnight shift, tortured African American suspect Anthony Holmes, using an electric shock box, suffocation with a bag, beating and racial epithets.

50.     The Chicago Police Department took no action to punish or restrain defendant Burge at that time. Over the next decade, Burge and other Area 2 detectives tortured many African American suspects, including Lawrence Poree, George Powell, Tony Thompson, Willie Porch, Ollie Hammonds, Derrick King, Michael Coleman, Sylvester Green, and Melvin Jones.

51.     In February 1982, the Superintendent of the Chicago Police Department, Richard

14

Brzeczek, and the Mayor of the City of Chicago, Jane Byrne, placed Defendant Burge in charge

of a manhunt for the killers of two white Chicago Police officers. In the course of that manhunt,

Burge and other Area 2 detectives tortured a number of African-American citizens, including

Donald White, Roy Brown, Walter Johnson, Paul Mike, Alphonso Pinex, and Larry Milan, and

abused and terrorized a large number of other African-American citizens.

52.     In the early morning hours of February 14, 1982, Defendant Burge and numerous

Area 2 detectives arrested Andrew Wilson for the police officer murders. Throughout that day,

Burge and other Area 2 detectives tortured Wilson, using the following techniques, among

others: electric-shocking on the genitals, ears, and other parts of the body with a black box and a

second plug in electrical device; suffocating with a plastic bag; burning on a radiator; and

beating. Defendant State's Attorney Daley, the then Mayor of the City of Chicago Jane Byrne,

and the then Superintendent of the Chicago Police Department Richard Brzeczek, all closely

monitored developments in the manhunt. All three learned from numerous sources of the

widespread abuse during the manhunt, including the torture and abuse of Andrew Wilson and did

nothing to prevent or stop that torture and abuse or to discipline, investigate, or otherwise bring

to justice Burge and the other detectives who perpetrated it.

53.     As a direct and proximate result of the failure of Defendants Daley and Leroy

Martin to intervene, to discipline and to adequately supervise, Defendants Burge, Byrne and

other Area 2 Detectives tortured numerous additional African American suspects with electric

shock, baggings, mock executions, and beatings, often while using racial epithets, in the period

from February of 1982 to July of 1986. The victims in this period included the following

African American men: Shadeed Mumin, Michael Johnson, Lee Holmes, Rodney Benson, Stanley Wrice, Eric Smith, Alonzo Smith, James Andrews, Reginald Mahaffey, Jerry Mahaffey, Gregory Banks, David Bates, Darrell Cannon, Leonard Hinton, Eric Smith, Leroy Orange, Leonard Kidd, Philip Adkins, Robert Billingsley, Stanley Howard, Alphonso Pinex, Thomas Craft, Lavert Jones, Lonza Holmes, and Aaron Patterson.

54.     Defendant Frenzer and the Police Officer Defendants also suppressed from Plaintiff and his counsel, the trial, appellate and post-conviction prosecutors, and the jurors and judges in Plaintiff's criminal proceeding, all of the facts regarding this extensive pattern of abuse and torture of African American men.  These defendants also suppressed the physical implements of their pattern and practice of torture, including the plastic bag and telephone book used, respectively, against Plaintiff and Bell, and the cattle prods, electric shock box, plug-in electrical device, plastic bags, typewriter covers, blackjacks, telephone books, shotguns, and handguns used by them and other Area 2 detectives against numerous other victims of their pattern and practice of torture.

**Defendant Daley's Failure to Intervene and Concealment of Exculpatory Evidence is a Proximate Cause of Plaintiff's Coerced Confession and Wrongful Conviction**

55.     By no later than February 1982, Defendant Daley had direct, personal knowledge that Defendants Burge and Yucaitis, and other Area 2 detectives committed acts of torture against African American suspects at Area 2.  During the February 1982 manhunt described above, Defendant Daley closely monitored events, receiving regular reports from subordinates who, at various times, were at Area 2.  Daley therefore knew or should have known of the abuses of African American citizens that occurred in the course of the manhunt, including, in particular,

16

the abuse of Donald White, who was placed in protective custody by the Cook County State's

Attorney's Office following acts of torture that Burge and his men perpetrated against him.

56.     Defendant Daley was also informed of the arrest of Andrew Wilson on the

morning of February 14, 1982.  Throughout the day of February 14, as Wilson was tortured

(frequently screaming in the course of the abuse), several high ranking Assistant State's

Attorneys were present at Area 2.  An Assistant State's Attorney assigned as a supervisor to the

Felony Review Unit, Larry Hyman, participated directly in the interrogation of Wilson, which

occurred between sessions of torture at the hands of Burge and his men.  The high ranking

members of the State's Attorney's Office present at Area 2 on February 14, 1982 knew or should

have known that Wilson was being tortured.  Those high ranking assistants were reporting

directly to Defendant Daley and to the First Assistant State's Attorney at the time, Richard

Devine.  Neither Daley nor any of his top assistants did anything to halt or prevent the torture of

Wilson.

