UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL TILLMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 4551 |
| | ) | |
| JON BURGE, former Chicago Police | ) | Judge Rebecca R. Pallmeyer |
| Department Commander; RICHARD M. DALEY, | ) | |
| former Mayor and former State's Attorney; | ) | |
| JOHN BYRNE, former CPD Sergeant; | ) | |
| PETER DIGNAN, former CPD detective; | ) | |
| RONALD BOFFO, former CPD detective; | ) | |
| JACK HINES, former CPD detective; | ) | |
| GEORGE PATTON, former CPD detective; | ) | |
| Estate of JOHN YUCAITIS, former CPD detective; | ) | |
| TIMOTHY FRENZER, former Cook County ASA; | ) | |
| LeROY MARTIN, former CPD Superintendent; | ) | |
| TERRY HILLARD, former CPD Superintendent; | ) | |
| GAYLE SHINES, former OPS Director; | ) | |
| THOMAS NEEDHAM, former aide to | ) | |
| the CPD Superintendent; CITY OF CHICAGO; | ) | |
| COOK COUNTY, ILLINOIS; and | ) | |
| COOK COUNTY STATE'S ATTORNEY'S OFFICE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Tillman served nearly 24 years in prison for a July 1986 rape and murder

before his conviction was vacated and the charges dismissed by a Cook County Special Prosecutor

in January 2010. He received a certificate of innocence from the Circuit Court of Cook County in

February 2010. Tillman brings a host of claims against the police officers, police supervisors, and

prosecutors involved in his arrest, conviction, and prolonged confinement.

Plaintiff alleges that shortly after his arrest, he was coerced to make inculpatory statements

by former Chicago Police Detectives Peter Dignan, Ronald Boffo, Jack Hines, George Patton, and

John Yucaitis, and by former Cook County State's Attorney Timothy Frenzer. He alleges that

former Chicago Police Commander Jon Burge and former Sergeant John Byrne encouraged and

countenanced this conduct, and that Frenzer, Burge, and Burge's subordinates suppressed evidence of Plaintiff's treatment. Plaintiff further alleges that former Mayor and State's Attorney Richard M. Daley and former Chicago Police Superintendent LeRoy Martin refused and failed to investigate a pattern of torture carried out at Area 2 prior to Plaintiff's arrest, proximately causing Plaintiff's torture and wrongful conviction. Plaintiff claims that Daley, Martin, former Chicago Police Superintendent Terry Hillard, former aide to the Chicago Police Superintendent, Thomas Needham, and former Office of Professional Standards Director Gayle Shines all conspired to suppress evidence of police torture that Plaintiff claims would have been exculpatory.

Plaintiff asserts the following claims under 42 U.S.C. § 1983: deprivation of fair trial and wrongful conviction, against all individual Defendants (Count I); coercive interrogation against Daley, Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Frenzer, Patton, and Martin (Count IV); and a *Monell* claim against the City of Chicago (Count VI). Plaintiff asserts a claim for conspiracy under 42 U.S.C. §§ 1985 and 1986 against all individual Defendants (Count V). In addition, Plaintiff asserts six state law claims: false arrest and false imprisonment against the individual Defendants (Count VII), malicious prosecution against the individual Defendants (Count VIII), intentional infliction of emotional distress against the individual Defendants (Count IX), conspiracy against the individual Defendants (Count X), *respondeat superior* against the City of Chicago (Count XI), and an indemnification claim pursuant to 745 ILCS 10/9-102 against the City of Chicago, Cook County, and the Cook County State's Attorney's Office (Count XII). Plaintiff has voluntarily withdrawn Count II, alleging false arrest and imprisonment against all individual Defendants, and Count III, alleging torture and physical abuse against Boffo, Burge, Byrne, Daley, Dignan, Frenzer, Hines, Martin, Patton, and Yucaitis.

Defendants have filed five separate motions to dismiss. For the reasons set forth below, the motions are granted in part and denied in part.

**BACKGROUND**

## I.     The Parties

Plaintiff Michael Tillman brings his claims against thirteen individual Defendants, all in their individual capacities, as well as the City of Chicago, Cook County, and the Cook County State's Attorney's Office.  Before examining the background and substance of Plaintiff's claims, the court briefly identifies the Defendants and describes their Motions to Dismiss.

### A.     Municipal Defendants

Defendants Terry Hillard, Thomas Needham, Gayle Shines, and LeRoy Martin, all former City of Chicago officials (the "Municipal Defendants"), have filed a joint motion to dismiss.  (Dkt. 64.) Defendant Martin served as Chicago Police Superintendent from 1987 to 1992, and before that, held positions including Commander of the Area 2 Detective Division, where he was the command supervisor for the remaining Defendant Officers, and direct supervisor to Defendant Burge.  (Compl. ¶ 11.)  Defendant Hillard served as Chicago Police Superintendent from 1998 to 2004.  (*Id.* ¶ 12.) Defendant Needham was counsel to, and administrative assistant for, Superintendent Hillard from 1998 to 2002.  (*Id.* ¶ 13.)  Defendant Shines was the Director of the Chicago Police Department's Office of Professional Standards from 1990 to 1998.  (*Id.* ¶ 15.)

### B.     The Defendant Officers and Burge

Defendants John Byrne, Peter Dignan, Jack Hines, Ronald Boffo, George Patton, and the Estate of John Yucaitis (the "Defendant Officers")[1], have filed a motion to dismiss jointly with the City of Chicago.  (Dkt. 67.)  Defendant Jon Burge has filed an individual motion to dismiss, which also adopts some arguments made by the Defendant Officers and the City of Chicago.  (Dkt. 78.)

Defendant Jon Burge was the commanding officer of Area 2 Detective Violent Crimes Unit from 1982 until August of 1986.  (Compl. ¶ 7.)  In this capacity, Burge was the supervising

---

[1]     Former Chicago Police Detective George Patton has not formally joined in this Motion to Dismiss, but the court will consider him one of the Defendant Officers for purposes of this opinion because of the similarity of the claims against him to those of the other Defendant Officers.

Lieutenant of Defendants Byrne, Dignan, Boffo, Yucaitis, Hines, and Patton. (*Id.*) Defendant John Byrne served as a Sergeant in the Area 2 Detective Violent Crimes Unit from 1982 to August of 1986. (*Id.* ¶ 8.) Defendants Dignan, Boffo, Yucaitis, Hines, and Patton were Chicago Police Detectives in the Area 2 Violent Crimes Unit. (*Id.* ¶ 10.) Byrne directly supervised Defendants Dignan, Boffo, and Yucaitis. (*Id* ¶ 8.)

In 1988, Burge was appointed Commander of Area 3 Detective Division by Defendant Martin. (*Id.* ¶ 7.) Burge held this assignment until 1991, when the Chicago Police Department fired him for the torture and abuse of Andrew Wilson. (*Id.*) On June 28, 2010, Burge was convicted of perjury and obstruction of justice for lying about police torture. (*Id.*; *United States v. Burge*, No. 08 CR 846, 2011 WL 167230 (N.D. Ill. Jan. 19, 2011); *United States v. Burge*, No. 08 CR 846, 2011 WL 13471 (N.D. Ill. Jan. 3, 2011).) On January 21, 2011, Judge Lefkow sentenced Burge to 54 months in prison. (*United States v. Burge*, No. 08 CR 846 [362].) He is currently in federal custody at the Butner Federal Correctional Complex in Butner, North Carolina. (Bureau of Prisons Inmate Locator.)

### C.    Cook County and Frenzer

Defendants Timothy Frenzer, Cook County, and the Cook County State's Attorney's Office have filed a joint motion to dismiss. (Dkt. 61.) Defendant Frenzer is a former Assistant Cook County State's Attorney who was assigned to the Felony Review Unit. (Compl. ¶ 17.)

### D.    Defendant Daley

Defendant Richard Daley filed an individual motion to dismiss. (Dkt. 65.) From 1981 to 1989, Daley served as the State's Attorney of Cook County. (Compl. ¶ 14.) From 1989 through the filing of this suit, Daley was the Mayor of the City of Chicago. (*Id.*) Cook County does not join Daley's motion to dismiss, and Plaintiff explains in his response brief that the majority of his claims against Daley do not relate to Daley's actions while State's Attorney. (Pl.'s Resp. to Daley Br. at 19 n.10.)

## II.     Factual Background

Plaintiff's 46-page complaint sets forth an account of the murder of Betty Howard and Plaintiff's arrest and prosecution for that murder, including the torture he alleges he endured at the hands of Area 2 police officers. The complaint also details the history of torture at Area 2 and the alleged involvement of the various Defendants in that torture and in subsequent efforts to cover it up. The allegations are summarized below, and are presumed true for purposes of this motion.

### A.     Plaintiff's Arrest, Interrogation, and Prosecution

Police found Betty Howard's body in the early morning hours of July 21, 1986, in a vacant apartment in the building in which Howard and Plaintiff both resided. (Compl. ¶ 20.) Howard had been beaten, stabbed and shot, and was found gagged, naked from the waist down, and tied by her wrists to a radiator. *People v. Tillman*, 226 Ill. App. 3d 1, 4, 589 N.E.2d 587, 589 (1st Dist. 1991).[2] Later that morning, at approximately 6:30 a.m., Plaintiff voluntarily went to the Area 2 police headquarters, where he was taken into an interview room for questioning by Defendants Boffo and Dignan. (*Id.* ¶ 22.) Later that day, Defendants Hines and Patton joined the investigation. (*Id.* ¶ 23.) Plaintiff alleges that over the course of the next four days, Defendants Boffo, Dignan, Hines, Patton, and Yucaitis held Plaintiff incommunicado and tortured him, and that Plaintiff eventually made false inculpatory statements to Yucaitis. (*Id.* ¶¶ 24, 29, 31.) Plaintiff's co-defendant, Steven Bell, was similarly tortured and, Plaintiff alleges, forced to make false statements implicating himself and Plaintiff in the murder.[3] (*Id.* ¶ 29.) Plaintiff alleges that Burge supervised the interrogation and that

---

[2]     The court takes judicial notice of the Illinois Appellate Court's opinion reversing and remanding Tillman's initial 1986 conviction.

[3]     Bell was acquitted of all charges. (Compl. ¶ 45.) The Appellate Court explained that Bell's trial was severed from but simultaneous with Plaintiff's. *Tillman*, 226 Ill. App. 3d at 3, 589 N.E.2d at 588. Bell testified at trial that he had been working at a fast-food restaurant at the time of the murder, an account the judge reportedly described as a "solid alibi"; the judge determined that the other evidence against Bell was "not conclusive." Linnet Myers, "1 Convicted, 1 Freed in Bizarre Death Case But More Are Involved, Judge Says," *Chicago Tribune* (Dec. 19, 1986).

Burge was at Area 2 during most of these four days and received reports concerning the interrogation.  (*Id.* ¶ 31.)

