IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Michael Tillman, | ) | |
| | ) | |
| Plaintiff, | ) | 10 C 4551 |
| | ) | |
| v. | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| Jon Burge, John Byrne, Peter Dignan, | ) | |
| Ronald Boffo, Jack Hines, George Patton, | ) | Magistrate Judge Keys |
| The Estate of John Yucaitis, Richard M. | ) | |
| Daley, LeRoy Martin, Gayle Shines, | ) | |
| Thomas Needham, Timothy Frenzer, and | ) | |
| The City of Chicago, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT OFFICERS' RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER CONCERNING
DEFENDANTS' MOTION TO RE-TEST CERTAIN PHYSICAL
EVIDENCE FROM PLAINTIFF'S CRIMINAL TRIALS**

Defendant officers Ronald Boffo, Jon Burge, John Byrne, Peter Dignan, Jack Hines, and the Estate of John Yucaitis, in opposition to plaintiff's motion for a protective order concerning defendants' motion to test certain physical evidence from plaintiff's criminal trials, hereby state in opposition:

**INTRODUCTION**

Plaintiff Michael Tillman filed the instant lawsuit alleging that defendant officers tortured and abused him, leading him and criminal co-defendant Steven Bell to falsely confess to the rape and murder of Betty Howard. Tillman was twice convicted for these crimes, once in 1986 and again in 1996. Tillman alleges the 23 years he spent incarcerated were wrongful, and seeks millions of dollars in damages from the defendants. (*See* plaintiff's complaint at para. 7-34, 98-145, D.E. 1, July 22, 2010). While all defendant officers except Jack Hines have chosen to exercise their Fifth Amendment rights,

1

Hines testified unequivocally that absolutely no torture, coercion or abuse occurred. (*See* Exhibit A, Deposition of Jack Hines, at p. 379:11-17)[1]

During plaintiff's 1986 trial, the State presented evidence through expert Ray Lenz that certain pink wool and red acrylic fibers found at the crime scene and on victim Howard's clothing were similar to certain pink wool fibers found on plaintiff's clothing, and certain red acrylic fibers found on Steven Bell's clothing. According to Chicago Police Department Crime Laboratory Reports, the fibers found on the victim, plaintiff, and Bell were similar in "morphology and optical properties." (*See* Exhibit B, Chicago Police Department Crime Laboratory Report dated 11/19/1986). In addition, the State also presented evidence that a pubic hair recovered from the crime scene could have originated from plaintiff. Lenz testified in both trials that a comparison between the hair found at the scene and a hair taken from plaintiff exhibited "the same characteristics" and "could have originated from Michael Tillman or someone whose hairs have the same individual characteristics." (*See* Exhibits C and D, excerpts of Ray Lenz's testimony from 1986, at pp. 1711-1716, and 1996, at pp. E-90-104).

On October 12, 2011, defendants moved for release of the pink fiber evidence impounded at the Circuit Court of Cook County. On November 3, 2011, defendant officers supplemented that motion to include the red fiber and hair evidence. During several motion hearings before Judge Paul Biebel in November and December of 2011, and January and February of 2012, plaintiff objected to the release of this evidence citing both the stay of discovery and the (then forthcoming) instant motion. (*See* Defendants motion and supplemental motion for release of evidence, attached hereto as Exhibit E).

Defendants seek release of these fibers and hairs for microscopic examination by expert witness Skip Palenik of Microtrace, LLC. Mr. Palenik is specially qualified to examine the trace and hair

---

[1] Failure to testify alone cannot be taken as an admission of guilt in judgment. See *LaSalle Bank Lake View v. Sebugan*, 54 F.3d 387, 390 (7th Cir. 1995) "[A]lthough inferences based on the assertion of the privilege are permissible, the entry of judgment based only on the invocation of the privilege and without regard to the other evidence exceeds constitutional bounds." *Id*. (citations omitted).