57.     On or about February 17, 1982, Superintendent Brzeczek received a letter from

Dr. John Raba, the Director of Medical Services at Cook County Jail, informing the

Superintendent that medical examination of Andrew Wilson revealed unmistakable evidence that

Wilson had been brutalized while in police custody, and that Wilson reported being tortured with

electric shock, and demanding an investigation.  After conferring with high ranking police

command personnel (and chastising those present at Area 2 for allowing Wilson's torture to

happen), the Superintendent wrote a letter to Defendant Daley, enclosing the Raba letter and

advising Daley that, in light of the pending prosecution of Wilson, the Superintendent would not

investigate or otherwise pursue the matter without instructions from Daley.

58.     Defendant Daley received the Brzeczek letter (with its enclosure) and shared and discussed it with his First Assistant and other high level subordinates.  He never responded to the letter.

59.     Daley and his subordinates were fully aware that Superintendent Brzeczek's letter set forth criminal conduct by Burge and other Chicago police detectives and officers, and they knew or should have known that ASA Larry Hyman might be complicit in this criminal conduct. They also knew that there was physical, medical, and testimonial evidence which supported the claim of physical abuse.  Not only did Defendant Daley fail to instruct the Superintendent of Police to conduct a criminal and/or administrative investigation, but he also failed to conduct a criminal investigation of his own, and did not refer the evidence to an independent agency for investigation. Instead, on information and belief, Daley communicated to Dr. Raba, through unsued co-conspirator and Cook County Board President George Dunne, that Raba "should not get involved" in the Wilson case, and subsequently, together with the Superintendent, Daley issued public commendations to Burge and his men.

60.     As a direct result of Defendant Daley's refusal to act, the Chicago Police Department, and its Office of Professional Standards indefinitely suspended all investigations into the allegations of torture and abuse made against Burge and his men, both by Wilson and Raba, and by the other African American citizens who were tortured and abused during the manhunt.

61.     Throughout the manhunt, the arrest of Andrew Wilson, the receipt and

18

discussions of the Brzeczek letter, and the decision not to contact Brzeczek or to investigate, Daley and his subordinates, on information and belief, generated memoranda, notes, and other written communications documenting these events and decisions.

62.     This documentation, including the original copy of the Brzeczek letter, which contained a received stamp from Defendant Daley, no longer exists, and, on further information and belief, was destroyed by Defendant Daley.

63.     In the period of time between Wilson's torture, in February 1982, and Plaintiff's torture, in July of 1986, the Cook County State's Attorney's Office, under the direction of Defendant Daley, prosecuted at least thirty African American men who were tortured by Defendants Burge and Byrne and Area 2 detectives under their command and supervision.  In none of these cases did Defendant Daley or his subordinates disclose specific exculpatory information within the possession of the office regarding the torture of Wilson and the specific knowledge of Defendant Daley and his high ranking subordinates as to the truth of Wilson's allegations.  In none of these cases, did Defendant Daley request or pursue an investigation into the allegations of torture.

64.     Defendant Daley had direct, personal knowledge of the claim of torture in a substantial number of the torture cases that the Cook County State's Attorney's Office prosecuted in this period of time.  There is no more grave and important decision made by the State's Attorney of Cook County than the decision to seek the death penalty against an accused defendant.  Each and every such decision was made personally by the State's Attorney himself after careful review of the case and full consultation with both his high command and the line

19

assistants handling the prosecution.

65.     Subsequent to seeking and obtaining the death penalty in the Wilson case and prior to Plaintiff's case, Defendant Daley personally decided to seek the death penalty against Darrell Cannon, Leroy Orange, Leonard Kidd, Stanley Howard, Aaron Patterson, Reginald Mahaffey and Jerry Mahaffey—all of whom claimed that they were tortured by Defendants Burge and Byrne and/or detectives under their command and supervision.  On information and belief, Defendant Daley's personal review of these cases revealed to him that each of these African American men claimed to have been tortured by Burge, Byrne and/or their men, in some cases using techniques identical to those Daley knew had been used against Andrew Wilson. Knowing that these individuals all credibly claimed that they had been tortured into confessing, Daley nonetheless decided to seek the ultimate punishment against each of them, in each case declining to pursue any investigation of the involved Area 2 officers and deliberately failing to disclose the exculpatory information in his personal possession and in possession of the Office of the Cook County State's Attorney.

66.     In the same manner, in November of 1986, Defendant Daley personally decided to seek the death penalty against Plaintiff and Bell and, in so doing, became personally familiar with Plaintiff's case and, specifically, that the only evidence against Plaintiff was oral admissions that he purportedly made under interrogation at Area 2, and later refused to repeat to the Felony Review ASA. At the time Defendant Daley reviewed Plaintiff's case and decided to seek the death penalty against him, Daley: (a) had near-certain personal knowledge that Andrew Wilson had been tortured and that numerous other African Americans had been tortured, abused,

20

and terrorized by Burge and his men during the Wilson manhunt; (b) had personal knowledge that Burge and his Area 2 detectives were allegedly continuing to practice extreme physical abuse and torture against African American suspects; and (c) personally knew of exculpatory information regarding the pattern of torture, which he had deliberately suppressed since February 1982. Defendant Daley nonetheless decided to seek the ultimate punishment against Plaintiff and Bell, again declining to pursue any investigation of Plaintiff's and Bell's allegations and deliberately failing to disclose the exculpatory information in his personal possession and in possession of the Office of the Cook County State's Attorney.