Plaintiff does not offer a specific timeline of the following events, but describes numerous instances of abuse:  Defendants Boffo and Dignan questioned Plaintiff while he was handcuffed to a wall, and Boffo struck Plaintiff on the head.  (*Id.* ¶ 24.)  At another point, Defendant Hines struck Plaintiff in the head and the stomach, causing him to vomit, and drove Plaintiff to a secluded location, forced Plaintiff to his knees, held a gun to his head, and threatened to kill him "like you killed that woman." (*Id.*)  Hines struck Plaintiff on his back and head with a telephone book, causing his nose to bleed on his clothing and in the interrogation room, then forced Plaintiff to clean up the blood with paper towels.  (*Id.* ¶¶ 24, 25.)  Defendant Boffo kicked Plaintiff in the leg, and Defendants Boffo, Dignan, Hines, and Yucaitis used their thumbs to push against Plaintiff's ears, pushed his head back, and poured 7-Up into his nose.  (*Id.* ¶ 24.)  Plaintiff also alleges that Defendants Yucaitis and Dignan repeatedly subjected him to near-suffocation by placing a plastic bag over his head, and that Defendant Dignan hit Plaintiff on the leg with his flashlight and waved the flame from a cigarette lighter under his arm.  (*Id.*)  During the course of this interrogation, Plaintiff was not allowed to speak with a family member or an attorney.  (*Id.* ¶ 30.)  Plaintiff ultimately agreed to cooperate, and Defendant Yucaitis later testified that Plaintiff made oral admissions concerning his involvement in the crime.[4]  (*Id.* ¶ 29.)

Meanwhile, at 4:00 p.m. on July 21, 1986, Steven Bell also voluntarily went to Area 2 to

---

[4]        Plaintiff does not detail these alleged admissions in his Complaint, but according to the Illinois Appellate Court opinion, Yucaitis testified that Plaintiff explained that he and Bell entered Howard's apartment, where Bell raped Howard while Plaintiff held her on the ground.  Yucaitis stated that Plaintiff admitted he and Bell then brought Howard to the vacant apartment on the seventh floor, tied her to the radiator, and stabbed her.  Plaintiff reportedly acknowledged having staged the scene to make it appear that someone had broken into the apartment.  According to Yucaitis, Plaintiff reported that he and Bell left the victim, returned to her apartment, and stole some of her belongings. 226 Ill. App.3d at 12, 589 N.E.2d at 594.  Yucaitis testified that Plaintiff recanted his statement several hours after giving it, and claimed that his brother Kenneth and Bell had actually committed the crime.  *Id.* at 11-12, 589 N.E.2d at 593-94.

answer questions about the murder. (*Id.* ¶ 26.) Bell had helped Plaintiff paint an apartment in the building where the murder occurred during the days prior to the murder. (*Id.*) Plaintiff alleges that Defendants Dignan, Yucaitis, and Byrne assaulted Bell, as well, hitting him with a telephone book, kicking him in the ribs, and striking him in his face, in Defendant Boffo's presence. (*Id.* ¶ 27.) Bell eventually agreed to make a statement implicating himself and Plaintiff in the murder. (*Id.* ¶ 28.) Plaintiff alleges that Defendant ASA Frenzer was "present" at Area 2 during most of these interrogations, was aware that Plaintiff and Bell were being tortured, and, rather than intervening to stop the abuse, took a false written statement from Bell and attempted to take a false written statement from Plaintiff. (*Id.* ¶ 32.)

Formal charges for the murder of Betty Howard were filed against Plaintiff on July 25, 1986. (*Id.* ¶ 33.) In November of 1986, Defendants Boffo, Yucaitis, Dignan, Hines, Patton, Byrne, and Frenzer all testified at a hearing on a motion to suppress statements filed by Plaintiff. (*Id.* ¶¶ 41, 42.) Plaintiff alleges that each of the Defendants falsely denied having abused Plaintiff. (*Id.*) Plaintiff's motion to suppress was denied, and in December 1986, Plaintiff was convicted after a bench trial, at which several of the Defendants testified, of murder, rape, and kidnaping, primarily upon the basis of Plaintiff's alleged "false, manufactured, and coerced oral admissions." (*Id.* ¶ 45.) He was sentenced to natural life imprisonment plus 45 years. (*Id.*) Bell was acquitted of all charges. (*Id.*) Plaintiff also alleges that his false admissions were recorded in reports relied upon by the prosecuting attorneys, and that Defendants collectively suppressed the nature of these admissions, as well as evidence of the interrogation methods used against Plaintiff and others at Area 2. (*Id.* ¶¶ 46, 47.)[5]

---

[5] A third man, Clarence Trotter, was also convicted of Betty Howard's murder in 1988 after police stopped Howard's missing vehicle and two men in that vehicle led them to Trotter. (Compl. ¶¶ 35-40.) Fingerprints on Coca-Cola cans found in the same apartment as Howard's body were matched to Trotter. (*Id.* ¶ 39.) Trotter also gave an allegedly coerced statement to police admitting to the murder and theft of the car and other items, but refusing to link Plaintiff or Bell to

(continued...)

Plaintiff's complaint does not discuss his second trial, which took place in 1996, after the Illinois Appellate Court reversed his original conviction based in part on a claim of ineffective assistance of trial counsel. *People v. Tillman*, 92 CR 27711, No. 1-96-1892, at *1-2 (1st Dist. June 23, 1999) (Ex. A to Municipal Br.). The court takes notice that on February 14, 1996, Plaintiff was again convicted, this time by a jury, and on May 14, 1996, was sentenced to natural life without parole for felony murder predicated on aggravated criminal sexual assault and 15 years concurrently for aggravated kidnaping. *Id.* At the second trial, Plaintiff told the jury that he was beaten and threatened by detectives, and threatened by Frenzer. *Id.* at *18. Plaintiff called Darrell Cannon, a convicted murderer, to testify regarding similar abuse at the hands of Area 2 detectives in 1983. *Id.* at *19. Flint Taylor, Plaintiff's attorney in this case, also testified, describing several conversations he had with other individuals regarding Yucaitis and Dignan's reputations for untruthfulness in dealing with suspects. *Id.*

## B. Pattern and Practice of Torture at Area 2

Plaintiff's Complaint includes allegations regarding the torture of other individuals in Area 2, including the high-profile case of Andrew Wilson. (Compl. ¶¶ 48-52.) Plaintiff alleges that the named Defendants in this case, along with others, engaged in this practice, failed to intervene to end it, and suppressed information regarding this extensive pattern of abuse.[6] (*Id.* ¶¶ 48-54.)

---

[5](...continued)
the crime. (*Id.* ¶ 38.) Trotter's conviction was initially reversed after his statement was found to be involuntary, but he was re-tried and re-convicted. (*Id.* ¶ 40.) No link between Trotter and Plaintiff was ever established. (*Id.* ¶ 39.)

[6]     Plaintiff alleges that between 1973 and 1982, Burge, as an Area 2 detective, and other Area 2 detectives tortured numerous African-American suspects, including Lawrence Poree, George Powell, Tony Thompson, Willie Porch, Ollie Hammonds, Derrick King, Michael Coleman, Sylvester Green and Melvin Jones. (Compl. ¶ 50.) Plaintiff alleges that between February 1982 and July 1986 Burge, Byrne, and other Area 2 detectives used electric shocks, baggings, mock executions, and beatings on suspects including Shadeed Mumin, Michael Johnson, Lee Holmes, Rodney Benson, Stanley Wrice, Eric Smith, Alonzo Smith, James Andrews, Reginald Mahaffey, Jerry Mahaffey, Gregory Banks, David Bates, Darrell Cannon, Leonard Hinton, Eric Smith, Leroy
(continued...)

Plaintiff alleges that as Mayor and State's Attorney, Defendant Richard Daley had personal knowledge of the alleged abuses perpetrated by Burge and other Defendants at Area 2, but declined to investigate the abuses and failed to disclose these exculpatory allegations. (*Id.* ¶ 66.) Plaintiff asserts that, had Daley and Martin investigated the allegations of abuse at Area 2 prior to his arrest, he would not have been tortured and would not have been wrongfully convicted. (*Id.* ¶¶ 67, 70.) Plaintiff further alleges that as a result of a conspiracy between Daley, Martin, Hillard, Needham, Shines and others to suppress information about torture at Area 2, "Plaintiff's wrongful prosecution was continued, his exoneration was delayed and his imprisonment lasted far longer than it otherwise would have." (*Id.* ¶¶ 72, 97.) According to Plaintiff, between 1989 and 1992, Daley and Martin were given "additional actual notice that Burge was the leader of a group of Chicago detectives that systematically tortured and abused African American suspects" through an Amnesty International report and public hearings. (*Id.* ¶ 85.) Plaintiff alleges that in 1996, despite his knowledge that findings of torture and abuse had been made against Defendant Dignan, Daley promoted Dignan to lieutenant. (*Id.* ¶ 91.) Plaintiff also alleges that Daley, against the advice of his senior advisers, "personally insisted" throughout his tenure that the City of Chicago "continue to finance the defense of Burge, Byrne, Dignan, and other Area 2 detectives, despite his personal knowledge that Burge committed acts of torture." (*Id.* ¶ 93.)

## C.    Plaintiff's Release and Exoneration

On January 14, 2010, Plaintiff's conviction was vacated based on a post-conviction petition, and he was granted a new trial. (*Id.* ¶ 95.) In the post-conviction petition, Tillman argued that his

---

[6](...continued)
Orange, Leonard Kidd, Philip Adkins, Robert Billingsley, Stanley Howard, Alphonso Pinex, Thomas Craft, Lavert Jones, Lonza Holmes, and Aaron Patterson. (*Id.* ¶ 53.) Physical implements used during the course of this torture, and the torture of Plaintiff and Bell, included plastic bags, telephone books, typewriter covers, blackjacks, an "electric shock box," plug-in electrical devices, shotguns, and handguns. (*Id.* ¶ 54.) Plaintiff does not describe the details of these alleged instances of torture aside from his own, Bell's, and that of Andrew Wilson.

conviction was the "direct and proximate result of the beating, bagging, mock execution and improvised waterboarding that Burge-commanded officers inflicted on [Plaintiff] in 1986." *People v. Tillman*, No. 92 CR 27711, Post-Conviction Petition, at *1. The petition noted that Burge had recently been indicted in connection with allegations of torture. *Id.* The petition went on to describe Plaintiff's allegations and the evidence of torture committed by Burge, Byrne, and others at Area 2. *Id.* The Cook County Special Prosecutor assigned to Plaintiff's case dropped all charges, and he was released from custody.[7] On February 19, 2010, the Circuit Court of Cook County found that Plaintiff had established that he was innocent of the charges for which he was convicted, and granted him a certificate of innocence pursuant to 735 ILCS 5/2-702. (Compl. ¶ 96.) Soon thereafter, Plaintiff brought this suit. The court now considers Defendants' motions to dismiss.

## DISCUSSION

### I.     Legal Standard

Defendants ask the court to dismiss Plaintiff's claims for failure to "state[] a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In deciding a motion to dismiss, the court views "the complaint in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from those allegations in his or her favor." *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003). While the court must accept factual allegations in the complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), nor is it obligated "to accept as true . . . unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

### II.    Count I: § 1983 Claim for Deprivation of Fair Trial and Wrongful Conviction

---

[7]     Details of these events do not appear in the Complaint. According to contemporaneous press accounts, at a January 14, 2010 hearing, a Cook County Assistant State's Attorney asked that the charges be dropped "because [Plaintiff] was convicted with 'coerced statements' and the state couldn't prove his guilt based on the remaining 'unreliable evidence,'" leading Judge Vincent Gaughan to dismiss the case. Matthew Walberg, "Freed in Burge Torture Scandal," *Chicago Tribune* (Jan. 15, 2010).