2

evidence recovered from the crime scene, plaintiff, his criminal co-defendant Steven Bell, and the victim, and can determine if the pink and red fibers found on the victim came from the same source as the fibers found on plaintiff and Bell. Such fiber comparison was not possible in 1986. Concerning the hairs in particular, while plaintiff argues in support of his proposition that microscopically examining the hairs cannot conclusively show a match, as stated by Mr. Palenik, there is still forensic value in re-examining the hair microscopically with technology unavailable in plaintiff's criminal trials. Mr. Palenik can conclude whether the hairs appear to have come from the same source. If such a threshold finding is established, defendants intend to seek mitochondrial DNA testing to determine for certain if the hairs originated from the same person. (*See* Declaration of Skip Palenik, attached hereto as Exhibit F.)

Defendants also dispute plaintiff's argument that the evidence from his criminal trials concerning the hairs' microscopic similarities is in some way inadmissible. First, questions concerning the admissibility of evidence at trial does not govern discovery under the Federal Rules. What is sought in discovery "need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). Second, the evidence of the similarities between the hair found at the scene and the hair taken from plaintiff was fairly presented at both of plaintiff's criminal trials in 1986 and 1996, and such results from microscopic testing are routinely admitted in courts today. See *Breard v. Greene,* 523 U.S. 371, 373 (1998)(State presented evidence that hairs on victim were "identical in all microscopic characteristics to hair samples taken from Breard.") Third, plaintiff's *Brady* claim in the instant case renders anything admitted at his two criminal trials relevant in discovery. *See Ruiz v. Cady*, where the Seventh Circuit reaffirmed the proposition that the alleged omission of certain evidence "[m]ust be evaluated in the context of the entire record (because) if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id*. at 587 (citation omitted). "Thus, when

3

"*Brady*" claims such as Ruiz' are raised, an examination of the entire record is required." *Id*. citing *United States v. Weidman*, 572 F.2d 1199 (7th Cir.), cert. denied, 439 U.S. 821 (1978); *United States v. Disston*, 582 F.2d 1108 (7th Cir. 1978), appeal after remand, 612 F.2d 1035 (7th Cir. 1980).

26 years have elapsed since these fibers were tested, and 16 years have passed since the hairs were tested. At this stage in discovery, the proposed testing is far from redundant in light of the technological advances achieved in the past 26 years that can permit a conclusively finding concerning whether the hairs and fibers originated from the same source. Such testing is highly relevant to plaintiff's claim of innocence and the defendants' defenses, specifically, that plaintiff's confession was not false, coerced or tortured but was a voluntary and true statement depicting plaintiff's involvement in the rape and murder of Betty Howard.

While consulting with Mr. Palenik concerning the instant motion, it became evident that the technological advances achieved in the past 26 years would prove scientifically probative not only in regards to the trace evidence (specifically the hairs, pink and red fibers relative to the instant motion), but as to all of the evidence impounded in connection with the criminal investigation. Defendants thus intend, after the instant motion is ruled upon by this Court, to file a second supplemental motion with the Circuit Court of Cook County for the release of all the evidence impounded, so that it may be examined and tested in its entirety by Mr. Palenik. (*See* Exhibit G, Order and Impounding Order in case number 86 CR 10969). In addition to the obvious relevance to this motion, defendants address their anticipated supplemental motion to save on both the court's resources and the parties' expenses, as the ruling on the release of all the evidence, and testing thereof, can likely occur at once. As more fully explained below, the release and testing of all evidence impounded is relevant to the plaintiff's claims and defendants' defenses, and should therefore proceed.

**BACKGROUND**

In the early morning hours of July 21, 1986, Betty Howard was found dead in a vacant apartment two stories up from where she resided at 2860 E. 76th St., Chicago, IL. Ms. Howard and Myron were earlier reported missing by Ms. Howard's two older children, Eddie and Angelita Howard, after Ms. Howard and Myron failed to arrive at a family party celebrating Myron's second birthday the day before. (*See* Chicago Police Supplementary Report dated July 31, 1986, RD number H-317814, at D 00000062, attached hereto as Exhibit H). Plaintiff also resided at this building with his girlfriend Princess Williams, and was working as the building's painter at the time. On the day Ms. Howard was reported missing, plaintiff indicated to Angelita that his girlfriend Princess had seen something that looked like table legs on the 7th floor, and together with the police, they went to the 7th floor. (*See* Exhibit I, Deposition of Michael Tillman taken in *Canon v. Burge*, at pp. 50:4-23; 54:2-55:3). At that time, victim Howard and baby Myron were discovered. (*See* Exhibit I, at p. 56:12-19) Ms. Howard was found gagged and tied to a radiator, half naked, an apparent victim of sexual assault. She had been stabbed in the heart and shot in the head. Her two-year-old son Myron was discovered in the bathroom of the same vacant apartment. (*See* plaintiff's complaint at para. 20, D.E. 1, July 22 2010; and July 22, 1986 Report of Postmortem Examination of Betty Howard, attached hereto as Exhibit J).