67.     The actions and inaction of Defendant Daley during the period from February 1982 through July of 1986 in refusing and failing to investigate the actions of Defendants Burge, Byrne, Dignan and their confederates and in suppressing the exculpatory evidence in his possession proximately caused Plaintiff's torture and his physical abuse, his wrongful conviction for crimes that he did not commit, and his wrongful incarceration.

**Defendant Martin's Failure to Intervene and Concealment of Exculpatory Evidence is also a Proximate Cause of Plaintiff's Coerced Confession and Wrongful Conviction**

68.     Defendant Martin was the Commander of Area 2 in 1983 and at that time was Defendant Burge's direct supervisor. At that time, Defendant Martin learned that Defendants Burge, Byrne, Dignan and detectives under their command systematically tortured and abused at least the following African American suspects: Eric Smith, Alonzo Smith, James Andrews, Jerry Mahaffey, Reginald Mahaffey, Gregory Banks, David Bates, Darrell Cannon, James Cody and Leonard Hinton. Defendant failed to initiate appropriate investigations or to discipline Burge in connection with any of these cases.

69.     In 1987, Martin was named Superintendent of the Chicago Police Department.
As Superintendent, possessing direct knowledge of Burge's practices from his time as Area 2
commander, Defendant Martin continued to fail to intervene, to supervise, discipline or
otherwise act to prevent the ongoing misconduct of Burge and his men. Following Plaintiff's
torture and wrongful conviction, Defendant Martin worked actively to conceal and suppress
evidence of the pattern of torture, as is fully alleged below.

70.     The actions and inactions of Defendant Martin during the period from 1983
through July of 1986, in refusing and failing to investigate the actions of Defendants Burge,
Byrne, Dignan, and their confederates and in suppressing the exculpatory evidence in his
possession proximately caused Plaintiff's torture and his physical abuse, Plaintiff's wrongful
conviction for crimes that he did not commit and Plaintiff's wrongful incarceration.

**The Actions and Inactions of Defendants Daley, Martin, Hillard, Needham and Shines to
Conceal and Cover Up the Pattern of Torture under Burge Frustrated Plaintiff's Efforts to
Exonerate Himself and Prolonged Plaintiff's Unjust Incarceration**

71.     Following his conviction in 1986, Plaintiff languished in prison until January 14,
2010, when the Cook County Special Prosecutor agreed to dismiss all charges against Plaintiff,
and he received a certificate of innocence from the Circuit Court of Cook County on February
19, 2010.

72.     Plaintiff's wrongful prosecution was continued, his exoneration was delayed and
his imprisonment lasted far longer than it otherwise would have because, for many years,
Defendants Daley, Martin, Hillard, Needham and Shines, in conspiracy amongst themselves and
with others, including the Police Officer Defendants, their confederates, and successive Police

Superintendents and police command personnel, continued to make extraordinary efforts to suppress, conceal and discredit exculpatory evidence regarding the pattern of torture and physical abuse of African American men by Chicago Police detectives under Burge's command.

73.     In 1989, Defendant Daley became the Mayor of the City of Chicago. In that capacity he was directly responsible for the appointment of the Superintendent of the Chicago Police Department. Defendant Daley also had ultimate responsibility for the operations of the Police. Daley therefore had the duty to take all necessary steps to ensure that the Department and its officers disclosed exculpatory information to victims of Defendant Burge and his men, including Plaintiff. In addition, Defendant Daley had an ongoing duty to disclose exculpatory information to Plaintiff and other Burge victims of which Defendant Daley had become personally aware while he was State's Attorney of Cook County.

74.     Defendant Daley did not disclose exculpatory information in his possession at any time from the date he resigned as State's Attorney of Cook County until January 14, 2010, when Plaintiff was finally exonerated and released from prison. Nor did Defendant Daley intervene at any time to direct the Chicago Police Department to disclose material exculpatory information in its possession regarding Burge or to conduct a thorough and appropriately aggressive investigation of Burge, Byrne, Dignan, and the other detectives who allegedly abused African American men while working under Burge's command and to follow through on the results of such an investigation.

75.     Rather than disclose exculpatory material and conduct appropriate investigations, Defendants Daley, Martin, Hillard, Needham, Shines and other co-conspirators caused the

Chicago Police Department to actively conceal and suppress information regarding the scope and extent of the torture and abuse of African American suspects that occurred under Burge. Their actions in this regard included, but are not limited to those alleged below.

76.     In 1990 a report (hereinafter, the "Goldston Report") was prepared by Chicago Police OPS investigator Michael Goldston, which found that there was systemic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it. In 1991, the Goldston Report was supplemented with a finding that Defendants Burge, Byrne, Dignan, and Yucaitis were the prime movers in this pattern of abuse and that Burge, Yucaitis and another Area 2 detective had tortured Andrew Wilson. In a companion Report (the Sanders Report) the OPS found that Burge, Yucaitis, and another Area 2 detective tortured Andrew Wilson and recommended that they be fired.