Plaintiff alleges that all of the individual Defendants deprived him of a fair trial, conspired to wrongfully convict him, and suppressed the truth about his wrongful conviction in order to keep him incarcerated. Plaintiff's Complaint is vague as to the specific actions alleged to have been carried out by each Defendant and the corresponding claims against each one, but Plaintiff does offer some clarification in his Responses to the Motions to Dismiss.[8]

Plaintiff contends that Officers Dignan, Yucaitis, Boffo, Hines, and Patton ("Defendant Officers"), who directly participated in his interrogation, tortured him and fabricated false statements, lied about these activities, and suppressed the truth concerning their conduct and a pattern of torture at Area 2. (Compl. ¶ 101.) Plaintiff alleges that Lieutenant Burge and Sergeant Byrne personally supervised this torture and interrogation, and also suppressed the truth about these events. (Id. ¶¶ 21-22, 101.) Plaintiff alleges that Daley, while he served as Mayor, knew about the pattern and practice of torture at Area 2 and worked actively to suppress the truth. (Id. ¶¶ 73-75.) Plaintiff alleges that Assistant State's Attorney Frenzer personally participated in his interrogation and attempted to take a coerced written statement from him. (Id. ¶ 32.) Martin supervised Burge at the time of Plaintiff's arrest, and served as police superintendent from 1987 to 1992; Plaintiff alleges that in those capacities, Martin supervised and was aware of the torture at Area 2 but suppressed the truth about it. (Id. ¶¶ 11, 101.) Hillard served as police superintendent from 1998 to 2004 and allegedly learned about and suppressed the truth concerning torture at Area 2, as well, as did his administrative assistant from 1998 to 2002, Thomas Needham. (Id. ¶¶ 12-13, 101.) Gayle Shines served as director of the Office of Professional Standards from 1990 to 1998, in which capacity she also allegedly learned about the torture at Area 2 and

---

[8] Plaintiff has also preserved a Fourth Amendment malicious prosecution claim, although he acknowledges that Seventh Circuit authority forecloses this theory. (Pl.'s Resp. to Officers' Br. at 13 n.7.) Plaintiff notes that several other circuits do recognize a federal malicious prosecution claim. See Novitsky v. City of Aurora, 491 F.3d 1244 (10th Cir. 2007); Fox v. DeSoto, 489 F.3d 227, 237 (6th Cir. 2007); Wood v. Kessler, 323 F.3d 872, 881 (11th Cir. 2003); Britton v. Maloney, 196 F.3d 24, 28-30 (1st Cir. 1999).

suppressed that information.  (*Id.* ¶¶ 15, 101.)

Plaintiff proceeds on this count based on two legal theories.  First, Plaintiff argues that Defendants have suppressed exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  *Brady* held that the failure to disclose favorable, material evidence violates a defendant's procedural due process rights.  *Id.* at 87.  There are three components to a *Brady* violation: "(1) the evidence at issue is favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued."  *Parish v. City of Chicago*, 594 F.3d 551, 554 (7th Cir. 2009) (citation and quotation omitted).

Plaintiff also alleges that Defendants have violated his "right not to be convicted on the basis of false, fabricated, or unconstitutionally coerced evidence."  (Pl.'s Resp. to Officers' Br. at 10.) Plaintiff invites this court to look beyond the ambit of *Brady* and allow him to pursue a claim that he was deprived of a substantive due process right to not be tried and convicted on the basis of fabricated evidence.  The court is unwilling to accept this invitation.  The Seventh Circuit has repeatedly rejected attempts to combine "what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment."  *Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009) (citation and quotation omitted).  The claim that "criminal proceedings were instituted against [Plaintiff] based on false evidence or testimony . . . is, in essence, one for malicious prosecution, rather than a due process violation."  *Id.* (citation and quotation omitted).  The Seventh Circuit has concluded that *Albright v. Oliver*, 510 U.S. 266 (1994) "scotches any constitutional tort of malicious prosecution when state courts are open."  *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001).  Though Plaintiff cites numerous cases in support of his due process theory, the vast majority of them either predate *Brady*, are contemporaneous with *Brady*, or conclude that allegations similar to those here actually support a *Brady* claim rather than any substantive due

12

process claim. (Pl.'s Resp. to Officers' Br. at 9-10.) Absent clear authority supporting the cause of action Plaintiff proposes, this court declines to entertain such a legal theory. The court also notes that Plaintiff has ample theories available through which to pursue his claims, including a state law malicious prosecution claim. As such, if Plaintiff has any claim on this count, it must proceed under *Brady*.

### A. Defendant Officers

Plaintiff's first claim against Defendant Officers is that they suppressed evidence of the "systematic practice of torture under Burge" and "never informed the prosecuting attorneys that they had committed [ ] torture during Plaintiff's interrogation in order to obtain false inculpatory statements" in violation of *Brady*. (Pl.'s Resp. to Officers' Br. at 5-6.)

Defendants contend that Tillman's *Brady* claim must be dismissed because Tillman was in fact aware of everything that he now claims was "withheld." According to Defendants, a due process claim cannot extend to situations where the plaintiff was aware of the alleged misconduct at the time of trial, regardless of whether the misconduct was "withheld" from prosecutors. *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003). The plaintiff in *Gauger* brought a *Brady* claim following his arrest and subsequent conviction for allegedly killing his parents, a conviction based primarily upon statements Gauger had made during an extended period of interrogation. *Id.* at 356-57, 360. When members of a motorcycle gang later admitted to the murder, Gauger's conviction was overturned, and the charges against him were dropped. *Id.* at 357-58. Gauger claimed that the statements during his interrogation were hypothetical and taken out of context, and that *Brady* required the detectives to give truthful accounts of the interrogation to the prosecutors and to his defense attorney. *Id.* at 360. The court rejected this argument. Gauger knew what was said at the interrogation, the court observed, and the state therefore had no duty to disclose that information. *Id.* "The problem was not that evidence useful to him was being concealed; the problem was that the detectives were giving false evidence." *Id.* To have allowed a *Brady* claim to proceed under

13

those circumstances would effectively create a duty "not merely to disclose but also to create truthful exculpatory evidence." *Id.* In short, the court rejected Gauger's attempt to "make every false statement by a prosecution witness the basis for a civil rights suit." *Id.*

Withholding evidence does, in some circumstances, constitute a *Brady* violation. Plaintiff argues that the evidence withheld in this case falls into that category. In particular, Plaintiff cites *Manning v. Miller*, 355 F.3d 1028 (7th Cir. 2004), where a Chicago police officer who had been working as an FBI informant was allegedly framed for murder and kidnaping in retaliation for his refusal to continue working as an informant. *Id.* at 1030. Manning alleged that the FBI agents induced a witness to identify him in a photo lineup, and that the agents arranged his placement in a cell with a jailhouse informant, who allegedly fabricated a confession from Manning to the crimes at their direction. *Id.* Defendant FBI agents argued that the claim that Plaintiff had been "framed" was really a claim that Defendants had committed perjury or conspiracy to commit perjury, not a claim of a *Brady* violation. *Id.* at 1031. The court concluded, however, that Manning had alleged more than perjured testimony:

> Manning points to actions taken over the course of years that set the stage for his trial; the timing of some of these claimed actions well before trial lends some credence to Manning's theory that this behavior goes beyond perjury. Such actions included inducing a witness to falsely identify Manning in a line-up, selecting Dye to be the jailhouse informant, and inducing Dye to create a false story. Manning argues that the agents failed to tell prosecutors that they had done these things. Further, Manning believes the agents created and submitted false written reports stating that Manning had confessed when they knew he had not, and destroyed or tampered with the physical evidence, namely the tapes of the purported confessions.

*Id.* at 1033 (footnotes omitted).

Several courts in this district have grappled with the question of whether claims similar to Plaintiff's more closely resemble *Gauger* or *Manning*. For example, in *Patterson v. Burge*, 328 F. Supp. 2d 878 (N.D. Ill. 2004) (Gottschall, J.), the court noted that Patterson's claim that police hid the coercion and fabrication of a confession might not itself state a *Brady* claim, but allegations that

police hid their knowledge of his actual innocence, gave perjured testimony, brought false charges against him, and "acted in concert to effectuate a pattern and practice of torture and frame-ups at Area 2," were adequate to state a valid *Brady* claim. *Id.* at 889. The *Orange v. Burge*, No. 04 C 0168, 2005 WL 742641 (N.D. Ill. March 30, 2005) (Holderman, J.) court agreed with that reasoning; Judge Holderman concluded that Orange stated a *Brady* violation because defendants (including individual officers, Burge, Hillard, Needham, Shines, Martin, an Assistant State's Attorney, and former State's Attorney Richard Devine) "caused Orange to experience an unfair trial through their false testimony and other acts taken to cover up the torture[-]obtained confession from Orange." *Id.* at *11. The court noted that "[t]he fact that Orange was present for the alleged torture has no impact on the defendants['] duty to disclose other exculpatory evidence." *Id. See also Cannon v. Burge,* No. 05 C 2192, 2006 WL 273544, *12 (N.D. Ill. Feb. 2, 2006) (St. Eve, J.) ("Plaintiff's knowledge of what transpired in the interrogation room does not relieve the City Defendants of their obligation under *Brady* to disclose exculpatory evidence regarding what transpired outside the interrogation room, or preclude the Court from finding the existence of a *Brady* violation.").

Tillman has alleged that the Defendant Officers engaged in "suppressing, destroying, and preventing the discovery" of exculpatory evidence, including that of "the instruments of torture," and have done so "by obstructing and improperly influencing investigations . . . [and] by suppressing and attempting to discredit findings of individual and systematic torture and abuse." (Compl. ¶ 101.) Because these allegations relate to circumstances that substantially exceed what Tillman was aware of based on his presence at the interrogation, the rationale of *Gauger* does not bar Tillman's *Brady* claim regarding the failure to disclose systemic abuse of criminal suspects.

Defendants next argue that Tillman's *Brady* claim must fail because the evidence of a pattern and practice of abuse and torture is not material. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Defendants advance two arguments in support of this claim: first, they argue that Tillman's conviction at a second trial, which included testimony describing torture at Area 2,[9] demonstrates the immateriality of the withheld evidence. Second, they urge that further information regarding systemic abuses at Area 2 would have been merely cumulative.

Defendants' first argument–that Tillman's 1996 conviction proves that the torture evidence is immaterial–is belied by consideration of the evidence introduced at Tillman's second trial. Plaintiff points out that the evidence he proffered concerning his allegedly coerced confession consisted of the testimony of Darrell Cannon, another alleged torture victim, and Flint Taylor, who represents Plaintiff in this lawsuit and is a longtime civil rights attorney. Neither of those witnesses was able "to provide direct, official evidence" of the systemic torture that occurred under Burge. (Pl.'s Resp. to Officers' Br. at 6 n.3.) The court agrees that the testimony of another criminal defendant, and that of a civil rights attorney, might well be viewed by a jury with suspicion. The fact that Tillman's conviction was eventually overturned, and that he was issued a certificate of innocence highlights this point: it was only after the pattern and practice of police torture at Area 2 came to light through official channels that Tillman's post-conviction petition was granted.

Further, the Complaint explicitly cites several instances of suppression that occurred or continued well after Tillman's 1996 retrial.[10] The complaint alleges that Defendants suppressed instruments used in the torture of suspects in Area 2. Plaintiff does not offer precise dates or

---

[9] Plaintiff's second trial took place after the 1992 release of the Goldston Report, but that report does not appear to have been introduced at the second trial, for reasons that are not clear from the record. The report, prepared by Office of Professional Standards Investigator Michael Goldston, "found that there was systemic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systemic abuse and encouraged it." (Compl. ¶ 76.)