On July 21, 1986, plaintiff voluntarily went to Area Two for questioning. While there, plaintiff was given a polygraph examination, the results showing that he was not being truthful regarding the homicide of Betty Howard. (*See* Exhibit H at D 00000111). Later that day, Steven Bell also voluntarily went to Area Two for questioning. (*See* plaintiff's complaint at para. 26). Though it remains highly disputed as to the circumstances surrounding it, plaintiff and Steven Bell later confessed to their involvement in the rape and murder of Betty Howard. Both plaintiff and Bell were charged with murder on July 25, 1986. (*See* plaintiff's complaint at para. 33, D.E. 1, July 22, 2010).

During the plaintiff's 1986 criminal trial, Ray Lenz, a criminalist working in the microscopy trace evidence division with the Chicago Police Department, testified as to findings of similarity between the red fibers, pink fibers, and the pubic hairs found at the scene and taken from the plaintiff and Bell. Lenz testified that the pubic hairs found at the scene and the pubic hairs taken from plaintiff were similar in shape, size and shared a unique color. Judge Gillis, while making his ruling finding plaintiff guilty, agreed with Lenz's findings that the hairs looked similar. (*See* Exhibit C at pp. 1711-1716 and Exhibit K, Excerpt from Judge Gillis' 1986 ruling). Lenz further testified that he viewed the red fibers taken from the victim and red fibers taken from Steven Bell under a microscope and found they were also similar in morphology and optical properties. Lenz also made the same findings of similarity as to the pink fibers taken from the victim and the crime scene and the pink fibers found on Tillman. (*See* Exhibit B and Exhibit C at pp.1746-1783).

Tillman was first convicted for these crimes after a bench trial in 1986, but his conviction was reversed due to ineffective assistance of counsel and he was granted a new trial in 1996. During plaintiff's second trial, Lenz again testified as to the hairs' similarities in shape, size and the unique color. Although plaintiff's expert, Kenneth Siegesmund, testified in disagreement with Lenz's findings of similarities between the pubic hairs, Tillman was convicted a second time when found guilty by a jury. (*See* Exhibit D at pp. 1746-1783, and Excerpts from Kenneth Siegesmund's 1996 testimony, at pp. H-123-127, attached hereto as Exhibit L). Plaintiff appealed his conviction again, this time to no avail. On March 25, 2005, plaintiff moved the Circuit Court to conduct "DNA testing in my case to prove my innocence." This motion was denied on May 18, 2005. Plaintiff attempted to appeal that ruling, but his pro se appeal was not timely filed. In 2009, plaintiff filed a post conviction petition that was granted on January 14, 2010. Within this petition, plaintiff did not present any forensic evidence exonerating him from the crimes, nor any witness testimony in support of his claims of innocence. Rather, plaintiff

argued that new evidence supported his claims that his arrest and confession were the product of torture and coercion by the same defendants he is suing in the instant case. Plaintiff was then granted a new trial, however, the States Attorney elected to *nolle prosequi* the charges. Plaintiff then moved for, and was given, a certificate of innocence on February 19, 2010. (*See* Exhibit M, plaintiff's 2009 post conviction petition at para. 13-16, and plaintiff's complaint at para. 95-96).

## LEGAL STANDARD

When information sought in discovery is relevant to a party's claims or defenses, discovery is deemed permissible. "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P.26(b)(1), cited by *CSC Holdings v. Redisi*, 309 F.3d 988, 995-996 (7th Cir. 2002)(reversing the lower court's denial of discovery of certain records relevant to plaintiff's damages claim). Speculating as to whether information sought in discovery will be admissible at trial is premature at this stage of litigation, and not a valid basis to deny defendants from conducting discovery on these matters. Information sought in discovery "need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1), cited by *EEOC v. Konica Minolta Business Solutions U.S.A.*, 639 F.3d 366, 369 (7th Cir. 2011)(reversing the lower court's denial of discovery of records related to hiring that could "illuminate the facts and circumstances surrounding Thompson's allegations of race discrimination."); see also *Gile v. United Airlines, Incorporated*, 95 F.3d 492, 495 (7th Cir. 1996)(reversing the district court's granting of summary judgment in favor of defendants due to the court's restrictive limitation on plaintiff's discovery requests concerning job vacancies. Such limitation on discovery precluded plaintiff from gathering the evidence necessary to defeat summary judgment.)