77.     The Goldston Report, and the information it contained, was highly exculpatory for Plaintiff, as he and Steven Bell were tortured just subsequent to the time period analyzed by the Goldston Report.

78.     Defendant Martin and other police command personnel delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, *inter alia*, by suppressing the findings that Wilson was tortured and by refusing to suspend, transfer or remove Burge either before, or for nearly a year after, the Goldston Report's findings were first made known to them in November of 1990.

79.     Defendant Martin and other command personnel further delayed, obstructed, and

24

otherwise undermined the OPS investigation, the Goldston Report, findings and conclusions set forth above, *inter alia*, by suppressing the findings that there was systematic abuse at Area 2, which implicated Defendants Martin, Burge, Byrne, Dignan, and other Area 2 detectives who worked under Burge's command.

80.    The Goldston Report and its findings were not publicly released until February 7, 1992, when Federal District Judge Milton I. Shadur ordered the Report's release.

81.    On or before February 7, 1992, Defendant Daley was specifically informed or was otherwise aware of the Goldston Report findings of "systematic" Area 2 torture that was "condoned and participated in" by Area 2 command personnel.  Defendant Daley knew or should have known that Defendant Martin had been the commanding officer at Area 2 and Defendant Burge's direct supervisor during part of the time the Goldston Report found there to be "systematic" torture, and that Defendant Martin therefore had a motive and the intent to suppress and discredit the Goldston Report and its findings.

82.    Despite this and all that he previously knew about torture by Burge and his men, and despite the findings of the Goldston Report itself, Defendant Daley did not seek an independent federal investigation; direct Defendant Martin to initiate a criminal investigation or to open disciplinary proceedings against the Area 2 detectives, supervisors and command officers identified in the Goldston Report; or seek the prosecution of Burge and his confederates.

83.    Instead, in a joint effort with Defendant Martin, Defendant Daley sought to publicly discredit the Goldston Report and defend Martin's prior suppression of it, saying "these are only allegations . . . rumors, stories, things like that." The intent and effect of these

25

statements was, *inter alia*, to undermine the accuracy and validity of the Goldston Report's finding that the torture at Area 2 was "systematic" and participated in by command personnel.

84.     Even after learning of the findings in the Goldston Report, Defendant Martin, Defendant OPS Director Shines, and other command personnel, in violation of police regulations, refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock and abuse previously made by electric shock victim Melvin Jones against Defendant Burge.

85.     From 1989 to 1992, Defendants Daley and Martin, and their command subordinates, through several public hearings held by the Chicago City Council and the Chicago Police Board, and a report by Amnesty International, were given additional actual notice that Burge was the leader of a group of Chicago detectives that systematically tortured and abused African American suspects in order to obtain confessions in murder and other serious felony cases.

86.     In January of 1992, Defendant Martin admitted in a publicly filed pleading that there was an "astounding pattern or plan" on the part of Burge and his confederates "to torture certain suspects, often with substantial criminal records, into confessing to crimes."

87.     In February 1993, the Chicago Police Board fired Defendant Burge for torturing Andrew Wilson. These findings became final in December 1995.

88.     In 1993 the OPS re-opened investigations into approximately ten Area 2 torture cases. After an exhaustive re-investigation, which uncovered substantial new evidence in support of the allegations, OPS investigator Veronica Tillman sustained numerous allegations

that Defendants Byrne and Dignan racially abused and tortured Darrell Cannon with the cattle prod. OPS supervisor Carmen Christia reviewed the findings and approved them.

89.     The OPS also entered sustained findings of torture and abuse against Byrne and Dignan in five other re-opened cases, including that of death row inmate Stanley Howard, as well as against Defendants Boffo and Yucaitis.

90.     From 1993 until 1998, Defendant Shines (who had previously been appointed by Defendant Daley), under pressure from her fellow Defendants and co-conspirators, suppressed these findings and the evidence which supported them by secreting the files in her personal office.

91.     In 1996, Defendant Daley, despite numerous allegations and sustained findings of torture and abuse against Defendant Dignan, meritoriously promoted Dignan to the police rank of lieutenant.

92.     In 1998, Defendants Hillard and Needham, with full knowledge that Defendants Burge, Byrne, Dignan, and other Area 2 and Area 3 detectives participated in a pattern and practice of torture and abuse of suspects, including Plaintiff, violated police regulations and obstructed justice by overturning the OPS sustained findings in the six re-opened cases set forth above; by refusing to investigate other torture victims' claims that they had been tortured; by refusing to investigate Defendant Shines' suppression of evidence; and by suppressing these OPS files and findings from Plaintiff and other criminal defendants.

93.     On information and belief, Defendant Daley also personally insisted, from the time he became Mayor through the date of Plaintiff's release from custody in January of 2010

that the City of Chicago continue to finance the defense of Burge, Byrne, Dignan and other Area 2 detectives, despite his personal knowledge that Burge committed acts of torture against African American men while employed as a Chicago Police officer and supervised and condoned such acts by supervisors and detectives under his command. Daley's insistence on defending Burge was contrary to the recommendation of Daley's senior staff that the City sue rather than defend Burge, and has continued to the present, despite Burge's indictment in October of 2008 for perjury and obstruction of justice, and his conviction on these charges on June 28, 2010.