[10] Some of these examples involve Defendants who will be discussed further below, but are illustrative of the type of evidence that allegedly remained suppressed.

circumstances of this suppression, but he does allege that the information was withheld from "the prosecutors and judges who prosecuted and heard Plaintiff's appeals and motions to suppress"; the court understands this allegation to mean that the information was not turned over during the pendency of Tillman's appeal from his 1996 conviction or thereafter, when it could have provided grounds for a post-conviction petition. (Compl. ¶ 47.) Plaintiff also alleges that Defendant Shines suppressed OPS determinations regarding abuse up until 1998, and that Defendants Hillard and Needham improperly overturned OPS findings in 1998. (*Id.* ¶¶ 90, 92.) Plaintiff also alleges that various Defendants otherwise engaged in a series of activities in an attempt to suppress details of the full extent of the systemic abuse of suspects in Area 2, including offering false statements during numerous civil lawsuits conducted between 2003 and 2009, in July 2006 in response to a special prosecutor's report, in October 2008 in response to Burge's indictment, and in June and July 2010 in response to Burge's conviction. (Details concerning these statements are not in the record as its exists at this stage in the litigation, but the court notes that Burge's conviction rested on his giving a false statement in a deposition during a civil lawsuit.) (*Id.* ¶ 97.) The imagination need not stretch far to conclude that, had the indicated findings of torture at Area 2 been in evidence, not to mention the Defendant Officers' testimony confirming the alleged torture of Tillman himself, there might have been a different result at the initial or subsequent trial. Again, it was evidence of coercion at Area 2 that led the Cook County State's Attorney's office ultimately to drop charges against Plaintiff.

Defendants' second argument, that additional evidence would have been merely cumulative, requires closer examination. To establish a *Brady* violation, a plaintiff must show that the evidence in question "is material and not merely impeaching or cumulative," and that it "probably would lead to an acquittal in the event of a new trial." *United States v. Hodges*, 315 F.3d 794, 801 (7th Cir. 2003). As such, the allegedly withheld information must be compelling enough to raise the likelihood of acquittal in a new trial above mere speculation. *United States v. Navarro*, 737 F.2d

625, 631 (7th Cir. 1984) ("A due process standard which is satisfied by mere speculation would convert *Brady* into a discovery device and impose an undue burden upon the district court.").

Plaintiff's allegations here are sufficient to support the inference that disclosure of the withheld information could have resulted in acquittal at a new trial. Plaintiff has alleged that his conviction and continued imprisonment sprang from a pattern or practice of abuse that was kept hidden for many years. Had the factfinder been aware of the scope of the abuse in Area 2, or had that abuse been confirmed through official channels, the trier of fact may have found the evidence–chiefly Plaintiff's confession–insufficient to support a conviction. As such, the evidence of abuse is more than "[e]vidence that impeaches an already thoroughly impeached witness." *See United States v. Kozinski*, 16 F.3d 795, 819 (7th Cir. 1994). Defendant Officers' motion to dismiss Count I of the Complaint is denied.

### B.      Municipal Defendants Needham, Shines, Hillard, and Martin

In Count I, Plaintiff also alleges that the Municipal Defendants "acted in collusion with Daley and high-ranking police officials to deflect public scrutiny of the actions of Burge and his men, as well as to deprive Plaintiff of information regarding the scope and nature of the torture," and that these actions prolonged his wrongful incarceration. (Pl.'s Resp. to Municipal Br. at 10.) Indeed, the protections of *Brady* "extend[] throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings. Put differently, the taint on the trial that took place continues throughout the proceedings, and thus the duty to disclose and allow correction of that taint continues." *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007). Plaintiff alleges here that Needham, Shines, Martin, and Hillard suppressed exculpatory material relating to the pattern or practice of abuse at Area 2 that would have been relevant in his post-conviction proceedings. Specifically, Plaintiff alleges that Martin "undermined investigations and findings of official misconduct," and, after becoming police superintendent, obstructed the dissemination of information about police torture at Area 2. (Pl.'s Resp. to Municipal Br. at 11.) After the Goldston

18

Report detailing torture was released, Plaintiff alleges, Martin and Daley publicly discredited its findings. (*Id.*) When additional allegations of torture surfaced, Martin and Shines declined to investigate those claims, and, after OPS found allegations of torture against Byrne and Dignan to be credible, Shines suppressed those findings for at least five years. (Compl. ¶¶ 84, 90.) In 1998, Hillard and Needham "essentially took over where Martin had left off" in concealing the reports and in reversing OPS's findings of torture. (Pl.'s Resp. to Municipal Br. at 12.)

As Plaintiff notes, several courts in this district have found similar allegations sufficient to state claims against these same Defendants. *See Orange*, 2005 WL 742641, at *13 (§ 1983 claim "assert[ing] that Martin, Shines, Hillard and Needham participated in covering up alleged torture, failing to investigate and suppressing of information" survives a motion to dismiss); *Howard v. City of Chicago*, No. 03 C 8481, 2004 WL 2397281, at *13 (N.D. Ill. Oct. 25, 2004) (rejecting motion to dismiss because plaintiff claimed "Martin, Shines, Hillard, and Needham suppressed material exculpatory evidence in the form of the Goldston report that documented 'systematic' and 'methodical' abuse and 'planned torture'").[11]

*Orange* and *Howard* concerned the suppression of evidence akin to what Plaintiff alleges the Municipal Defendants suppressed. Defendants argue that those cases were decided before the *Twombly* and *Iqbal* decisions, and therefore today, similar accusations should be dismissed for failure to clear the "plausibility" bar those decisions require. As the court sees it, plausibility is not

---

[11] Plaintiff cites two additional cases from this district as well, but those cases are less helpful to him; they highlight the difference between the due process violation Plaintiff alleges the Municipal Defendants to have committed, and those he alleges the Defendant Officers involved with his interrogation committed: Plaintiff alleges the Defendant Officers were personally involved in the suppression of the truth about *his* torture and *his* alleged statements, but as to these supervisory Defendants, Plaintiff alleges suppression of information related to the torture of *other* individuals. In *Cannon*, 2006 WL 273544, the court allowed a *Brady* violation claim to proceed when plaintiff alleged defendants had suppressed information concerning conduct that occurred "outside the interrogation room" but was related to plaintiff's torture itself. *Id.* at *12. Similarly, in *Patterson*, the court found that the alleged suppression of evidence of Patterson's abuse supported a due process violation. 328 F. Supp. 2d at 890. In neither of these cases did the allegations of suppression relate to the type of systemic abuse Plaintiff alleges the Municipal Defendants covered up.

at issue here. Plaintiff offers specifics describing the type of evidence suppressed and who suppressed it. Plaintiff's later exoneration and the public airing of much of this evidence supports the plausibility of Plaintiff's claims–the issue is not so much whether the allegations that this evidence was suppressed are plausible, but whether such suppression was material. The question that the court must answer in determining whether the alleged withheld evidence supports a claim of due process violation is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). At the pleading stage, this question can be answered in the affirmative. Plaintiff alleged torture from the get-go, and the impeachment of the officers involved in his interrogation, or those overseeing it (such as Burge) could reasonably have been expected to cast the charges against Plaintiff in a very different light. The Municipal Defendants' motion to dismiss Count I of the Complaint is denied.

### C.  Frenzer

As discussed previously, the evidence of Plaintiff's torture that Frenzer and the Defendant Officers allegedly suppressed is material within the meaning of *Brady*. Frenzer, however, argues that he enjoys immunity from individual liability for any suppression.

The Supreme Court has held that a prosecutor enjoys absolute immunity both for the use of perjured testimony and the suppression of exculpatory evidence. *Imbler v. Pachtman*, 424 U.S. 409, 431 n.34 (1976). *See also Houston v. Partee*, 978 F.2d 362, 365 (7th Cir. 1992) (noting that *Imbler* granted prosecutors absolute immunity "for the knowing use of false testimony and the deliberate suppression of exculpatory evidence at trial"). In *Houston*, the Seventh Circuit concluded that two prosecutors did not enjoy absolute immunity for the suppression of exculpatory evidence they uncovered *after* their involvement in the plaintiff's case had ended because their actions "had no connection to their role as advocate for the state." *Id.* at 366-67 (citation and quotation omitted). "The prosecutors are thus not entitled to any more immunity than the defendant police officers."

20

*Id.* One court to address similar allegations distinguished *Houston* in circumstances where "the exculpatory information in question was obtained by the ASAs while they were still performing their role as prosecutors. Prosecutors remain immune from having to divulge exculpatory information they obtained while prosecutors, even after they are no longer prosecutors." *Kitchen v. Burge*, No. 10 C 4093, ___ F. Supp. 2d ___, 2011 WL 1485301, at *7 (N.D. Ill. April 19, 2011) (Bucklo, J.).

Plaintiff contends, however, that reliance on *Kitchen* is misplaced and that Frenzer is not entitled to immunity because he participated in the interrogation himself, helped to coerce Plaintiff to giving false testimony, and therefore was not "performing [his] role as [a] prosecutor[]" within the meaning of *Kitchen*. Whether absolute prosecutorial immunity attaches is determined based on the function that the defendant was performing at the time the allegedly exculpatory information was acquired. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). If the prosecutor was acting more in an investigatory capacity rather than a prosecutorial capacity, the prosecutor would only be entitled to the qualified immunity afforded to law enforcement officials.[12] *Id.* at 270. Plaintiff asserts that Frenzer was at Area 2 during most of the time he and Bell were being tortured, and that Frenzer knew they "were being subjected to torture and abuse, yet instead of intervening to prevent said torture and abuse, took a false and manufactured written statement from Bell, and unsuccessfully attempted to take a false written statement from Plaintiff." (Compl. ¶ 32.) These facts, Plaintiff urges, present a case similar to that examined in *Orange v. Burge*, No. 04 C 0168, 2008 WL 4443280, at *10 (N.D. Ill. Sept. 29, 2008), where Judge Holderman concluded in ruling on a motion for summary judgment that absolute immunity was not available where the prosecutor

---

[12]    The court does not address claims of qualified immunity in this opinion because the parties have not made them; that torture is unlawful has been clearly established for decades, thus rendering futile any argument that an individual who engaged in torture should enjoy qualified immunity. *Wilkerson v. State of Utah*, 99 U.S. 130, 136 (1878) ("[I]t is safe to affirm that punishments of torture . . . are forbidden by . . . the Constitution."). *See also Vance v. Rumsfeld*, 694 F. Supp. 2d 957, 966 (N.D. Ill. 2010) (quoting *Wilkerson*). Similarly, the suppression of material exculpatory evidence has also long been recognized as the type of right whose violation is not subject to qualified immunity. *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008).

was "personally involved" in Orange's interrogation and "coached Orange regarding the false confession Orange was to deliver in exchange for the cessation of the alleged torture sessions." *Id.* at *10. Because the prosecutor "actively assisted in gathering the evidence that would later form the basis of the charges against Orange," he acted more as an investigator than a prosecutor. *Id.* (denying summary judgment on this count). Similarly, in *Williams v. Valtierra*, No. 00 C 5734, 2001 WL 686782, at *2 (N.D. Ill. June 18, 2001) (Kennelly, J.), the court denied prosecutors' motion to dismiss where the plaintiff alleged that "when the prosecutors arrived, they did not evaluate information but rather forced Williams to produce inculpatory information by denying her medical care." *Id.*

Judge St. Eve explained in *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009), that "a prosecutor involved in a conspiracy to target a criminal suspect is not protected by absolute immunity . . . nor is a prosecutor who fabricates evidence." *Id.* at *11. In *Hill*, the court rejected summary judgment for the defendant prosecutor because there was a dispute as to whether he had participated in coercing plaintiff's confession. *Id.*

Plaintiff alleges that Frenzer personally participated in his interrogation and that of Bell, and then suppressed the truth concerning those events. This allegation puts Frenzer's conduct outside the scope of a prosecutorial function, and is therefore enough to survive an absolute immunity challenge. Defendant Frenzer's motion to dismiss Count I is denied.