## ARGUMENT

I. **THE REQUESTED FORENSIC TESTING IS REASONABLY CALCULATED TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE.**

### A. Evidence Of Guilt Is Relevant To Plaintiff's Claims And Damages.

As more fully explained below, the requested forensic examination and testing of the evidence impounded fulfills the requirements set forth by Fed.R.Civ.P 26(b)(1). The information sought through this testing has the potential to lead to admissible evidence concerning plaintiff's damages, his claim of innocence, his malicious prosecution and *Brady* claims, and defendants' defenses in this litigation. (*See* plaintiff's complaint at para. 99-103; 132-133)

#### 1. Guilt Is Relevant To Rebut Plaintiff's Damages.

Innocence or guilt "may affect the damages [plaintiff] can recover and may buttress his claim that his confession was the result of undue police pressure or torture." *Patterson v. Burge*, 03-CV-4433, 2007 WL 1498974 at *2 (N.D.Ill.May 17, 2007). Here, just as in *Patterson*, evidence of plaintiff's guilt is relevant to his claimed damages, which include allegations that he falsely confessed due to police wrongdoing, as well as plaintiff's emotional damages, for being "wrongfully convicted." Evidence concerning plaintiff's guilt in the crime rebuts and mitigates his emotional damages. "[T]he Court cannot help but agree that a person serving a life sentence for a murder they did commit, only to be released ten years later due to police, misconduct, may actually feel more elation than distress. Indeed, as defendants point out, a factually guilty individual's distress at his own confinement may be attributable to the "justified deprivation and not the deficient procedures that caused the justified deprivation." *Carter v. City of Philadelphia,* Civ. A. No. 97–CV–4499, 2000 WL 1016653, at *2 (E.D.Pa. July 12, 2000) (quoting *Carey v. Piphus,* 435 U.S. 247, 263–64 (1978)). This issue was recently decided by Judge Matthew Kennelly in *Jiminez v. City of Chicago et al*, 09 C 8081. There, the court ruled that evidence concerning consciousness of guilt was relevant and admissible to the plaintiff's damages. "Both sides agree that evidence of guilt or innocence that wasn't introduced or maybe wasn't even available at the time of the criminal trials is relevant on damages. And I agree with that too. I'm

persuaded by those arguments that both sides make." (*See* Exhibit N, 1/11/12 Transcript of Proceedings at 754:13-18, *Jimenez v. City of Chicago et al*, 09 C 8081 (Kennelly, J.). Just as Judge Kennelly ruled in *Jimenez*, here too defendants should be allowed to gather and present evidence concerning plaintiff's guilt in the underlying crimes to attack plaintiff's damages. Plaintiff's argument that evidence of his guilt is substantially outweighed by other factors under Federal Rule of Evidence 403 is premature and also incorrect. Indeed, the probative value of evidence indicating plaintiff's guilt is neither confusing nor unfair when plaintiff's claims relate directly to his purported innocence. It is defendants, rather, who will suffer great prejudice if deprived of the opportunity to conduct discovery to defend and rebut plaintiff's serious claims of physical torture until he confessed to a crime he didn't commit. To succeed in this claim, plaintiff must show, in part, that his confession was false. Evidence of plaintiff's actual guilt, which can be more fully developed through the testing at issue, corroborates defendants' argument and defense that plaintiff's confession was voluntary, and not coerced. Thus, the testing should proceed.