### Plaintiff's Exoneration on the Basis of Innocence

94.     The concealment, obstruction and suppression of exculpatory information and continuing failure to investigate or discipline described above materially and significantly continued the wrongful prosecution of Plaintiff, substantially delayed Plaintiff's exoneration, and caused Plaintiff to face many additional years of unjust incarceration that he would not have endured if the obstruction, suppression and concealment had not occurred.

95.     Pursuant to his Post-Conviction Petition, on January 14, 2010, Plaintiff's conviction was vacated by the Circuit Court trial judge, he was granted a new trial, his case was *nolle prosequied* by the prosecution, and he was released from custody.

96.     On February 19, 2010, the Circuit Court of Cook County found, pursuant to 735 ILCS 5/2-702, that Plaintiff had established by a preponderance of the evidence that he was innocent of the charges for which he was convicted and granted him a certificate of innocence.

### The Defendants' Misconduct Was Committed in Furtherance of a Conspiracy

97.     All of the named individual defendants, acting jointly and with other police and

28

prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in an ongoing course of conduct and joint action and otherwise conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights. This conspiracy has continued to the present, as evidenced, *inter alia*, by the false testimony and statements denying torture given in the years 2003 through 2009 by these Defendants and their fellow officers in various civil torture cases; false statements and testimony that defendant Burge, co-conspirator and former Area 2 detective Michael McDermott, and various other police and assistant state's attorney co-conspirators gave to the FBI, before the Federal Grand Jury, and/or at trial in *U.S. v Burge*; and by false public statements concerning police torture made by, *inter alia*, Defendants Daley and Byrne and co-conspirator Richard Devine, including those made in July of 2006 in response to the Special Prosecutor's Report, in October of 2008 in response to Burge's indictment and in June and July of 2010 in response to Burge's conviction. By and through these overt acts, together with those set forth above, each and every defendant deprived and continues to deprive Plaintiff of those rights, including his right to be free from unreasonable arrest and seizure, wrongful confinement and imprisonment; his right to be free from involuntary self-incrimination and from interrogation techniques that "shock the conscience;" his right to access to the courts and to a fair and impartial trial; and his right to equal protection of the law, all as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## Plaintiff's Damages

98.     Plaintiff spent 23 years and five months in prison for a crime he did not commit.

29

This time was emotionally, physically, and psychologically dehumanizing and dehabilitating, and Plaintiff has suffered from constant fear and anxiety, deep depression, despair, rage, boredom and loneliness. Plaintiff also suffered from the loss of sustained contact with his children, mother, father and sister, and has been prevented from holding gainful employment or pursuing educational opportunities outside the prison walls. He continues to live under the effects of his isolation, incarceration, and depression. Additionally, Plaintiff suffered and continues to suffer, egregious pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and post traumatic stress disorder from his torture and abuse.

**COUNT I**
**(42 U.S.C. 1983 Claim for Deprivation of Fair Trial and for Wrongful Conviction)**

99.     Plaintiff re-alleges paragraphs 1 through 98.

100.     Defendants Daley, Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, Frenzer, and Martin, individually, jointly, and in conspiracy, caused the wrongful charging, prosecution, conviction, and imprisonment of Plaintiff. Additionally, these same Defendants, together with Defendants Shines, Hillard, and Needham, individually, jointly, and in conspiracy, caused the continuation of that wrongful conviction.

101.     These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts: coercing, constructing and/or fabricating the false and totally unreliable statements and admissions which formed the basis for Plaintiff's charging, prosecution and conviction; by withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that these statements and admissions were false, totally unreliable,

constructed and coerced; by suppressing, destroying and preventing the discovery and development of additional exculpatory torture findings and evidence, including, but not limited to, the instruments of torture as well as other exculpatory evidence; by giving a false and incomplete version of events to prosecutors; by writing false reports and giving false testimony; by improperly influencing the judges hearing Plaintiff's case, *inter alia*, by making false public statements; by obstructing and improperly influencing investigations which would have led to discovery of further exculpatory evidence; by suppressing and attempting to discredit findings of individual and systematic torture and abuse; and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

102.    Additionally and/or alternatively, the Defendants named above failed to intervene to stop Plaintiff's wrongful prosecution and conviction and resultant imprisonment despite having the opportunity and duty to do so.

103.    The actions of Defendants Daley, Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, Frenzer, Martin, Shines, Hillard, and Needham in depriving Plaintiff of his right to a fair trial and not to be wrongfully convicted and imprisoned, and, additionally and/or alternatively, in failing to intervene to stop said violations, were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, the Estate of Yucaitis, Boffo, Hines, Patton, Frenzer, Martin, Shines, Hillard, and

Needham, for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II
### (42 U.S.C. § 1983 Claim for False Arrest and Imprisonment)

104.    Plaintiff re-alleges paragraphs 1 through 103.

105.    The actions of Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, and Patton, individually, jointly, and in conspiracy, in falsely arresting and imprisoning Plaintiff, and of these same Defendants, together with Defendants Daley, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, in continuing said imprisonment for twenty-one years, without probable cause, violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizures and deprived plaintiff of liberty without due process of law.