### D.    Daley

Plaintiff alleges that as Mayor of Chicago, Daley concealed exculpatory information regarding police torture that could have led to Plaintiff's exoneration.[13] Daley argues that "the

---

[13]    Plaintiff clarifies in his response brief that he does not bring this claim against Daley as State's Attorney, and concedes that Daley may be entitled to absolute immunity from a *Brady* claim for concealment of this information while he was a prosecutor. (Pl.'s Resp. to Daley Br. at 19 n.10.)  Instead, Plaintiff alleges only that during his tenure as Mayor until Plaintiff's release, Daley concealed evidence of police torture that would have exculpated Plaintiff. (Compl. ¶ 93.)
(continued...)

alleged misconduct still lacks a plausible causal connection to *plaintiff's* ongoing imprisonment." (Daley Reply at 10.) Daley continues, "[t]hese allegations have nothing to do with plaintiff, this lawsuit, his alleged coercive interrogation, his criminal prosecution and convictions, or his ongoing incarceration." (*Id.*)

Much of Daley's argument rests on assertions that his involvement with the suppression of this information was at a supervisory level, or that he was not personally involved in its suppression, or that its suppression sprang from his role as a prosecutor, rendering him immune from any liability. The allegation Plaintiff makes, however, is that Daley, as Mayor, personally acted to suppress evidence of torture at Area 2, and to undermine the value of any such information that did become public.

That said, the court observes that the evidence allegedly suppressed by Daley does not appear to be the type of material exculpatory evidence that *Brady* addresses. Plaintiff alleges that Daley was on notice of torture at Area 2 by virtue of public hearings and in an Amnesty International report. But that information was not "suppressed"—the hearings and the report were public. (Compl. ¶ 85.) Daley's alleged public statements discrediting the Goldston Report does not constitute suppression, nor is there any allegation that he personally withheld the report between the time of its creation and 1992 release. (*Id.* ¶¶ 76-83.) Refusing to launch investigations, and, indeed, promoting Dignan, are also not fairly characterized as suppression. (*Id.*) Statements Daley made in response to the Special Prosecutor's report released in 2006, or the Burge

---

[13](...continued)
Daley would be immune from this claim based on information he learned as a prosecutor and continued to suppress, *see Kitchen,* 2011 WL 1485301, at *7. Several cases in which claims against Daley were dismissed involve allegations directed solely at his activities as a prosecutor. *Fields v. City of Chicago*, No. 10 C 1168, 2011 WL 1326231, at *12-13 (N.D. Ill. April 4, 2011) (Kennelly, J.) (dismissing claim against Daley as prosecutor under a "failure to intervene" theory); *Andrews v. Burge*, 660 F. Supp. 2d 868, 877 (N.D. Ill. 2009) (Zagel, J.) (rejecting *Brady* claim against Daley as a prosecutor for, among other reasons, failure to allege Daley "knew of evidence of widespread torture at Area Two while [plaintiff's] case was being prosecuted").

indictment in 2008 and conviction in 2010, also do not fit the bill–after all, these events were all public. And Plaintiff does not allege that Daley himself knew something about them that he suppressed, but instead says only that Daley expressed opinions contrary to the facts suggested by these events. (*Id.* ¶ 97.) Similarly, Daley's alleged decision to defend Burge in civil suits, rather than heed the advice of his senior staff and sue Burge, does not support the conclusion that exculpatory information was suppressed. (*Id.* ¶ 93.) While there is a blanket allegation that "Defendant Daley did not disclose exculpatory information in his possession," (*id.* ¶ 74), Plaintiff fails to allege with any specificity what that information might have been, whether it differed from information that had already trickled out into the public, or whether Daley took specific steps to conceal that information.

The court is unwilling to adopt Defendant Daley's conclusion that no *Brady* violation could have occurred because "[n]one of these allegations relate to the constitutional deprivations underlying *plaintiff's* action or suggest Mr. Daley concealed any evidence relative to *plaintiff*." (Daley Reply at 10.) Had Daley been in possession of undisclosed information that Burge and his subordinates had engaged in other instances of torture at Area 2, such information could be material and exculpatory even if it did not relate directly to Plaintiff. The conduct of Mayor Daley that Plaintiff challenges in this case does not relate to such undisclosed information, however, and did not otherwise influence Plaintiff's conviction and sentence. In *Kitchen,* 2011 WL 1485301, Judge Bucklo examined allegations similar to those made here and concluded that "[i]t cannot plausibly be argued that Kitchen would have been exonerated if Daley had not promoted Dignan, or if he had not ordered Burge's defense, or if he had not criticized the OPS Report." *Id.* at *9. While Judge Bucklo acknowledged the tension inherent in allowing similar claims to proceed against Martin and Shines, she distinguished those allegations because "[a]lthough none of the suppressed information had specifically to do with Kitchen's case, it is not unreasonable to infer that other instances of torture could have drawn attention to the problem more generally, causing

24

Kitchen's case to come to light much sooner." *Id.* at *10. With regard to Daley, Judge Bucklo explained, "judicial experience and common sense do not permit such a reasonable inference based on Daley's decision to promote Dignan, for example, or to provide Burge's legal defense." *Id.* This court agrees. Daley's motion to dismiss Count I is therefore granted.

### III. Count II: § 1983 Claim for False Arrest/False Imprisonment

Defendants argue that Plaintiff's § 1983 claims for false arrest and imprisonment (Count II), torture and physical abuse (Count III), and coercive interrogation (Count IV), are time-barred. While state law determines the limitations period for § 1983 actions, the accrual date for a § 1983 action is a matter of federal law. *Sellars v. Perry*, 80 F.3d 243, 245 (7th Cir. 1996). Under federal law, a § 1983 claim accrues "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (citation and quotation omitted).

The applicable statute of limitations for false arrest claims arising in Illinois is two years. *Brooks v. City of Chicago*, 564 F.3d 830, 832 (7th Cir. 2009), *citing* 735 ILCS 5/13-202 (2009). A § 1983 false imprisonment claim seeks damages for injury caused by detention without probable cause. *Nat'l Cas. Co. v. McFatridge*, 604 F.3d 335, 344 (7th Cir. 2010). As such, the claim accrues when the plaintiff is held pursuant to a warrant or other judicially issued process. *Id.*

Plaintiff was formally charged on July 25, 1986 and the statute of limitations for this claim expired on July 25, 1988. (Compl. ¶ 33.) Plaintiff filed this Complaint on July 22, 2010. (Dkt. 1.) Plaintiff concedes that these claims are untimely, and agrees to dismissal of Count II. (Pl.'s Resp. to Municipal Br. at 4 n.1.)

### IV. Count III: § 1983 Claim for Torture and Physical Abuse

Plaintiff's § 1983 claim for torture and physical abuse in violation of the Fourth Amendment is similarly time-barred. Because Plaintiff had a "complete and present" cause of action immediately following his 1986 interrogation, *Wallace* bars this claim, as well. *See* 549 U.S. at 388.

Plaintiff has conceded this in his brief, but wishes to preserve the claim should a change in the governing law occur.  (Pl.'s Resp. to Municipal Br. at 4 n.1.)  Defendants' motion to dismiss Count III is granted.

## V.    Count IV:  § 1983 Claim for Coercive Interrogation

Plaintiff alleges that the Defendant Officers violated the Fifth and Fourteenth Amendments through torture that "resulted in false, coerced, and fabricated admissions that were subsequently used against him in his criminal proceeding[]."  (Compl. ¶ 114.)  Plaintiff also alleges that Burge and Byrne, though supervisors, personally participated in these actions, as did Frenzer.  (*Id.* ¶ 114-15.)  Further, Plaintiff alleges that Daley, as State's Attorney, and Martin, as Area 2 Commander, "repeatedly failed to intervene to stop and prevent" torture at Area 2, despite learning about this conduct in 1982, which "proximately caused Plaintiff's coercive interrogation by torture and his resultant injuries and damages."  (*Id.* ¶¶ 116-117.)

The Fifth Amendment prohibits compelling any person "in any criminal case to be a witness against himself."  U.S. CONST. AM. V.  Use of a compelled statement against an individual at trial constitutes an actionable violation of the Fifth Amendment.  *Chavez v. Martinez*, 538 U.S. 760, 767 (2003).  In addition, a plaintiff may assert a Fourteenth Amendment substantive due process claim based on "police torture or other abuse that results in a confession."  *Id.* at 773.  "Convictions based on evidence obtained by methods that are so brutal and offensive to human dignity that they shock the conscience violate the Due Process Clause."  *Id.* at 774 (citation and quotation omitted).

Before addressing the merits of these allegations, the court addresses Defendants' contention that this claim, too, is time-barred.

### A.    Statute of Limitations

Like claims for false arrest and imprisonment, a § 1983 claim under the Fifth Amendment accrues when a plaintiff has a "complete and present" cause of action.  *Wallace,* 549 U.S. at 388.  Ordinarily, the period of limitation for Fifth Amendment claims begins to run upon the use of the

improperly obtained admissions at trial. *See, e.g., Sornberger v. City of Knoxville*, 434 F.3d 1006, 1023-27 (7th Cir. 2006) ("[T]he Self-Incrimination Clause, requires, at the very least, the initiation of a legal proceeding . . . before a suspect's self-incrimination rights are implicated."); *see also Chavez*, 538 U.S. at 767.

Plaintiff argues that the statute of limitations on his Fifth Amendment claim is tolled under *Heck v. Humphrey*, 512 U.S. 477 (1994). The plaintiff in *Heck* was convicted of killing his wife and sentenced to fifteen years in prison. *Id.* at 478. While his case was still on appeal, Heck filed a suit pursuant to 42 U.S.C. § 1983, alleging that police, investigators, and prosecutors had violated his constitutional rights by engaging in an "unlawful, unreasonable, and arbitrary investigation," "knowingly destroy[ing]" evidence, and causing "an illegal and unlawful voice identification procedure" to be used at his trial. *Id.* at 479. The Seventh Circuit had affirmed the district court's dismissal of the complaint because "if [plaintiff] won his case the state would be obliged to release him even if he hadn't sought that relief, [therefore] the suit is classified as an application for habeas corpus and the plaintiff must exhaust his state remedies, on pain of dismissal if he fails to do so." *Heck v. Humphrey*, 997 F.2d 355, 357 (7th Cir. 1993). The Supreme Court agreed that dismissal was appropriate:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

*Heck*, 512 U.S. at 486-87.

Defendants argue that *Heck* does not apply here in light of *Wallace*, where the Supreme Court held that "a claim that accrues before a criminal conviction may and usually must be filed without regard to the conviction's validity." *Evans v. Poskon*, 603 F.3d 362, 363 (7th Cir. 2010),

*citing Wallace*, 549 U.S. at 393-94. In *Wallace*, the plaintiff sued the City of Chicago and several Chicago police officers challenging his arrest for a 1984 murder. 549 U.S. at 386-87. Prior to his criminal trial, plaintiff moved to suppress statements he had made to police in an unlawful arrest. The suppression motion was denied, however, and the plaintiff was convicted of first degree murder and sentenced to twenty-six years in prison. *Id.* In 2001, his sentence was overturned, and a new trial was ordered, because "the effect of [his] illegal arrest had not been sufficiently attenuated to render his statements admissible." *Id.* at 387.