**2.    Guilt Is An Absolute Defense To Plaintiff's Malicious Prosecution Claim.**

As it relates to the malicious prosecution claim, evidence of plaintiff's guilt is relevant and admissible under Federal Rules of Evidence 401 and 402 because guilt is an absolute defense to a malicious prosecution claim. "Even if the plaintiff in malicious prosecution can show that the defendant acted maliciously and without probable cause in instituting a prosecution, it is always open to the defendant to escape liability by showing in the malicious prosecution suit itself that the plaintiff was in fact guilty of the offense with which he was charged." Prosser and Keeton, *supra,* at 885 (*citing* Restatement of Torts § 657). Demonstrating such guilt can bar recovery even when the plaintiff was acquitted in the prior criminal proceedings, for a verdict of not guilty only establishes that there was not proof beyond a reasonable doubt. *Hector v. Watt,* 235 F.3d 154, 156 (3d Cir. 2000)(citing Prosser and Keeton, *supra,* at 885 (*citing* Restatement of Torts § 657); see also *Sessions v. Union Sav. & Trust Co.*,

9

338 F.2d 752, 756-757 (6th Cir. 1964); *Davis v. Giles*, 769 F.2d 813, 816 (D.C. Cir. 1985)(Wald, J. dissenting); *Ienco v. City of Chicago*, 148 F.Supp.2d 938, 945 (N.D.Ill.2001)(reversed in part on other grounds by *Ienco v. City of Chicago*, 286 F.3d 994 (7th Cir. 2002); *James v. Fast Fare, Inc.*, 685 F.Supp.565, 567-568 (D. S.C. 1988); *Barnes v. Borough of Pottstown*, No. 93-1498, 1994 WL 114359, at *3 (E.D. Pa. Mar. 30, 1994); *Wal-Mart Stores, Inc. v. Blackford*, 449 S.E. 2d 293, 295, n.4 (Ga. 1994); *Shoemaker v. Selnes*, 349 P.2d 473, 476 (Or. 1960). "This defense does not depend…upon what the malicious prosecution defendant knew when he filed charges. Rather, it is closely related to the defense of truth in a defamation action and is supported by a similar public policy favoring exposure of the guilty." *Junod v. Bader*, 458 A.2d 251 n.3 (Pa. 1983). Defendants should be permitted to present evidence of plaintiff's guilt in underlying crimes to defend themselves from plaintiff's malicious prosecution claim.

  **B.** **Defendants Are Not Estopped From Conducting Discovery And Gathering Evidence Concerning Plaintiff's Guilt To Defend Against Plaintiff's Claims.**

In paragraphs 8-9 of plaintiff's motion, he contends testing should be barred because any resulting evidence that would "impeach the special prosecutor's decision to dismiss the charges against plaintiff, the certificate of innocence issued by Judge Biebel, and Judge Gillis' acquittal of Steven Bell" would be "cumulative, irrelevant and inadmissible at trial." [2] (*See* plaintiff's Motion for a Protective Order Concerning Defendants' Motion to Re-Test Certain Physical Evidence from Plaintiff's Criminal Trials at para. 8, D.E. 248, March 30, 2012). Such statements lead defendants to believe plaintiff is arguing that any discovery or evidence concerning plaintiff's guilt or innocence is prohibited.

---

[2] Despite Judge Gillis' finding that the State did not prove Bell was guilty beyond a reasonable doubt, such ruling does not mean that Bell was exonerated of any involvement or was innocent. "We have explained that "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." *U.S. v. Watts*, 519 U.S. 148, 155, 117 S.Ct. 633, 637 (U.S.Cal.,1997)(citing *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 361, 104 S.Ct. 1099, 1104, 79 L.Ed.2d 361 (1984)).

Neither a certificate of innocence nor the dismissal of charges precludes discovery or evidence on the plaintiff's guilt or innocence. "The district court in *Kitchen* assumed that a certificate of innocence is one way that Illinois provides for vitiating a conviction. It isn't. Under the 2008 statute, a conviction's vacatur is a precondition to obtaining a certificate; it is not something that can be accomplished by a certificate." *Rodriguez v. Cook County, Ill.*, 664 F.3d 627, 630-631 (7th Cir. 2011). Indeed, the statute governing the standards for which a certificate of innocence may be granted explicitly states that "[t]he decision to grant or deny a certificate of innocence *shall be binding only with respect to claims filed in the Court of Claims and shall not have a res judicata effect on any other proceedings.*" 735 ILCS 5/2-702(j)(emphasis added). Thus, the recommendation of the special prosecutor, findings of the criminal court judges, and plaintiff's certificate of innocence, should have no bearing on discovery parameters.