106.    Additionally Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, and Frenzer, failed to prevent Plaintiff's wrongful arrest and resultant imprisonment despite having the opportunity and duty to do so, while Defendants Daley, Martin, Hillard, Needham and Shines failed to prevent the continuation of Plaintiff's wrongful arrest and resultant imprisonment despite having the opportunity and duty to do so.

107.    The actions of the Defendants in falsely imprisoning Plaintiff, continuing said false imprisonment, covering up their own misconduct, and/or failing to prevent said unlawful arrest and imprisonment, and/or its continuation were the direct and proximate cause of

32

Plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, Estate of Yucaitis, Boffo, Hines, Patton, Frenzer, Martin, Shines, Hillard, and Needham, for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT III
### (42 U.S.C. § 1983 Claim for Torture and Physical Abuse)

108.    Plaintiff re-alleges paragraphs 1 through 107.

109.    The actions of Defendants Byrne, Dignan, Yucaitis, Boffo, and Hines, in torturing and physically abusing Plaintiff and threatening him with additional torture and physical abuse, individually, jointly and in conspiracy, violated his Fourth and Fourteenth Amendment rights to be free from unreasonable seizures.

110.    Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, and Frenzer were aware of the torture and physical abuse of the Plaintiff, and participated in it by encouraging it and/or allowing the torture and abuse to continue while having the obligation and duty to stop it, and by failing to report the abuse to superiors in the Police Department and the State's Attorney's Office.

111.    Additionally, Defendants Daley and Martin had repeatedly failed to intervene to stop and prevent Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, and their co-conspirators from continuing their coercive interrogations and torture tactics, *inter alia*, by

exposing rather than covering-up said conduct, and by investigating, prosecuting, removing or otherwise disciplining them when they first learned of their criminal conduct in 1982, and on numerous occasions subsequent thereto, despite having the opportunity and duty to do so, thereby constituting a failure to intervene and prevent Plaintiff's torture and abuse.

112.    The actions of the Defendants, individually, jointly and in conspiracy, in torturing and physically abusing the Plaintiff, threatening to inflict further torture and physical abuse, and/or failing to stop or prevent Plaintiff's torture and abuse while having the opportunity and duty to do so, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, Estate of Yucaitis, Boffo, Hines, Patton, Frenzer, and Martin for compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT IV
### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

113.    Plaintiff re-alleges paragraphs 1 through 112.

114.    The actions of Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, and Patton, individually, jointly, and in conspiracy, in coercively interrogating Plaintiff, and in using torture techniques which "shock the conscience" during said interrogations, resulted in false, coerced, and fabricated admissions that were subsequently used against him in his criminal proceedings, and thereby violated Plaintiff's Fifth and Fourteenth Amendment rights to be free

from compulsory self-incrimination and deprivation of liberty without due process of law.

115.    The actions of Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, and Patton in using torture and other coercive techniques to interrogate Plaintiff, and/or, together with Defendants Patton and Frenzer, in encouraging, condoning and permitting the use of said techniques, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

116.    Additionally, Defendants Daley and Martin had repeatedly failed to intervene to stop and prevent Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, and their co-conspirators from continuing their coercive interrogations and torture tactics, *inter alia*, by exposing rather than covering-up said conduct, and by investigating, removing or otherwise disciplining them when they first learned of their criminal conduct in 1982, and on numerous occasions subsequent thereto, despite having the opportunity and duty to do so, thereby constituting a failure to intervene and prevent Plaintiff's brutal and torturously coercive interrogation.

117.    The failure of Defendants Daley, Martin and their co-Defendants to intervene to stop Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, and their co-conspirators from continuing their coercive interrogations and torture tactics proximately caused Plaintiff's coercive interrogation by torture and his resultant injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, Estate of Yucaitis, Boffo, Hines, Frenzer, Patton, and Martin for substantial

compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT V
### (42 U.S.C. §§ 1985, 1986 Claim for Conspiracy)

118.   Plaintiff re-alleges paragraphs 1 through 117.

119.   Defendants Daley, Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, Frenzer, Martin, Shines, Needham, and Hillard, together with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above.

120.   Because said conspiracy or conspiracies and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Plaintiff, who is African American, and numerous other African American torture victims of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy, the Defendants also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

121.   Additionally or alternatively, Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, and Frenzer knowing that the above §1985 conspiracy to torture and wrongfully

36

convict Plaintiff was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused so to do, in violation of 42 U.S.C.§1986.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from Defendants Daley, Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, Frenzer, Martin, Shines, Needham, and Hillard and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

### COUNT VI
### (42 U.S.C. § 1983 *Monell* Policy Claim Against the City of Chicago)

122.    Plaintiff re-alleges paragraphs 1 through 121.

123.    The actions of Defendants Daley, Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton and Martin as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago.