In holding that the plaintiff's Fourth Amendment claim was not subject to the delayed accrual rule under *Heck*, the Court relied upon the fact that at the time Wallace's cause of action accrued, there was no "outstanding criminal judgment" such as a conviction or sentence. *Id.* at 393. As discussed previously, because a § 1983 false imprisonment claim seeks damages for injury caused by detention without probable cause, false imprisonment necessarily ends when the plaintiff is held pursuant to a warrant or other judicially issued process. *Nat'l Cas. Co.*, 604 F.3d at 344. The Court concluded that Wallace's claim accrued in 1994 when formal legal process was initiated against him. 549 U.S. at 390.

Several courts in this district have considered whether *Wallace*'s accrual rule trumps the *Heck* bar in the coercive interrogation context. In almost every case, the courts have concluded that where (as in this case) the plaintiff's conviction rested largely upon the allegedly coerced confession, a coercive interrogation claim necessarily impugns the validity of the conviction. The *Heck* bar therefore applies, and the claim accrues once the prisoner's conviction is formally impugned. Thus, in examining whether plaintiff Oscar Walden could bring a coercive interrogation claim after he was pardoned for the rape of which he was convicted, Judge Castillo explained that "the central evidence used against Walden was his confession" and that a claim that his confession was coerced "necessarily call[s] into question Walden's conviction." *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 956 (N.D. Ill. 2010). Because "challenging the Fifth Amendment violation would

have necessarily impugned the validity of Walden's conviction," *Heck* would have barred Walden from bringing suit until he had obtained a pardon, so the statute of limitations did not begin to run until that occurred. *Id.*

Other judges in this district have reached similar conclusions. *See Hill v. City of Chicago*, No. 06 C 6772, 2007 WL 1424211, at *3 (N.D. Ill. May 10, 2007) (St. Eve, J.) (motion to dismiss); *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *5-6 (N.D. Ill. Jan. 26, 2009) (St. Eve, J.) (summary judgment); *Orange*, No. 04 C 168, 2005 WL 742641, at *7 (N.D. Ill. March 30, 2005) (Holderman, J.) ("An evaluation of Orange's § 1983 claim [for coercive interrogation] in the 1980s would have forced the evaluating court to directly determine whether his conviction was invalid."); *Howard v. City of Chicago*, No. 03 C 8481, 2004 WL 2397281, at *7 (N.D. Ill. Oct. 25, 2004) (Andersen, J.) ("Since Howard's conviction rested almost entirely on his involuntary confession . . . we conclude that Howard could not have challenged the Defendants' acts of torturing him and fabricating his confession without necessarily implying the invalidity of his conviction."); *Patterson*, 328 F. Supp. 2d at 897 (Gottschall, J.) (same).

In one other case, the court found that plaintiff's cause of action accrued when an allegedly coerced confession was used against him in a probable cause hearing and was the subject of a suppression hearing (the details and outcome of that hearing are not presented in the district court's opinion on the accrual issue). *Lanza v. City of Chicago*, No. 08 C 5103, 2009 WL 1543680, at *3 (N.D. Ill. June 2, 2009) (Andersen, J.). At that point, the court concluded, the plaintiff "knew or reasonably should have known of the use of the confession against him." *Id.* But the *Walden* court distinguished *Lanza*, noting that "the plaintiff in *Lanza* was never tried or convicted; the implications of *Heck* were never at issue." *Walden*, 755 F. Supp. 2d at 956.

This court sides with the weight of authority and concludes that, had Plaintiff brought this claim earlier, it would have impugned the validity of his conviction within the meaning of *Heck*, and would therefore have been premature. Plaintiff's coercive interrogation claim survives the

timeliness challenge.

**B.    Defendant Officers, Byrne and Burge**

Defendant Officers also seek dismissal of this claim on substantive grounds.  They note that "Plaintiff fails to allege he made or signed any inculpatory statements that were used against him at trial," and argue that this means no Fifth Amendment violation occurred.  (Officers' Br. at 5.) Plaintiff responds that "[D]efendants both coerced from him and fabricated oral admissions that formed the basis of his wrongful conviction."  (Pl.'s Resp. to Officers' Br. at 16.)  Indeed, numerous allegations in the complaint refer to coerced oral admissions, false admissions, and false statements.  (Compl. ¶¶ 45, 46, 101, 114, 135.)

Defendant Officers urge that the alleged conduct nevertheless does not constitute a Fifth Amendment claim because Plaintiff did not actually "confess" to the alleged crime.  Instead, they contend, Plaintiff has alleged that Defendant Yucaitis fabricated testimony concerning oral admissions that Plaintiff made.  (Officers' Reply at 9-10.)  Defendants cite *Sornberger* for the proposition that "[a] critical component to a coerced confession claim is a *confession*."  (Officers' Reply at 9.)  *Sornberger* involved both a written and verbal confession, which the plaintiff claimed had been coerced and was in fact false.  434 F.3d at 1011, 1020.  But *Sornberger* does not suggest that a Fifth Amendment claim is limited to a particular type of confession, and does not hold that such a claim must be dismissed if it is alleged that statements are cut from whole cloth rather than coerced from the suspect's own mouth.  This court need not decide whether any such distinction is meaningful; Plaintiff here does allege that oral admissions were coerced from him.  (Pl.'s Resp. to Officers' Br. at  16; Compl. ¶¶ 45, 46, 101, 114, 135.)  That these admissions did not take the form of a signed statement, and that, at trial, they were introduced along with statements that Plaintiff alleges were completely fabricated, does not extinguish this claim.

Second, Defendants argue that *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), requires the conclusion that "any allegation that plaintiff's confession was fabricated, in that the defendants

testified that plaintiff confessed when in fact he did not, falls within the purview of plaintiff's state law malicious prosecution claim." (Officers' Reply at 9-10.) *Newsome*, however, explains only that "when state courts are open," no federal malicious prosecution claim may proceed: "[I]f a plaintiff can establish a violation of the fourth (or any other) amendment there is nothing but confusion to be gained by calling the legal theory 'malicious prosecution.'" *Id.* at 751. Plaintiff here appears to be adhering to that guidance–he asserts Fifth and Fourteenth Amendment claims rather than a federal malicious prosecution claim.

Defendant Officers' challenge to Plaintiff's Fifth Amendment claim fails, and, beyond the timeliness defense discussed earlier, they have not addressed the Fourteenth Amendment claim. Their motion to dismiss these claims is denied.

## C. Burge

Defendant Burge argues that this claim (along with all other constitutional claims) fails because Plaintiff does not allege that Burge was personally involved in his interrogation, and § 1983 does not allow for supervisory liability. (Burge Br. at 3-5.) Plaintiff cites cases, including *Steidl*, for the proposition that "supervisors may be liable for their subordinates' violation of others' constitutional rights when they know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." 494 F.3d at 631 (citation and quotation omitted).

Plaintiff has alleged that Burge was present at Area 2 during his interrogation, that the physical evidence of his torture was apparent to those at Area 2, and that Burge "encourag[ed], condon[ed] and permitt[ed]" his torture. (Compl. ¶¶ 24-25, 31, 115.) Though more details concerning Burge's involvement would be useful, the court concludes these allegations are sufficient to support the inference that Burge was indeed personally involved in the deprivation of

Plaintiff's constitutional rights.[14]

In his reply brief, Burge also argues that Plaintiff's substantive due process claim is more properly styled as a Fifth Amendment claim and should be dismissed for that reason. (Burge Reply at 5.) Burge cites *Albright*, which explains that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." 510 U.S. at 273. At this stage, it is not clear to the court based on the sparse factual record that the Fifth Amendment claim is preferable to Plaintiff's due process theory. Notably, as discussed earlier, Defendant Officers have argued that Plaintiff's "confession" is not of the type that supports a Fifth Amendment claim at all (*see, e.g.*, Officers' Reply at 9). The court declines to dismiss the substantive due process claim.

### D. Frenzer

Plaintiff alleges that ASA Frenzer "encourag[ed], condon[ed] and permitt[ed] the use of [torture and other coercive techniques]." (Compl. ¶ 115.) In support of this contention, Tillman alleges that Frenzer was "present" at Area 2 during most of Tillman's interrogation, that Frenzer was aware that Tillman was bleeding from the nose during the interrogation, and that Frenzer unsuccessfully attempted to take a written statement from Tillman. (*Id.* ¶ 32.) From these allegations, Plaintiff urges, "[i]t is plausible to infer . . . that Frenzer was well aware that Plaintiff was being coerced into giving the statement, and in fact participated in the planned use of torture to

---

[14] In *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), the Supreme Court made clear that the bar on *respondeat superior* liability applies in the *Bivens* context just as it does in the § 1983 context. In this court's view, that case plows no new ground as to the allegations alleged here–it merely confirms what the existing §1983 case law, including *Steidl*, has long held–"a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S.Ct. at 1948. Plaintiff does also allege that Burge "supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives and supervisors" (Compl. ¶ 7), but those allegations are in addition to allegations that Burge was personally involved in the conduct underlying Plaintiff's claims.

extract Plaintiff's false admissions." (Pl.'s Resp. to Cook County Br. at 7.) These allegations are obviously similar to those in support of Plaintiff's *Brady* claim in Count I, discussed above; here, Plaintiff urges that Frenzer's conduct violated his Fifth Amendment right to be free from self-incrimination and a Fourteenth Amendment substantive due process right.

Frenzer contends he is shielded from liability for this conduct based on prosecutorial immunity. Again, though it is undisputed that Frenzer was acting as an Assistant State's Attorney at the time of these events, it is "[t]he nature of the function performed, not the identity of the actor who performed it" that controls whether and what type of immunity may be available. *Buckley*, 509 U.S. at 269. Prosecutors are, for example, absolutely immune from liability under § 1983 for core prosecutorial actions, including "initiating a prosecution and . . . presenting the State's case." *Imbler*, 424 U.S. at 431. Where a prosecutor steps beyond the prosecutorial function, and acts as an investigator or administrator, only qualified immunity may apply. *Buckley*, 509 U.S. at 270.

Plaintiff has alleged that Frenzer encouraged, condoned, and permitted the use of torture against him in order to secure a confession. Those allegations, presumed true for purposes of this motion, are sufficient to support the inference that Frenzer participated in an investigatory rather than prosecutorial role. The court notes that at this stage the allegations against Frenzer do lack specifics; if Frenzer did not actually participate in the alleged torture, but instead was present at Area 2 only to take Plaintiff's statement, he may well be entitled to summary judgment on grounds of immunity. *See, e.g.*, *Hunt v. Jaglowski*, 926 F.2d 689, 693 (7th Cir. 1991) (affirming grant of directed verdict for prosecutor asserting prosecutorial immunity against plaintiff's allegations of police coercion because plaintiff testified he had no contact with prosecutor "until after he had confessed and agreed to give a statement"). The allegations do survive a pleadings challenge, however, and Frenzer's motion to dismiss this claim is denied.

### E. Daley and Martin

Finally, Plaintiff makes claims against Daley and Martin for their alleged involvement in his

coercive interrogation. Plaintiff alleges that the repeated failures of Martin and Daley to intervene and prevent torture at Area 2, despite their knowledge that it was occurring, proximately caused Plaintiff's torture. (Pl.'s Resp. to Daley Br. at 8-9; Compl. ¶¶ 116-17.) Again, these allegations are similar to those discussed with respect to Plaintiff's *Brady* claims in Count I. With respect to his due process claims, Plaintiff has not alleged that Daley or Martin were personally involved in his torture, an allegation necessary to establish their liability under § 1983. *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Without a showing of direct responsibility for the improper action, liability will not lie against a supervisory official. A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.") While a defendant's "direct participation in the deprivation is not required," the defendant may only be liable "if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985). As explained earlier, for a supervisor to be liable for a constitutional deprivation, he "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). *Cf. Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994) (police chief is not liable for subordinate's wrongdoing absent an allegation that the chief "observed, directed, ignored, approved, participated in any way, or even knew about the incidents" alleged to be constitutional violations).