II. **RE-TESTING OF ALL THE EVIDENCE, FIBERS AND HAIRS IN 2012 WILL PRODUCE MORE CONCLUSIVE AND RELIABLE RESULTS.**

   A. **Technology Today Can Show Whether The Pink Fibers Found On Tillman, And The Red Fibers Found On Bell, Match Fibers From The Victim.**

During the plaintiff's 1986 trial, expert witness Ray Lenz testified that he scraped down clothing from plaintiff and co-defendant Steven Bell, collecting any trace materials (such as fibers) that were present. Lenz also scraped and gathered trace materials from the victim's clothing, the ligatures used to tie the victim, and various other items from the crime scene and compared it all with the trace materials from plaintiff and Bell. Lenz then examined all the trace materials under various microscopes, and found that the trace materials from the plaintiff contained dark pink wool-type fibers similar to pink fibers found on the victim's clothing. In addition, Lenz testified the red acrylic fibers found on the victim appeared similar to the fibers found on Steven Bell. The pink and red fibers from the victim and from Tillman and Bell were each revealed "to be similar in morphology and optical properties." (*See* Exhibit C, at pp. 1746-1783). Judge Gillis also viewed the fibers during the 1986 trial, and while his lay opinion

differed from Lenz's opinion as to the red fibers, Judge Gillis agreed that the pink fiber found on the ligature in the bathroom "came very close to one of the dark pink wool fibers." (*See* Exhibit K, at p. 2496)

During the 1996 trial, neither the State nor plaintiff's defense chose to use the red or pink fibers in their case in chief. Therefore, defendants believe the last time the fibers were tested was in 1986. Now, 26 years later, technological capabilities coupled with Skip Palenik's expertise can permit a scientific determination that was not possible in 1986. Through testing, Mr. Palenik will be able to offer an expert opinion as to whether the pink and red fibers came from the same source or rather, if the pink fibers found on the victim match the pink fibers taken off of Tillman, and if the red fibers found on the victim match the red fibers taken from Bell. (*See* Exhibit F). If either match is made, the evidence therefrom would be very probative of plaintiff's presence and participation in the crime, and would corroborate Bell's statements to police concerning his and plaintiff's involvement in the crimes.

### B. A Microscopic Examination Of The Pubic Hairs Taken From Tillman With The Pubic Hairs Taken From Victim Can Show Sufficient Similarities To Submit The Hairs For Mitochondrial DNA Testing.

Lenz also microscopically examined a pubic hair found in the apartment where the victim was discovered with a pubic hair taken from plaintiff and found that the two hairs were similar in diameter, appeared similarly flat, and had moderate pigment distribution throughout most of the shaft of the hair but was heavier towards the tip. Further, there was predominantly continuous medulla in both hairs. (*See* Exhibit C at pp. 1746-1783). Judge Gillis, in making his ruling in 1986, agreed with Lenz's appraisal of the similarities between certain fibers and hairs.

> "I've taken into account that pubic hairs can accidentally fall on bathroom floors. But I believe that the defendant Michael Tillman's hair was found on this spot with the ligatures involved with the child in the bathroom as shown in the bathroom on the second floor…The hairs involved were, in my opinion to my naked eye and lay opinion, I don't in any way contradict the defendant, but they were as close to anything as I have ever seen…The part from the edge of the hair to the top of the

medulla was the same and the unknown hair of – Michael Tillman's hair, the bottom of the hair to the top of the medulla was the same and Michael Tillman's hair and on the unknown hair, the medulla was the same shape. It matched from the unknown hair to Michael Tillman's." (*See* Exhibit K, at pp. 2492-2494)

During plaintiff's second trial in 1996, Lenz testified again that the hair found in the bathroom and the hair taken from plaintiff were similar in all possible characteristics, and "that specific hair – in every way I could compare them microscopically, they were similar…everything I looked at microscopically was similar." Lenz further testified that the hair taken from plaintiff had a unique variation which was shared with the hair found in the bathroom, in that both hairs changed in color from dark brown to light, something Lenz found "rather unique." (*See* Exhibit D, at pp. E-99-100).