124.    At all times material to this complaint, the Defendant City of Chicago through its Police Department, Police Superintendents, Police Board, Mayors, City Council and/or Corporation Counsel's Office had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

    a.    conducting physically, psychologically or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain confessions and wrongful convictions, particularly the use of torture techniques under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3;

    b.    manufacturing, fabricating, and/or using improper suggestive tactics to obtain false witness statements;

c.      the filing of false reports, and giving false statements and testimony about said interrogations and confessions and fabricating or constructing parts or all of said confessions, suppressing evidence concerning said interrogations and confessions, pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions obtained during said interrogations, denying suspects their right to full and fair access to the courts, and otherwise covering up the true nature of said interrogations and confessions particularly in circumstances where torture techniques were used by Area 2 and Area 3 detectives under the command and supervision, and with the active participation of, Defendants Burge and Byrne;

d.      the failure to video and/or audio tape the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in a-b above;

e.      the failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of torture and related abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercive questioning or interrogation of witnesses, suspects and arrestees, particularly persons who were tortured and or physically and/or psychologically abused during questioning. This failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control includes the "repeater" Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, and all the other Area 2 and 3 detectives who were repeatedly accused of torturing and physically abusing suspects;

f.      the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above (i.e., police torture and other unconstitutional and coercive interrogations at Area 2 and Area 3 under the command and supervision of Defendants Burge and Byrne) whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. Said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have tortured or coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant, particularly in cases where torture techniques under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3. This code of silence in the torture

cases has most recently been evidenced and invoked in response to the federal government's investigation and prosecution of Jon Burge and the investigation of men under his command; and

g.    covering up and suppressing evidence and findings, refusing to properly investigate, arrest and charge, continuing to finance Defendant Burge's defense and otherwise attempting to both publicly and judicially defend his actions long after repeatedly acknowledging that he had committed repeated acts of torture, and after he had been indicted and convicted for lying about these acts, and otherwise obstructing justice in police torture cases, particularly those that arose at Area 2 and Area 3 under the supervision, and with the participation of, Defendant Burge.

125.   The pattern and practice of torture and abuse at Area 2 and Area 3, the cover-up of that abuse and the wrongful prosecutions and convictions which resulted therefrom, were well known within Area 2 and Area 3 both well before and after Plaintiff was tortured and wrongfully convicted, including by the command officers at Area 2, which included Defendants Burge and Martin, and Burge's successor, Phil Cline, as well as to former Chicago Mayor Jane Byrne and to Defendant Daley (both before and throughout his tenure as Mayor of Chicago) and their Chiefs of Staff, including Sheila O'Grady, successive Police Superintendents, including Richard Brzeczek, Fred Rice, Defendant Martin, Matt Rodriguez, Defendant Hillard, and Phil Cline, to the successive OPS Directors, including Defendant Shines, various Command Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke and Townsend, the Chiefs of Detectives, including William Hanhardt and Defendant Hillard, to the Chicago City Council and the Chicago Police Board, and to other policy making, command, and supervisory City and police personnel, who participated in the cover-up and suppression of evidence, the wrongful prosecution and conviction of the Plaintiff and other torture victims, and the denial of their full and fair access to the courts, *inter alia*, in the manner set forth in this complaint.

126.    Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; they encouraged, *inter alia*, the coercing of statements from suspects, witnesses and arrestees, by torture and related abusive tactics and techniques, the construction and fabrication of confessions, admissions, statements, and other false witness evidence, the suppression and destruction of evidence of torture and other exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the State and Federal courts, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a direct and proximate cause of the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators, and the injuries suffered by the Plaintiff.

127.    Additionally, the City of Chicago's said failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, Martin, Shines, Hillard, and Needham was also done with deliberate indifference and likewise acted as a direct and proximate cause of the injuries to Plaintiff.

128.    Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above, by Chicago governmental and police policymakers, including, but not limited to, successive Police Superintendents, including Defendants Martin and Hillard, and their direct subordinates, including, but not limited to, Defendants Shines and Needham, and several Mayors, most notably Defendant Mayor Richard M. Daley, who continues

40

to publicly both ratify said actions and deny his involvement in said conduct to this day, establish that said constitutional violations were directly and proximately caused by the City of Chicago and its Police Department.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT VII
### (State Law Claim for False Arrest and Imprisonment)

129.    Plaintiff re-alleges paragraphs 1 through 128.

130.    The arrest and imprisonment of Plaintiff, without probable cause, individually, jointly, and in conspiracy by Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, and Frenzer, and its continuation by these Defendants, together with Defendants Daley, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, constituted the torts of false arrest and imprisonment under Illinois law.

131.    Defendants' actions in arresting and imprisoning Plaintiff were willful and wanton.

WHEREFORE, Plaintiff demands compensatory damages against Defendants Daley, Burge, Byrne, Dignan, Estate of Yucaitis, Boffo, Hines, Patton, Frenzer, Martin, Shines, Hillard, and Needham, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, punitive damages, and such other and additional relief as this Court deems just and equitable.