Plaintiff asserts that the Tenth Circuit has held that § 1983 liability can attach where "[a] defendant supervisor's promulgation, creation, implementation, or utilization of a policy . . . caused a deprivation of plaintiff's rights." Notably, the case he cites, *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) itself recognizes that *Iqbal* has called this holding into question, and that only "defendants whose own individual actions cause a constitutional deprivation" face § 1983 liability. In any event, authority in this Circuit requires a showing that a supervisor's actions be tied to the

specific constitutional violation at issue in order for the supervisor to be liable. Thus, in *Orange*, Judge Holderman examined plaintiff's claim, almost identical to the one here, that "Orange would not have been tortured in 1984 if [then-First Assistant State's Attorney Richard Devine] had only investigated and prosecuted Area 2 police officers for the torture of Andrew Wilson in 1982." 2008 WL 4425427, at *5. Holderman concluded that, even accepting Orange's allegations as true, "[t]he chain of inferences . . . is too tenuous" to support a claim against Devine. *Id.* *See also Patterson v. Burge*, No. 03 C 4433, 2010 WL 3894433, at *3 (N.D. Ill. Sept. 27, 2010). This court, too, concludes that too many variables stand in the way of a determination that there is a causal connection between Daley and Martin's failure to investigate and the deprivation of Plaintiff's rights. The many years it has taken for the allegations of torture at Area 2 to come to light bear this out–the notion that the wrongdoing would have stopped once an inquiry was launched is simply too tenuous. *Iqbal* has reaffirmed the Supreme Court's unwillingness to extend supervisory liability for constitutional violations in the civil context. Absent any controlling authority for a finding of liability under a "failure to investigate" theory, the court sustains these Defendants' objections, and grants Daley and Martin's motions to dismiss Count IV.

**VI.    Count VII: State Law Claims for False Arrest and False Imprisonment**

Like Plaintiff's claims in Count II, Plaintiff's Count VII state law claims for false arrest and false imprisonment are time-barred. Plaintiff argues that his false imprisonment claim is not predicated on his 1986 arrest, but rather upon Tillman's subsequent years of imprisonment, and as such his claim did not accrue until his release; but this court is no more persuaded by this argument than was Judge Bucklo in *Kitchen*. She observed that false imprisonment does not constitute a continuing tort or violation that accrues upon release, but is rather a tort that accrues upon imprisonment regardless of the continuing effects of that tort. "Courts have indicated that false imprisonment should be viewed as springing from an unlawful act that results in continual ill effects, not from continuing unlawful acts." *Kitchen*, 2011 WL 1485301, at *14.

Plaintiff cites *Cooper v. Butler*, No. 92 C 5604, 1995 WL 399009, at *5 (N.D. Ill. June 29, 1995) (Andersen, J.) and *Hernandez v. Sheahan*, No. 93 C 1668, 1993 WL 257486 (N.D. Ill. July 8, 1993) (Kocoras, J.), for the proposition that the limitations period for state false imprisonment claims does not start to run until the imprisonment ends, but, as explained by the *Kitchen* court, these are the only two cases in this district supporting such a theory, and their reasoning has been rejected elsewhere. In *Thompson v. City of Chicago*, No. 07 C 1130, 2009 WL 674353 (N.D. Ill. March 12, 2009), Judge Guzman noted that no Illinois state court decisions have agreed with the two district court opinions that adopted the continuing violation theory of *Cooper* and *Hernandez*. *Id.* at *5. The *Thompson* court concluded that the majority view "reflect[s] the general principles of tort claim accrual set forth by the Illinois Supreme Court." *Id.* at *5 (citing *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 798 N.E.2d 75, 85-88 (2003)).

Count VII is dismissed as untimely.

## VII. Counts V & X: § 1985 & § 1986 and State Law Claims for Conspiracy

Plaintiff contends that all of the individual Defendants were involved in a wide-ranging conspiracy beginning in 1973 and lasting until the filing of the lawsuit. (Compl. ¶¶ 48-54; 119.) He alleges a § 1983 conspiracy, a § 1985 conspiracy, and a conspiracy as defined by Illinois state law. The conspiracy to torture and abuse suspects, in particular African-American men, allegedly began with the May 1973 torture of Anthony Holmes at Area 2 and continued under the direction of Burge and Byrne. Because Daley and Martin failed to intervene, a team of detectives and officers continued the misconduct, engaging in numerous instances of abuse from February 1982 through July 1986. (Compl. ¶ 53.) Plaintiff also alleges that Frenzer and the Officers suppressed the truth about this torture and abuse, as well as the physical evidence of it, from Plaintiff and all those involved in his criminal proceedings. (*Id.* ¶ 54.)

The Defendant Officers assert that to the extent that Plaintiff's other constitutional claims fail, those same allegations cannot support the derivative conspiracy claims. (Officers' Br. at 11.)

36

Because the substantive claims in Counts I and IV have survived Defendants' motion, however, the conspiracy allegations will not be dismissed on that basis.

Defendants also argue that Plaintiff has not pleaded his § 1983 conspiracy claim with sufficient particularity. A complaint must at least identify (1) the parties to the conspiracy, (2) the general purpose of the conspiracy, and (3) the approximate date of the conspiracy. *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006). Even then (and especially after *Twombly* and *Iqbal*), "the plaintiff must meet a high standard of plausibility" when alleging "a vast, encompassing conspiracy." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009). "Even before the Supreme Court's new pleading rule . . . conspiracy allegations were often held to a higher standard than other allegations; mere suspicion that persons adverse to the plaintiff had joined a conspiracy against him or her was not enough." *Id.* A complaint consisting of nothing more than "'naked assertion[s]' devoid of 'further factual enhancement,'" must be dismissed under Rule 8. *Iqbal*, 129 S. Ct. at 1949. In *Andrews*, confronted with allegations of police torture, Judge Zagel of this court noted that "[i]ndiscriminately incorporating every paragraph of every count in other counts . . . can result, as it does here, in a complaint that does not tell some of the defendants why they are liable. . . . In a simpler case, a general conspiracy claim is adequate but not here." 660 F. Supp. 2d at 879-80. While plaintiff had made "very specific allegations about what certain named police officers and a prosecutor did with respect to Andrews," Judge Zagel noted that "[t]he further up the chain of command the complaint goes, the more vague are the grounds for individual liability." *Id.* at 880.

In this case, Plaintiff has explained the role that each of the individual Defendants played in greater detail. His allegations suggest that Plaintiff's torture was more than just an isolated incident, and suggest, further, that the suppression of the truth about what occurred at Area 2 was the result of coordinated efforts that continued for some time. (Compl. ¶¶ 119, 121.) As discussed above, the Defendant Officers are alleged to have participated directly in the torture, as did Burge; Frenzer allegedly did so as well, by attempting to take a statement when he knew the torture was

ongoing; Martin and Daley are said to have undermined and obstructed findings of torture; Shines allegedly suppressed findings of torture; and Plaintiff claims that Needham and Hillard continued to suppress findings and undermine investigations into torture at Area 2 after they took office. Plaintiff has listed a litany of actions at Area 2 furthering and concealing the abuse that took place there (Compl. ¶¶ 48-50, 52, 56, 63, 65, 88, 89), and has also provided specific allegations regarding acts of torture performed on this Plaintiff and on others. (*Id.* ¶¶ 21-34.) These allegations are sufficient to allege a § 1983 conspiracy. More specific allegations against the individual Defendants–a showing that their decisions to join in the general purpose of the conspiracy were deliberate and coordinated, for example–would indeed be helpful. The nature of conspiracy itself often prohibits such detail at the pleading stage, however. The court concludes Plaintiff has presented more than "naked assertions," and his conspiracy claim survives.

Second, the Defendant Officers argue that Plaintiff fails to plead a proper § 1985 conspiracy claim sufficient to support liability for additional Defendants under § 1986. A § 1985 conspiracy claim may be brought when "two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985(3). To state such a claim, plaintiff must allege a conspiracy, a purpose of depriving a class of persons of equal protection of the laws, an act in furtherance of the conspiracy, and an injury to plaintiff or a deprivation of his civil rights or privileges. *Indianapolis Minority Contractors Ass'n Inc. v. Wiley*, 187 F.3d 743, 754 (7th Cir.1999). Section 1986 provides for liability for an individual who knows that actions prohibited by Section 1985 are about to occur, and with "reasonable diligence could have prevented" them, but either neglected or refused to do so. 42 U.S.C. § 1986.

To make the showing required by § 1985 that Defendants had the purpose of denying equal protection, Plaintiff must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Griffin v. Breckenridge*, 403 U.S. 88, 102

(1971).  Plaintiff here urges that there was a racial motivation behind the actions of the alleged conspirators; he has alleged that the conspiracy was engaged in "with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy." (Compl. ¶ 120.)  Plaintiff also identified more than thirty alleged victims of police torture who are African-American. (Pl.'s Resp. to Officers' Br. at 20.)  Plaintiff asserts that this conspiracy "is, without doubt, fundamentally premised on and permeated by powerful racial animus." (*Id.*)

The Seventh Circuit has recently rejected a claim under § 1985, albeit in a different context, because plaintiff failed to offer any "'factual allegation to plausibly suggest [that defendants had] discriminatory state of mind.'" *Brown v. JP Morgan Chase Bank*, 334 Fed.Appx. 758, 759-60 (7th Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1952).  Courts in this district have rejected similar claims where plaintiff has done no more than plead that the plaintiff was a member of the protected class. *See Green v. Lichtcsien*, No. 00 C 0563, 2001 WL 78915, at *4 (N.D. Ill. Jan. 26, 2001). Substantially more detail may not be necessary, however.  In a recent non-§ 1985 case, *Swanson v. Citibank*, 614 F.3d 400, 406-07 (7th Cir. 2010), the Seventh Circuit reversed dismissal of a race discrimination claim where few details were offered at the pleading stage.  Plaintiff Swanson, who had applied for a home equity loan, alleged that while entering information into the computer, the loan officer had asked her a question about her race and commented that his own "wife and son were part African-American." *Id.* at 402-03.  The plaintiff was conditionally approved for the loan based on her own estimate of the loan's value, but after an appraiser assigned a more modest value to the property, the bank rejected her application. *Id.* at 403.  The court concluded that the wide variation between plaintiff's valuation and the later appraisal, and the mention of her race by the loan officer, were sufficient to allow this allegation to proceed past the pleading stage.  The Seventh Circuit noted that even after *Twombly* and *Iqbal*, "the court will ask itself *could* these things have happened, not *did* they happen." *Id.* at 404.

The court concludes that Plaintiff does sufficiently plead a § 1985 conspiracy claim, though barely. He has alleged that all or nearly all of the victims of the alleged conspiracy were members of the same class, and that racial epithets were commonly used during the course of this torture. Those allegations lend sufficient credence to Plaintiff's claims at the pleading stage. As in *Swanson*, the question before this court is whether the conspiracy alleged here *could* have been motivated by racial animus. Plaintiff's allegations appear to meet that test.

Finally, for purposes of his state law conspiracy claim (Count X), Plaintiff must allege that each Defendant "knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 133, 720 N.E.2d 242, 258 (1999). The allegations discussed earlier also meet these criteria; Plaintiff has alleged that each of the individual Defendants participated in this common scheme to engage in torture, an unlawful act. Though he does not again outline the specifics of these actions in Count X, the allegations are the same–that Defendant Officers, Burge, and Frenzer participated in the torture itself and that Daley, Hillard, Martin, Needham, and Shines covered up and suppressed evidence of that pattern and practice of torture of which Plaintiff was a victim. Defendants' motion to dismiss the conspiracy claim is denied.