The proposed microscopic examination and comparison of these hairs can sufficiently show whether the hairs are suitable to submit to mitochondrial DNA testing. Such testing will conclusively show whether the plaintiff's pubic hair either was or was not found at the crime scene. (*See* Exhibit F). Defendants' discovery of such evidence through the proposed testing of the hairs and fibers and other evidence is necessary for their defense that plaintiff voluntarily confessed to his involvement in the crimes because he was, in fact, actually involved in the crime.

    **C.**    **Releasing and Re-Testing All Of The Evidence Impounded Is Necessary For A Complete Examination By Mr. Palenik.**

As discussed above, the evidence collected in plaintiff's underlying criminal cases relates directly to plaintiff's damages and *Brady* claim and is therefore relevant for discovery purposes. Further, the technological advances in the past 26 years render the re-examination and re-testing of all evidence impounded prudent at this stage in litigation. Mr. Palenik will require access to all of the evidence collected in the investigation to make a thorough and complete examination in determining whether the hairs and fibers collected came from any of the other evidence impounded. For example, the victim's clothing, as well as the sheets and blankets taken from the victim's apartment and crime scene, may bear

similar scientific properties that can help in determining where the trace evidence originated. Thus, the release and testing of all evidence impounded should be allowed to proceed.

III. **PLAINTIFF'S ARGUMENT THAT RE-TESTING IS "NEEDLESSLY CUMULATIVE AND REDUNDANT," CAUSING ONLY "UNNECESSARY COSTS TO PLAINTIFF" IS INSUFFICIENT TO BAR TESTING.**

As more fully stated above, the overwhelming prejudice that defendants will suffer in defending against plaintiff's claims should this testing be prohibited is clear, and not outweighed by any of the factors set forth in plaintiff's motion to bar. Plaintiff's argument that the testing of the hairs and fibers will result in opinions that are "needlessly cumulative and redundant" and "far too attenuated to be admissible" ring hollow. As explained above, the fibers were last tested 26 years ago, and Lenz's findings that the fibers shared similarities can now be more fully developed by Mr. Palenik under important technological advances. (*See* Exhibit F). The hairs were last tested 16 years ago, and while that testing established the similarities defendants have already stated, these similarities should be more fully explored with the expertise of Mr. Palenik and the technology now available in 2012. Should Mr. Palenik find that the hairs are similar enough, defendants intend to seek mitochondrial DNA testing. DNA testing in a case such as this should be allowed. Plaintiff himself previously sought to conduct DNA testing. He should not be heard to object to any such testing now. (*See* Exhibit M, at para. 16).

Lastly, plaintiff's argument that the costs will be "unnecessary" is insufficient to overcome the already stated relevance this testing presents. Plaintiff has already expended funds to retain expert Max Houck to opine that defendant's proposed testing would be redundant, and if Mr. Palenik's examination, as defendants anticipate, can shed new knowledge and an advanced scientific opinion on the existing similarities of these fibers and hairs, along with all of the other evidence impounded, the cost pales in comparison to the millions of dollars in damages plaintiff seeks from defendants. Mr. Palenik estimates it will cost between $5-7,000 to test the fibers and hairs at issue in this motion, and $15,000 to examine

all the evidence impounded (*See* Exhibit G). These are modest costs compared to the high damages award plaintiff seeks.

## CONCLUSION

As stated more fully above, the proposed testing and release of all evidence relates directly to plaintiff's claims and damages, as well as defendants defenses. This testing is in fact likely to lead the discovery of admissible evidence, thereby meeting the minimal demands required by Fed.R.Civ.P.26(b)(1). Thus, the release and testing of all evidence should be allowed to proceed. Wherefore, Defendants respectfully request this Honorable Court deny the plaintiff's motion for a protective order barring the re-testing of evidence.

|  |  |
|---|---|
| Andrew Hale | Respectfully submitted, |
| Avi Kamionski | |
| James McGovern | DEFENDANTS |
| Helena Wright | |
| Cherie Getchell | By: /s/ *Cherie Getchell* |
| **Andrew Hale & Associates** | Cherie Getchell |
| 53 W. Jackson Blvd., Suite 1800 | One of the Attorneys for Defendants |
| Chicago, IL 60604 | |
| 312/341.9646 | |