41

## COUNT VIII
### (State Law Claim for Malicious Prosecution)

132.    Plaintiff re-alleges paragraphs 1 through 131.

133.    Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, and Frenzer, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendants Daley, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, continued said prosecution, again without probable cause. Said prosecution was ultimately terminated in Plaintiff's favor.  The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff set forth above.

WHEREFORE, Plaintiff demands actual or compensatory damages against Defendants Daley, Burge, Byrne, Dignan, Estate of Yucaitis, Boffo, Hines, Patton, Frenzer, Martin, Shines, Hillard, and Needham, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, punitive damages, and such other and additional relief as this Court deems equitable and just.

## COUNT IX
### (State Law Claim for Intentional Infliction of Emotional Distress)

134.    Plaintiff re-alleges paragraphs 1 through 133.

135.    Defendants Daley, Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Frenzer, and Martin individually, jointly, and in conspiracy, by, *inter alia*, torturing false admissions from Plaintiff and/or by failing to prevent or stop said torture, by constructing and fabricating admissions, and by procuring his prosecution, conviction, re-prosecution and life sentence for a

42

murder he did not commit by means of said false admissions, engaged in extreme and outrageous conduct. Additionally these same Defendants, together with Defendants Hillard, Shines, and Needham, individually, jointly, and in conspiracy, *inter alia*, by fabricating, coercing, and suppressing other evidence, by continuing Plaintiff's false imprisonment after procuring his wrongful conviction, by refusing to investigate or discipline the torturers, and by making false public statements, engaged in additional extreme and outrageous conduct.

136.    Defendants Daley, Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, Frenzer, Martin, Shines, Needham, and Hillard intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

137.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was and continues to be injured, and has, and continues to, experience, severe emotional distress, including fear of execution, nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression, inability to focus or concentrate, and a recurring fear of re-arrest, torture, and re-prosecution.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, Estate of Yucaitis, Boffo, Hines, Patton, Frenzer, Martin, Shines, Needham, and Hillard, for compensatory damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

43

## COUNT X
### (State Claim for Conspiracy)

138.    Plaintiff re-alleges paragraphs 1 through 137.

139.    Defendants Daley, Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, Frenzer, Martin, Shines, Needham, and Hillard, with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to falsely imprison and/or to continue said imprisonment, to maliciously prosecute and/or continue said prosecution, and to intentionally inflict continuing severe emotional distress on Plaintiff.

140.    In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the facts above.

141.    Said conspirac(ies) and overt acts were and are continuing in nature.

142.    Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from Defendants Daley, Burge, Byrne, Dignan, Estate of Yucaitis, Boffo, Hines, Patton, Frenzer, Martin, Shines, Needham, and Hillard, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

44

## COUNT XI
## (State Law Respondeat Superior Claim)

143.    Plaintiff re-alleges paragraphs 1-142.

144.    Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, Martin, Shines, Needham, and Hillard were, at all times material to this complaint, employees of the Defendant City of Chicago, were acting within the scope of their employment, and their acts which violated state law are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

145.    Defendant Daley, at the times specified in the complaint, was an employee of the Defendant City of Chicago, was acting at these times within the scope of his employment as a City employee, and those acts which are actionable under state law are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff demands judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiff's state law claims against the Defendants named in this Count, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT XII
## (745 ILCS 10/9-102 and Common Law Claims Against the City, County and SAO)

146.    Plaintiff re-alleges paragraphs 1 through 145.

147.    Defendant City of Chicago was the employer of Defendants Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, Martin, Shines, Needham, and Hillard at all times relevant and material to this complaint.

148.     These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

149.     Additionally, Defendant City of Chicago was the employer of Defendant Daley at the times so specified in this complaint; Daley committed the acts which he committed during his employment with the City in the scope of his employment as an employee of the City of Chicago.

150.     Defendant Cook County and its State's Attorneys' Office was at all times material to this complaint the employer of Defendant Frenzer; additionally it was the employer of Defendant Daley while he was State's Attorney of Cook County. Said County is therefore responsible for any judgment entered against Defendant Frenzer and for any judgment entered against Defendant Daley for acts committed by him during said employment with the County, making the County a necessary party to this complaint. Defendants Frenzer and Daley committed the acts alleged above under color of law and, when so employed, in the scope of their employment as employees of Cook County and its State's Attorneys' Office.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to law, demands judgment against the Defendants City of Chicago, Cook County and its State's Attorneys' Office, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

Dated:  July 22, 2010               Respectfully submitted,

                                     /s/ G. Flint Taylor
                                     G. Flint Taylor
                                     Joey L. Mogul
                                     Ben H. Elson
                                     Sarah Gelsomino
                                     People's Law Office
                                     1180 N. Milwaukee Avenue
                                     Chicago, IL 60642
                                     (773) 235-0070

                                     Locke E. Bowman
                                     MacArthur Justice Center
                                     Northwestern University Law School
                                     357 E. Chicago Ave.
                                     Chicago, IL 60611
                                     (312) 503-8576

                                     Attorneys for Plaintiff Tillman

                                   **Plaintiff demands trial by jury on all counts.**