## VIII. Count VI: § 1983 *Monell* Claim

Although styled as an independent claim, Count VI, the *Monell* policy allegations, are instead a basis to impose liability on the City for acts by the individual Defendants. The City challenges this theory of liability on two grounds: first, that Plaintiff's *Monell* claim cannot survive if his constitutional claims do not; and second, that Plaintiff has not alleged with sufficient specificity that a specific custom, policy, or practice of the city caused his constitutional injury. (Officers' Br. at 12.) Because Counts I and IV have survived this motion, the court need not address the first of the City's arguments.

The substantive argument bears more discussion. To establish the City's liability for a § 1983 claim under the *Monell* doctrine, Plaintiff must show: (1) a violation of his constitutional rights; (2) an injury; and (3) that the injury and violation of rights was directly caused by the City's own action or inaction. *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404 (1997). The Supreme Court has explained that plaintiff must establish that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404. Plaintiff can establish such a causal link in one of three ways, by showing

> (1) the City had an express policy that, when enforced, causes a constitutional deprivation; (2) the City had a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law; or (3) plaintiff's constitutional injury was caused by a person with final policymaking authority.

*McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). In establishing the existence of such a policy or practice, it is insufficient to "splatter-paint a picture of scattered violations" through "collateral accusations of marginally related incidents." *Carter v. Morris*,164 F.3d 215, 218-19 (4th Cir. 1999).

Plaintiff's allegations in this case are more than splatter-paint. He has alleged that there was a widespread, well-settled practice within Area 2 of systematic abuse of suspects. (Compl. ¶ 76.) Plaintiff notes that this practice was confirmed through OPS findings and other determinations that confirmed the abuse was "systemic." (*Id.* ¶¶ 76, 87-89.) As explained *supra* n.6, Plaintiff alleges that the same instruments and methods were used at Area 2 on more than two dozen suspects in similar circumstances. Such accusations establish the type of "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law" that *McCormick* held sufficient to establish *Monell* liability. Numerous courts in this district that have examined *Monell* claims in

similar circumstances have allowed them to proceed.  *See, e.g., Kitchen*, 2011 WL 1485301, at \*15; *Andrews*, 660 F. Supp. 2d at 882; *Cannon*, 2006 WL 273544, at \*15.  The City's motion to dismiss Count V of the Complaint is denied.

IX.     **Counts VIII & IX: State Law Claims for Malicious Prosecution and Intentional Infliction of Emotional Distress**

Plaintiff alleges state law claims for malicious prosecution and intentional infliction of emotional distress ("IIED").  He alleges that Burge, Byrne, Dignan, Yucaitis, Boffo, Hines, Patton, and Frenzer "initiated a malicious prosecution without probable cause," and that those Defendants were joined by Daley, Martin, Shines, Hillard, and Needham, in continuing that prosecution without probable cause.  (Compl. ¶ 133.)  Plaintiff also alleges intentional infliction of emotional distress against all the same Defendants based on his torture and wrongful conviction.  (Compl. ¶¶ 135-37.) The Defendants have moved to dismiss this claim on numerous grounds, as well.

A.     **Defendant Officers**

Defendant Officers argue that the court lacks subject matter jurisdiction over pendant state law claims where all federal claims have been dismissed.  (Officers' Br. at 15.)  Because Counts I and IV have been allowed to proceed, Defendants' motion to dismiss Counts VIII and IX are denied.

B.     **Burge**

Defendant Burge argues that because he did not take a direct role in Plaintiff's abuse, his actions were not so "extreme and outrageous" as to state a claim for intentional infliction of emotional distress.  (Burge Br. at 8, citing *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 360 N.E.2d 765 (1976)).  Plaintiff contends, however, that Burge encouraged, condoned, and permitted the use of torture on Plaintiff, and that Burge took charge of the investigation and monitored its progress. (Compl. ¶¶ 21,115.)  Actions are sufficient to support an IIED claim if they are so "extreme and outrageous" as to go "beyond all bounds of decency and [are] considered intolerable in a civilized

community." *Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006) (allegations plaintiff was deprived of food and water for several days while in police custody could state a claim for IIED). The court has little difficulty in concluding that the torture allegations leveled in this case constitute "extreme and outrageous" conduct sufficient to state an IIED claim. Burge himself does not argue otherwise; he merely asserts that Plaintiff is attempting to hold him liable in a supervisory capacity for the actions of others. Because, as explained previously, the court concludes Plaintiff has alleged Burge's personal involvement, his motion to dismiss Count IX is denied.

### C.    Frenzer

Frenzer argues that he is entitled to absolute prosecutorial immunity from these state law allegations. (Cook County Br. at 12-14.) Illinois law affords prosecutors acting within the scope of their prosecutorial duties the same immunity as it does judges–absolute immunity. *Aboufariss v. City of DeKalb*, 305 Ill. App.3d 1054, 1064, 713 N.E.2d 804, 812 (2d Dist. 1999). *See also Hughes v. Krause*, No. 06 C 5792, 2008 WL 2788722, at *1-2 (N.D. Ill. July 17, 2008) (dismissing Illinois state law claims on the same basis that federal claims had already been dismissed: absolute prosecutorial immunity).

In his malicious prosecution claim against Frenzer, Plaintiff alleges that Frenzer initiated a prosecution without probable cause (Compl. ¶ 133)–precisely the type of action barred by absolute prosecutorial immunity: "[I]n initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Imbler*, 424 U.S. at 431. "[A]bsolute immunity shields prosecutors even if they act maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence." *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (citation and quotation omitted). The state malicious prosecution claim against Frenzer is dismissed.

The intentional infliction of emotional distress claim might fairly be construed as brought against Frenzer acting not in the scope of his duties as a prosecutor, but rather as an investigator

based on his participation in Plaintiff's torture. As explained *infra* Section I.C., the absolute immunity inquiry is a functional one, and where a prosecutor acts as an investigator, he loses absolute immunity. In *Orange*, for example, where the prosecutor "coached Orange regarding the false confession Orange was to deliver in exchange for the cessation of the alleged torture sessions" and "actively assisted in gathering the evidence that would later form the basis of the charges against Orange," he relinquished absolute immunity in the *Buckley* analysis. *Orange*, 2008 WL 4443280, at *10. As discussed previously at some length, the allegations against Frenzer–though not nearly as developed at the motion to dismiss stage as were the allegations in *Orange* at the summary judgment stage–are that he personally participated in the torture and that his role in doing so more closely resembled that of an investigator than a prosecutor. The court denies Frenzer's motion to dismiss the IIED claim without prejudice to renewal of his immunity argument at a later stage.

D. **Municipal Defendants Hillard, Needham, and Shines**

The Municipal Defendants argue for dismissal of the state malicious prosecution claim on the ground that Plaintiff has not offered allegations sufficient to raise the possibility of relief above a speculative level, as required by *Twombly.*

In Illinois, a malicious prosecution claim "requires proof that the defendant commenced or continued a criminal proceeding without probable cause." *Brown v. Village of Romeoville*, 407 Fed. Appx. 56, 58 (7th Cir. 2011). *See also Ross v. Mauro Chevrolet*, 369 Ill. App. 3d 794, 801, 861 N.E.2d 313, 319 (1st Dist. 2006) (listing all elements of a malicious prosecution charge). As discussed in the court's consideration of Count I, Plaintiff has adequately alleged that the Municipal Defendants continued his prosecution after becoming aware of facts regarding torture at Area 2 that would have seriously undermined, and potentially eviscerated, the probable cause for Plaintiff's arrest and prosecution. These malicious prosecution claims survive the Municipal Defendants' motion to dismiss. Martin offers no argument with respect to the state law claims other than his

adoption of the Defendant Officers' contention that dismissal of all federal claims requires dismissal of the state law claims as beyond the court's jurisdiction.  That objection is overruled as well.

The Municipal Defendants offer no specific argument regarding the IIED claim (Municipal Reply at 11 n.5), but the court is uncertain of its sufficiency as against these Defendants and would invite further briefing on this subject.

### E.    Daley

Daley argues in passing that he is immune from the state law malicious prosecution claim based on prosecutorial immunity.  (Daley Br. at 7.)  To the extent such a claim is premised on Daley's decision as State's Attorney to initiate Plaintiff's prosecution or is otherwise tied to his activities while State's Attorney, Daley is correct; any such claim must be dismissed for the same reasons that the court dismissed the malicious prosecution claim against Defendant Frenzer.  To the extent the malicious prosecution claim is based on Daley's continued prosecution of Plaintiff's case after Daley became Mayor, that claim fails, as well.  There is no basis for the conclusion that, in his role as Mayor, Daley was involved in any decisions regarding Plaintiff's prosecution.   As explained earlier in Section II.D, Plaintiff does not allege that Daley was personally aware of facts regarding torture at Area 2 that would have been exculpatory to Plaintiff.

Daley has not made any arguments concerning the IIED claim, but the court is uncertain that Plaintiff has alleged any extreme or outrageous conduct on the part of Mr. Daley as Mayor.  The court will invite further briefing on that claim, as well.

### X.    Count XI: State Law *Respondeat Superior*

Count XI adequately alleges a claim for *respondeat superior* liability against the City of Chicago.  In its motion to dismiss, the City argues only that Plaintiff's *respondeat superior* claim should be dismissed because it cannot exist unless the claims against individual City of Chicago Defendants proceed.  (Officers' Br. at 14-15.)  Because the court has not dismissed all of the state law claims, the City's objection to any *respondeat superior* theory is overruled, to the extent that

45

Defendants were acting within the scope of their employment when they committed those state law torts. *Doe v. City of Chicago*, 360 F.3d 667, 670 (7th Cir. 2004); *Rico v. City of Chicago*, No. 08 C 2763, 2010 WL 5391185, at *2 (N.D. Ill. Dec. 22, 2010) (Kocoras, J.). Defendants' motion to dismiss Count XI is denied.

XI.     **Count XII: 745 ILCS 10/9-102 and Common Law Claims against the State's Attorney's Office and Cook County**

Count XII adequately alleges a claim for indemnification under 745 ILCS 10/9-102 against the City of Chicago and against Cook County, contingent upon success of the claims against brought against state and local employees acting within the scope of their employment. *See Askew v. Sheriff of Cook County*, 568 F.3d 632, 636-37 (7th Cir. 2009).

Defendants appear to believe that Plaintiff has asserted a *respondeat superior* claim against Cook County (Cook County Br. at 24-25); Plaintiff denies he has asserted such a claim, and the court construes any such claim as withdrawn voluntarily. The State's Attorney's office is also dismissed as it is a state office that is immune from suit. *Hernandez v. Joliet Police Department*, 197 F.3d 256, 265 (7th Cir. 1999).

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions to dismiss [61, 64, 65, 67, 78] are granted in part and denied in part. Count I survives this motion to dismiss against all named Defendants except Defendant Daley; Counts II and III are dismissed in their entirety; Count IV survives as to all named Defendants other than Daley and Martin; Count VII is dismissed in its entirety; Counts V, VI, IX, and X survive in their entirety; Count VIII survives against all named Defendants other than Daley; and Count XII survives, except that the Cook County State's Attorney's office is dismissed as a Defendant.

ENTER:

Dated:  July 20, 2011

_____
REBECCA R. PALLMEYER
United States District Judge