# EXHIBIT C

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE STATE OF ILLINOIS ) Indictment 86-CR-10969
)
VS ) Before JUDGE KENNETH L. GILLIS
MICHAEL TILLMAN AND STEVEN BELL ) Thursday, December 4, 1986
1:30 o'clock P.M.

Court convened pursuant to recess.

Present:

Hon. Richard M. Daley
State's Attorney of Cook County, by
Mr. Larry Lykowski and
Ms. Lynne Kawamoto,
Assistant State's Attorneys
appeared for the People;

Mr. Daniel Franks,
appeared for Defendant Bell;

Mr. William O'Neal,
appeared for Defendant Tillman.

---

(Whereupon, the Court gave its attention to other matters, after which the following proceedings herein were had; to-wit:)

THE CLERK: People of the State of Illinois versus Michael Tillman and Steven Bell.

FORM IL-124 REPORTERS PAPER & MFG. CO 800-626-6313

needed. If it is, we will try and accommodate your schedule at the time. All right, thank you.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Call your next witness.

MS. KAWAMOTO: Judge, may we have just a few moments to bring out some of the evidence?

THE COURT: All right, go ahead. You can bring it out.

(Brief pause.)

MS. KAWAMOTO: All right. Thank you again.

(Witness sworn.)

RAYMOND LENZ,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

MS. KAWAMOTO: May I proceed, Your Honor?

THE COURT: Yes, you may.

DIRECT EXAMINATION

BY MS. KAWAMOTO:

Q. Sir, would you please state your name and spell your last name.

A. My name is Lenz, L-e-n-z.

Q. Mr. Lenz, where are you employed, sir?

A. The Chicago Police Department Crime Lab.

FORM LL-134 REPORTERS PAPER & MFG. CO. 800-626-6313

FORM FL-124 REPORTERS PAPER & MFG. CO 800-626-6313

the contents, did you perform any type of examination on those exhibits?

A Yes, I did.

Q How did you conduct those examinations?

A Well, before I opened the bag, excuse me, I laid out some plain brown paper, took the contents from the bag and put it on the brown paper. I then looked at the exhibits visually, with my eyes, and even scraped them down or plucked whatever trace material off of this that I could recover, also, from the shoes and all the strip of cloths. I looked under the steri-microscope to help me aid in recovering other trace materials, and then I took the trace materials and I placed them in a pill box.

Q Are these the collected trace materials for People's Exhibit Numbers 52, 53 and 54?

A Yes, from these, yes. Since they were packaged together, all of these trace materials go in the same pill box.

Q Showing you now what I will mark as People's Exhibit Number 67, I ask if you recognize this?

A Yes, I do.

Q What do you recognize that to be, sir?

A This is the trace material taken from these exhibits.

FORM FL-124 REPORTERS PAPER & MFG. CO 800-626-6313

Q How is it that you recognize that box as such?

A I have the RD Number, my initials, the victim's name, Betty Howard, the inventory number, and what is inside, trace from pair of shoes and fibers.

Q Do you know where this box has been from the time that you removed those trace materials from People's Exhibit Number 53 and 54 and placed them in the box? Do you know where that box has been?

A Yes, it has been on my desk in the lab.

Q This box has been sealed and in your custody during the entire time, up until today's date when you brought it down to court?

A Yes.

Q What if anything did you do with the contents of People's Exhibit Number 67?

A I examined the contents with the steri-microscope.

Q How were you able to make that examination, sir?

A I don't understand.

Q Did you make any preparation?

A Well, after collecting it in the box, I collected all of those materials, and at a later date I took the box, opened it, looked inside the box with the steri-microscope and collected trace materials therein, and I mounted them on slides.

Q All right, showing you what I will label as People's Group Exhibit Number 68 for identification, consisting of five slide packages --

A Mailers.

Q Mailers.

A They are called mailers, yes.

Q I ask you to inspect People's Group Exhibit Number 5 -- strike that, 68-A through D, and ask if you recognize those.

A Yes, I do.

Q What do you recognize that Group Exhibit to be, sir?

A Those are the slides that I made from the trace materials that I recovered from this pill box.

Q People's Exhibit Number 67?

A That is correct.

Q All right.

THE COURT: Why did you make five slides?

THE WITNESS: There was a great deal of trace materials in the box, Your Honor, and I needed that to completely trace the trace materials.

MS. KAWAMOTO: Q All right, for each slide mailer, how many actual slides are contained in each?

A Well, some have one large one, and/or one small one,

some have two.

Q All right. Did you then examine under the microscope those slides that were prepared from trace materials that you just testified to?

A YES. After marking the slides with the information, the RD Number, the victim's name, the inventory number, the items it came from, and my initials, I covered them and permanently mounted all of the trace materials, the fibers. I mounted any hair that might have been present.

Q Did you at a later time -- strike that.

Showing you now what has been previously marked as People's Exhibit Number 59, I ask you to look at that, sir. Have you ever seen this item before?

A Yes, I have.

Q How do you recognize that item, sir?

A It is identified as being pubic hair taken from Michael Tillman at Area 6 Violent Crimes, the RD Number, and date it was taken, my initials, and the case number where I cut the envelope open.

Q Where was it that you first saw this item? Where were you?

A In the lab.

Q What was the condition of this item when you first saw it?

A It was sealed.

Q You stated that you cut the envelope open?

A Yes, right along here (indicating).

Q What did you do after you cut the envelope open?

A I extracted the hair from the envelope and I mounted them on slides in permount, similar to how I mounted the slides from --

Q Did you then do anything else? Did you then do anything else with that envelope?

A Yes. After I was done with the hair, I sealed the envelope back up.

Q Showing you now what I will mark as People's Exhibit Number 9, I ask you to look at that exhibit and ask if you recognize that, sir.

A Yes.

Q What do you recognize that to be?

A Those are some of the hairs taken from the envelope of Michael Tillman's pubic hair.

Q What if anything have you done with those hairs?

A The hairs were mounted on slides with permount, and cover-slipped and permanently fixed, and they were marked with RD Number and the victim's name, and what they are, Michael Tillman's pubic hair, my initials both on the mailer and slides themselves.

Q After you prepared this People's Exhibit Number 69, what if anything did you do with it?

A After I prepared it, I later examined it, microscopically, for general characteristics, specific characteristics of the hairs.

Q Did you at any time have an occasion to compare People's Exhibit Number 69 with People's Exhibit Number, Group Exhibit Number 68-A through D?

A Yes, I did. I took the hairs that I found from the trace materials of these exhibits, and I looked at the general makeup of the hair, the color, the shape, things like that, and I divided the hairs in that way, general characteristics, amongst themselves. They are different hairs, okay, different kinds of hair showing fragments, different colors, shade and shapes of hair, and hair that I thought to be similar to Michael Tillman's pubic hair, I examined under the microscope and compared it to a -- using the comparison microscope.

Q Were you able to come to any conclusion as to those comparisons?

A Yes, I was.

MR. O'NEAL: I would like to see some of those, Your Honor, because she hasn't shown us anything.

MS. KAWAMOTO: I am sorry.

THE COURT: All right, you might as well take a look at this.

All right, is 68-A through E, and 69, in the same condition or substantially now in court as they were when you examined them?

THE WITNESS: Yes, except for the exhibit numbers that are stuck on them, Your Honor.

MS. KAWAMOTO: I am sorry, Your Honor, it is People's Group Exhibits 68-A through E.

THE COURT: That is what I said.

MS. KAWAMOTO: No, I was saying D though.

THE WITNESS: That was from the trace materials. These are the hairs and fibers that I collected out of this pill box from the trace materials.

MS. KAWAMOTO: Let the record reflect that Counsel, Mr. O'Neal, has approached the bench and is inspecting the exhibits.

THE WITNESS: Those are some of the hairs that were from this envelope, recovered from Michael Bell.

MR. O'NEAL: What is that black stuff?

THE WITNESS: That is black magic marker that I marked to show where I want to compare a certain part of the hair.

MR. O'NEAL: Let me see this one.

THE WITNESS: Those are hairs. Do you want me to take

the glass out for you? It was a light background. Do you see the hair on that?

Okay, same in here, there are hairs here (indicating). There are some fibers on this one. Watch it.

MR. O'NEAL: Some fibers?

THE WITNESS: Yes, yes. They are very microscopic. You can't see all of them. All right, there are hairs here, okay, and these hairs (indicating).

MR. O'NEAL: All right. Is this hair or fiber?

THE WITNESS: I would have to look at it through a microscope, but I believe that is a fiber.

MR. O'NEAL: All right. Thank you, Judge.

MS. KAWAMOTO: Q Could you please tell the Court what a comparison microscope is and how it is used?

A Sure. We have two comparison microscopes at the lab; one is a phase contrast comparison scope, and the other is a polarized comparison microscope. Comparison microscope, simply, is two microscopes connected by one bridge, whereby you can see two things at the same time from each scope. All right, you put a specimen on this scope and specimen on that scope. You can see them side by side; or you can overlap them with a scope.

Q Is that what was done in this comparison of the pubic hair?

A Yes, sir.

Q Did you reach a conclusion in your comparison of these materials?

A Yes.

Q Could you please tell the Court, if you can, what that conclusion was?

A Well, for one particular hair there that I found in the trace materials, it was similar to Michael Tillman's pubic hair. It had different characteristics, the color cross-sectional shape, the pigment distribution, the buckling, and the overall -- all the property that I could find, all the characteristics that I could compare the two, they were the same.

Q Do you recall exactly what those characteristics were?

A Well, I believe they were both flat. They had moderate pigment distribution throughout most of the shaft of the hair, and then towards the tip it was very heavy, then the depth itself it was light. There was predominantly continuous medulla in both of them. They were both the same colors. They tapered to a tip at the end, so there was no damage at the end. They both had their roots present, and I believe that is all the points to compare them to.

Q Did you note any dissimilarities?

A No, I did not. I did look for some, but I did not find any.

Q No?

A The diameters were also similar. They may vary slightly beyond shaft, but that is to be expected.

Q All right, I am sorry, I can't hear you.

A That may have varied on the shaft, but that is to be expected, slightly.

Q Calling your attention now to -- showing you now what has been previously marked as People's Exhibit Number 12 that is now in a sealed container. I ask if you recognize the container, as you view that?

A Well, it is a plastic bag containing two manila envelopes. One is marked 53, 5 July, '86, with the date, 22 July, '86, marked fingernails. The other is marked similarly, 53, the date if July 29, 1986, and then marked, head hair.

MS. KAWAMOTO: If I may have a moment, Your Honor, I will get a pair of scissors to open this.

(Brief pause.)

MS. KAWAMOTO: I will ask you now to open the plastic, clear plastic seal and remove People's Exhibit Number 12.

A Okay.

Q And I ask you to look at that. What is the

STATE OF ILLINOIS )
) SS.
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE )
STATE OF ILLINOIS )
) No. 86-10969
VS )
) Before JUDGE KENNETH L. GILLIS
)
MICHAEL TILLMAN, )
STEVEN BELL and )
CLARENCE TROTTER )
(Impleaded) )

Friday, December 5, 1986
11:00 o'clock A.M.

Court convened pursuant to adjournment

Present:

HONORABLE RICHARD M. DALEY, State's Attorney of Cook County, by MR. LAWRENCE LYKOWSKI and MS. LYNNE KAWAMOTO, Assistant State's Attorneys, appeared for the People;

MR. WILLIAM O'NEAL, appeared for Defendant Tillman;

MR. DANIEL FRANKS, appeared for Defendant Bell.

- - - - - - - - - - - - - - - - - - - - - - - - - -

THE CLERK: People of the State of Illinois versus Michael Tillman, Steven Bell.

THE COURT: Ready to resume with Mr. Lenz?

MS. KAWAMOTO: Yes, your Honor.

THE COURT: Call Mr. Lenz.

MS. KAWAMOTO: Mr. Lenz, please.

THE COURT: You are under oath as you were yesterday.

THE WITNESS: Yes, your Honor.

THE COURT: You may be seated.

RAYMOND LENZ,,

resumed the stand, having been previously duly sworn, was further examined and testified as follows:

FURTHER DIRECT EXAMINATION

BY MS. KAWAMOTO:

MS. KAWAMOTO:

Q. Sir, showing you what has previously been marked People's Exhibit Number 56, I would ask you to inspect that.

And do you recognize that, sir?

A. Yes.

Q. Have you ever seen that item before?

A. Yes.

Q. Where were you when you saw that?

A. In the laboratory.

Q. And what condition was this in when you first saw this?

A. Well, it was sealed.

Q. And what is that, sir?

A. It's a brown paper bag.

Q. Are there any markings on it?

A. Yes. RD number of this case, what's inside, the sweat pants, white undershorts, right under are my initials, the RD number where I opened the bag.

Q. And after you opened the bag, did you remove the contents from the bag?

A. Yes, I did.

Q. Showing you now what is has been previously marked as People's Exhibit Numbers 57 and 58. I ask you to inspect those items, sir.

A. Yes.

Q. Do you recognize them?

A. Yes, I do.

Q. What do you recognize People's Exhibit Number 57 to be?

A. The blue sweat pants that came out of that bag.

Q. And what about Exhibit Number 58?

A. Excuse me. These are the white undershorts that were in the bag.

Q. Are there any markings on those?

A. Yes. I have the RD number, my initials on both of these.

Q. And are all three exhibits, or I should say People's Exhibits 57 and 58, are they in substantially the same condition now as they were when you first saw them in the laboratory?

A. Yes, except Cathy has taken some extracts out of this.

Q. Has she left her marks by the --

A. Yes.

Q. What did you do with these items after you inventoried them, People's Exhibits 57 and 58?

A. Before I took them from the bag. I laid out a clean piece of brown paper, opened the bag, took one of the items out, scraped it down, collected any trace materials that were on there, noted any damage or any particular uniqueness about the garment, any damage, and put the trace materials in the pill box.

Q. Did you then examine the next exhibit, that being People's Exhibit Number 58?

A. Yes. I examined it the same way. I scraped it down and collected any trace materials

I saw and noted any remarks in my notes about the condition of the garment and put them in the same pill box since they were both packed together.

Q. Showing you what I will mark as People's Exhibit Number 87 for identification. I ask if you recognize this, sir?

A. Yes, I do.

Q. What do you recognize that to be?

A. It's the pill box that I collected the trace materials from those items.

Q. And how do you know that, sir?

A. I marked it with the RD number, my initials, the inventory number and what was inside, trace for clothing.

Q. And after you placed the trace materials inside of this pill box and marked it, did you later remove any of those trace materials?

A. Yes, I did. I mounted some of the trace materials on slides and put them in slide mailers.

Q. Showing you now what I have previously marked as People's Exhibit Numbers 88 A, B and C, consisting of three slides mailers. I ask you to inspect these and ask if you recognize those?

A. Yes. These are the slides and the

mailers that I prepared from the trace in that pill box. I got the RD number, Betty Howard's name, the inventory number, and trace from clothing and my initials on both mailers on the inside of the slides.

Q. And are these slides and pill box -- contents with the box in the same condition now as they were when you removed them and prepared them?

A. Yes, except for the exhibit tags.

Q. Where have these box and slides been since you have prepared them?

A. In my possession at the laboratory.

Q. Okay.

Now, sir, calling your attention to People's Group Exhibit Number 68, consisting of five slide mailers. I believe these are the slide mailers prepared from the trace that was removed from the pair of children's sandals and five sections of cloth that was previously marked and identified as People's Exhibit Number 12. I'm sorry. Strike that. People's Exhibit Numbers 54 and 53 and referred to in your report as S-3 and S-4.

Did you have an occasion to inspect the

trace materials that you had placed on these slides?

A. Yes, I did.

Q. And do you recall at this time what your findings were as to those trace materials that you examined?

A. Not exactly.

Q. Is there anything that would refresh your recollection, sir?

A. Yes. My lab report.

MS. KAWAMOTO: At this time, your Honor, I request permission to tender to the witness a copy of his lab report. I believe each counsel has a copy of said report.

THE COURT: Any objection?

MR. FRANKS: No.

MR. O'NEAL: No.

THE COURT: You may proceed.

MS. KAWAMOTO:

Q. First of all, would you please explain to the Court how you examined the tarce materials that you recovered from those items?

A. Well, I take the pill box, open it, examine it using the steri-microscope, and I

withdraw any or recover any trace materials, that is, any fibers or hairs and with my tweezers, and then I mount them on the slides.

Q. And how is it that you look at them?

A. Microscopically. After the slides are prepared, I examine the fibers and hairs, whatever I find on the microscope, polarized light microscope and the phase contrast microscope.

Q. In reference to your report, that being Exhibits S-3 and S-4, would you please tell the Court what your findings were of your microscopic examination of the trace materials from these exhibits?

A. My examinations, microscopic examinations of the trace materials from S-3 and S-4 revealed the presence of a few red acrylic, dark pink wool, long blue acrylic, blue cotton, white cotton, blue polyester, white polyester fibers as well as a shaft of flat brown to dark brown to light brown hair and several shafts and fragments of round brown human hair.

Q. All right.

THE COURT: Ask you to repeat that sequence slowly.

THE WITNESS: Yes, your Honor.

THE COURT: A few red acrylic --

THE WITNESS: A few red acrylic, dark pink wool, long blue acrylic, blue cotton, white cotton, blue polyester and white polyester fibers, and one shaft of flat brown to dark brown to light brown human hair, and several shafts and fragments of round brown human hair.

MS. KAWAMOTO:

Q. Referring now to what has been previously marked as People's Exhibit Number 71, those being the mailers and the slides prepared from People's Exhibit Number 12, formerly identified as the fingernails of the victim, Betty Howard, referring to your report as K-3.

Did you have occasion to also inspect those slides under microscope?

A. Yes, I did.

Q. And what were your findings, sir?

A. Findings revealed presence of a few red acrylic, blue polyester, bluish-purple wool-type and light yellow natural fiber.

THE COURT: State that again.

THE WITNESS: A few red acrylic, blue

polyester, bluish-purple wool-type fibers.

THE COURT: Are these separate fibers?

THE WITNESS: Yes, these are separate fibers, your Honor.

And light yellow natural fibers.

THE COURT: What is a natural fiber?

THE WITNESS: That is a fiber made from a vegetable source, like wood fiber, or such things like that.

MS. KAWAMOTO:

Q. Did you have an occasion to inspect under the microscope People's Exhibit Number 73, which is a group of slides, A, B, C, D, E and F, and those slides being prepared from trace materials from People's Exhibit Numbers 4, 5 and 6 previously identified as the sheet, blouse and tube top of the victim referred to in your report as K-4, K-5 and K-6?

A. Yes.

Q. And what were your microscopic findings of those trace materials?

A. Excuse me.

My microscopic examinations revealed the presence of a few light pink acrylic fibers, red

acrylic fiber, white cotton fiber, white nylon.

THE COURT: Wait. I'm sorry. Go back to light pink acrylic.

THE WITNESS: Light pink acrylic fiber, red acrylic fiber, white cotton fibers, white nylon.

THE COURT: Light?

THE WITNESS: White, your Honor. Blue acetate fiber, red nylon fiber, light yellow polyester fiber, dark pink wool fibers, plant fibers, a few white animal hairs, several fragments of brown human hair, and several shafts and fragments of brown to light reddish-brown human hair.

MS. KAWAMOTO:

Q. Calling your attention now to what has been previously been marked as People's Group Exhibit Number 67 consisting of three slide mailers labeled A, B and C. I ask -- these were taken from the trace materials of what you previously identified as People's Exhibit Number 45, a light yellow towel and referred to in your report as S-2.

Did you have an occasion to microscopically examine these slides?

A. Yes, I did.

Q. And what were you findings, sir?

A. The findings from my microscopic examination of these trace materials revealed the presence of a few red acrylic fibers, white cotton fibers, blue acrylic fibers, blue acetate fibers, brown acrylic fibers, blue cotton fibers, and several shafts and fragments of brown human hair.

Q. Did you have an occasion to microscopically examine what has been previously marked as People's Group Exhibit Number 78 consisting of four slide mailers labeled A, B, C and D which were taken from the trace materials of previously marked People's Exhibit Number 34 identified as defendant Bell's gym shoes referred to in your report as B-1?

A. Yes, I did.

Q. And what were your microscopic findings of these trace materials?

A. My findings from my microscopic examine of these slides revealed the presence of a few red acrylic, white cotton, dark pink wool, light pink or white nylon, red cotton, blue cotton, and white polyester fibers, a few glass particles and three fragments of brown human hair.

THE COURT: That was dark pink?

THE WITNESS: Dark pink wool, your Honor.

MS. KAWAMOTO:

Q. Did you have an occasion to microscopically examine what has been previously marked as People's Exhibit 80 consisting of two slide mailers marked A and B which was identified as having come from the trace materials of previously marked People's Exhibit Number 33 identified as defendant Bell's pants or slacks and referred to in your report as B-2?

A. Yes, I did.

Q. What were your microscopic findings?

A. My findings from my microscopic examine of these slides revealed the presence of a few red acrylic, dark pink wool, and light pink, white nylon fibers.

THE COURT: What was that again?

THE WITNESS: Light pink, white nylon.

THE COURT: Light?

THE WITNESS: Light pink and white, your Honor, several shafts of brown to reddish-brown human hair, and several fragments of brown and dark brown human hair.

MR. FRANKS: Could I have that read back?

THE COURT: Brown to reddish-brown hair. Is that the one we're working on? Read it again.

THE WITNESS: Several shafts of brown to reddish-brown human hair and several fragments of brown and dark brown human hair.

MS. KAWAMOTO:

Q. Did you have an occasion to microscopically examine the slides contained in People's Exhibit Number 82?

THE COURT: Hold up.

MR. FRANKS: Judge, I have -- I haven't objected until now, but relative to B-1 and B-2, the clothing of the defendant Bell.

THE COURT: That's People's Exhibit Numbers 33 and 34?

MR. FRANKS: Yes. I have no objection to trying to move this witness along in terms of his testimony, but we went from identifying the items that he examined and the fact he did a microscopic examination. I have no problem with that at all. But how he's identifying acrylics and fibers and wools and there is absolutely no indication as to how this witness did that. And it seems that

saying that something is a dark pink wool or a light pink or white nylon fiber is a conclusion that this expert is making, and there has been no explanation as to how he made it.

I would object to reporting from the report what his findings were without a proper foundation.

THE COURT: Well, I'm going to allow that to be taken up on cross examination.

MS. KAWAMOTO: Your Honor, we, as an offer of proof, before I finish the direct, the witness will be explaining how he makes his identifications.

May I proceed, your Honor?

THE COURT: Yes.

MS. KAWAMOTO:

Q. Did you have occasion to, sir, to examine microscopically what has been marked as People's Exhibit Number 82, that being one mailer containing slides taken from the trace materials of what was previously marked as People's Exhibit Number 65 and identified as a blanket from the seat of the victim's, Betty Howard's car and marked in your report as F-4?

A. Yes.

Q. And what were your microscopic --

THE COURT: Wait a minute.

MS. KAWAMOTO: Fine.

THE COURT: This is 82 containing 65, right?

THE WITNESS: Yes.

MS. KAWAMOTO: Yes.

THE WITNESS: The examination, microscopic examination of the trace materials revealed the presence of a few red acrylic, white acrylic, and pink polyester fibers and several gray and black animal hairs.

THE COURT: Pink, what was it?

THE WITNESS: Polyester, your Honor.

MS. KAWAMOTO:

Q. Did you have an occasion to microscopically examine what has been previously marked as People's Exhibit Number 84 consisting of one mailer with slides prepared from trace materials recovered from People's Exhibit Number 10, that being the ligature from the left wrist of the victim, Betty Howard, identified in your report as K-10?

A. Yes, I did.

Q. And what were your microscopic findings of these trace matters of the slide?

A. My microscopic examination of the trace materials revealed the presence of a few purple wool, long white cotton fibers, light bluish-purple polyester --

THE COURT: Wait a minute. Go ahead.

THE WITNESS: Dark pink wool, light pink cotton, yellow cotton fibers, and a fragment of brown human hair.

MS. KAWAMOTO:

Q. Did you have an occasion to microscopically examine what has been previously marked as People's Exhibit Number 86 consisting of three slide mailers marked A, B and C, previously identified as coming from the trace materials from People's Exhibit Number 48, the victim's shorts, identified in your report as S-10, as People's Exhibit Number 49, the victim's sandals identified in your report as S-7, People's Exhibit Number 50, the victim's panties identified in your report as S-9, and People's Exhibit Number 51, a comb identified in your report as S-8?

A. Yes, I did.

Q. And what were your microscopic findings?

A. Microscopic examination of these trace materials revealed the presence of a few light purple wool fibers, white cotton fibers, white polyester fibers, dark pink wool fibers, blue acetate fibers, light yellow polyester fibers, and long red wool fibers, several particles of mineral debris, and two fragments of brown human hair, one fragment of bluish-black human hair, two shafts of brown human hair, and one fragment of brown to reddish-brown human hair.

Q. And did you have an occasion to microscopically examine what has been previously marked as People's Exhibit Number 88, consisting of three slide mailers marked A, B and C, and identified as having come from the trace materials from People's Exhibit Number 57 identified as defendant Tillman's blue sweat pants and identified in your report as T-1, and also from People's Exhibit Number 58 identified as defendant Tillman's shorts and identified in your report as T-2?

A. Yes, I did.

Q. And what were your microscopic findings

of these slides?

A. My microscopic exams of the trace materials revealed the presence of a few dark pink wool and light pink nylon fibers, one shaft of brown animal hair, one shaft of brown to light brown human hair, and two fragments of dark brown hair.

Q. Now, sir, after having made all of these findings concerning each of these slides that were prepared from the trace materials of the various items that you have testified to, did you make any comparisons between these slides and these findings?

A. Yes. Any similar fibers or hair that I found I compared to one another microscopically using the comparison microscope.

Q. Would you please explain to the Court your examination of the fibers and the identifications of the various wool and acrylic fibers?

A. All of the fibers involved in this case that I identified and compared I used the -- I did using the polarized light microscope. It is a type of microscopy that polarizes light through the

microscope so as to determine different optical properties of what you're looking at, a specimen, a fiber, a hair, a mineral or a piece of glass. Different optical properties of these different things can be determined by use of this microscope. One thing is refractive index. Okay. Index of a refraction is -- a simple explanation would be when you take a glass of water and put a pencil in it, it seems bent, the pencil. This happens because there is a difference in refractive index of the air and the water. Okay.

All of these items, fibers, hairs, different things, minerals, all have certain refractive indices, indices that exist because of their optical properties because of their compenents. Okay, and man-made fibers are -- came from chemicals and they contain certain optical properties and refractive index is one of them.

If you take the fiber and put it in a medium of a known refractive index, such as I did here, I put the fibers in aroclor, a-r-o-c-l-o-r, which is of one known refractive index, you can tell what the refractive index of the fiber is in different orientations relative to this mounting

media, whether it be lower or higher than that, as long as you have the known refractive index.

This is one part that you use, one point of determination in identifying the fibers or crystals or anything else you might need to use the polarized microscope for.

Interference colors is another way of identifying different types within the polarized light microscope. These colors are gotten by crossing the polars in the microscope. There is a polarizer at the bottom of a light source and for the specimens and there's a polaroid piece of glass that has the specimen above the objectives. The polarizer only lets one plane of light through. You can think of light as being multi-planal, different planes come through. Normal light polarized will only let one plane through and it will affect whatever you're looking at in a way as to show different optical properties. If you cross those poles, that polar will have this plane going the opposite direction. It will block out all light coming through and it just sends one plane of light through.

When this light, this one plane hits a fiber, the fiber there deflects that light in the same way a prism deflects light and breaks into different colors. These fibers will also give different what we call interference colors which happens because of polarized light illuminating them and it being crossed and you'll find out what these interference colors are of the fiber. And this is another form of identification and comparison of the fiber.

There is other optical properties involved in certain fibers also, but utilizing also the polarized light, cross the polarized light and filters, interference filters, some fibers have the interference colors that we get and the different fibers have different orders of color. There's first, second, third, fourth, fifth order of different colors. Fibers that exhibit a high first order color, which is the colors gray, white, and straw yellow have what is known as a sign of elongation and this can be determined by using a 530 nanameters wave plate, which is an interference-type filter that determines the sign of elongation which is the

vibrational direction of the light going through the fibers, which is a fiber having those inference colors, having a negative or a positive.

Q. Are these some of the means you used to identify these fibers?

A. Yes, these are some of the means I used.

Q. You have testified that you have identified some fibers as being wool, some as being cotton, some as being polyester, acetate, and acrylic. Is that correct, sir?

A. Yes.

Q. Can you please tell in a general sense how it is that you can tell if a fiber is wool, what determines if it's cotton, what determines if it is a polyester, and those terms, the identifying factors for these of the fibers?

A. If cotton, being as it's twisted in nature, its naturally twisted fibers, it's -- you never have it flat in one plane on the slide and, therefore, any time the light hits it, you constantly have interence colors. And so that when you rotate the slide around on the microscope, you constantly see interference colors which is unique to cotton.

Other fibers will have a point of extention where the vibrational direction of the light coming through will be the same in the fiber and will disasppear momentarily at different points as you rotate it on the microscope. Cotton will not. That's the only fiber that will not and that's how I identified cotton.

Q. As to wool, sir?

A. Wool is an animal, basically an animal fiber. All right. It's a fiber used to make garments from the hairs of animals, okay, most notably a sheep. It can be done because the scales on the wool fiber which are similar to the scales on a human hair are a lot longer and larger than on a human hair and they lend themselves to being intertwined very easily and woven into different fabrics. And it also, as with a human hair, has a medulla. It's an animal. And it takes up a larger part of the hair than the human hair. The medulla in the human hair only takes up about a third of the total amount of the hair. In an animal hair the medulla will take up to two-thirds, a half, okay, and this I would determine between animal and human hair. You can tell this is an animal

hair because of the way the scales are shaped, the medulla, and diameter.

Q. And how would you identify an acetate fiber?

A. Acetate fiber would be identified using the polarized light microscope. It's a man-made fiber. Excuse me. It has positive signs of elongation, as I referred to earlier, okay, and the refractive indices are such in parallel and perpendicular that they're less than aroclor which is 166. These are different characteristics that you would use to identify an acetate fiber.

Q. How would you identify an acrylic fiber?

A. An acrylic is one of these fibers that I referred to earlier that has -- that has first order colors that are very grayish-white, and it shows a negative sign of elongation. It's one of only a few fibers that do, okay, and that's a unique characteristic. That would show its uniqueness from say a polyester, which does not have that characteristic.

Q. How do you identify a polyester?

A. Polyester when mounted in aroclor has a refractive index in one direction. When I say one

direction, I'm speaking about placing the fiber either parallel or perpendicular to the X-axis on the microscope, which would be the horizontal axis as you're looking through it. So this would be parallel and this would be perpendicular, okay. As you're looking through the microscope, one refractive index is below aroclor and the other one is above aroclor. This is unique in polyester. Their interference colors are also rose, usually rose and light green or light green colors, and this is another point in comparison that you would use to determine a polyester fiber.

Q. And how do you determine a nylon fiber?

A. Nylon is similar to polyester in that you get color interence colors. There are different colors of rose and green and the refractive indices are different from polyester. They're both below aroclor so you can differentiate between the two that way.

Q. After having identified these various fibers from the various slides obtained from the trace materials of the various exhibits, did you isolate -- make any specific comparisons?

A. Yes, I did. There were some fibers that

were similar to several different boxes of the trace materials or trace materials that J mounted on the slides.

Q. And do you recall which fibers these were?

A. I believe there was pink wool, red acrylic and blue acetate. Excuse me.

Q. And would you please explain to the Court what your comparisons consisted of and how you compared these various fibers?

A. We have two polarized microscopes that are set up in comparison connected by a bridge, an optical bridge. You can look through one set of oculars and see whatever the specimen is on both the microscopes at the same time. Okay. So you can compare these fibers or hairs by actually putting them side by side virtually through this microscope.

Q. Do you recall -- would you please tell the Court which fibers you compared under the comparison micrscope and what your findings were to those comparisons?

A. Excuse me. I used the comparison micrscope to compare the fibers that I found to be

similar in gross morphology, meaning the same type and same type of fiber, and looked at it more closely using the comparison microscope. I actually set the fibers side by side and imposed them on one another and looked at different characteristics that were similar and looked for any dissimilarities.

Q. And did you arrive at any conclusions after your comparisons?

A. Yes, I did.

Q. And do you recall what those conclusions are?

A. No. I need to refer to my lab report for that.

Q. Please refer to your report.

MR. FRANKS: Judge, I'm going to object at this point to the conclusions. I think what he observed should be first stated before we come to a finding.

THE COURT: Any objection to that?

MS. KAWAMOTO: No, your Honor I'll ask the witness.

MS. KAWAMOTO:

Q. Would you please tell the Court in your

comparisons what is was that you observed specifically?

A. Specifically?

Q. As to your observations of the various fibers. Would you please explain to us -- perhaps identify to us -- I believe you mentioned a red acrylic fiber.

A. Yes.

Q. Sir, if I may, did you have an occasion to compare the red acrylic fibers found from the trace materials of the exhibit marked in your report as K-3 which was previously identified as having come from the victim's fingernails, with the red acrylic fibers that you testified came from Exhibits K-4 through K-6 previously identified as having come from the sheet, blouse and tube top with the red acrylic fibers as identified as having come from S-2 previously identified as having come from a light yellow towel with the red acrylic fibers that had come from --

THE COURT: Wait a minute. Hold it. Start over using the exhibit numbers used in this courtroom and in addition to the lab exhibit

number. For example, the fingernails is 71. By the time I find that, you're onto something else.

MS. KAWAMOTO: I'm sorry, your Honor.

MR. LYKOWSKI: I'm tendering to the Court, not the entire report, but the first three pages which is a listing of the exhibits.

THE COURT: All right. Go ahead.

MS. KAWAMOTO: If I may start over, your Honor.

MS. KAWAMOTO:

Q. Sir, did you have an occasion to examine and compare the red acrylic fibers that you found on People's Exhibit Number 12 which was previously identified as the victim's fingernails and identified in your report as K-3 with the red acrylic fibers found on People's Exhibit Numbers 4, 5 and 6 previously identified as the sheet, blouse and tube top?

THE COURT: All right. Now, let me interrupt right there. It could be that he's examining 12, 45 and 6, or is he examining 71 and 73, the slides of those? I don't know.

MS. KAWAMOTO: Oh, I see, your Honor. It would be the comparison of the slides made from

these materials.

THE COURT: All right. 71, I think, is the slide that contains the residue from People's Exhibit Number 12, the fingernails.

MS. KAWAMOTO: That's correct, your Honor. If I may again start over.

MS. KAWAMOTO:

Q. Okay.

Starting over once again, sir, did you have an occasion to make a microscopic examination and comparison of the red acrylic fibers found in the trace materials that you mounted on People's Exhibit Number 71 identified as People's Exhibit 12, the victim's fingernails, and referred to in your report as K-3 with the slides previously marked and identified as People's Exhibit Number 73, the six slide mailers prepared from the trace materials recovered from People's Exhibit Numbers 4, 5 and 6 previously identified as the sheet, blouse and tube top and referred to in your report as K-4, 5 and 6?

A. Yes.

Q. And were you able to make any determinations upon your comparison of these red

acrylic fibers?

A. Yes. Comparing some of them microscopically, I found them to be the same type of fiber, meaning they're acrylic, using the different characteristics as I explained before with the polarized microscope, the same cross-sectional shape, they were similar in color, and they were the same or similar in diameter.

Q. Did you also have an opportunity to compare each of those red acrylic fibers with People's Exhibit Number 76 A, B and C, the slide mailers -- just double-check me -- taken from the trace materials from People's Exhibit Number 45 identified as a light yellow towel referred to in your report as S-2?

A. Yes, I did. I also compared them to each other.

Q. To each other. And what were your findings upon these comparisons, sir?

A. I found that also to be similar, the optical properties and color. It was also an acrylic fiber. It was also red and I compared them with the comparison microscope in the same way I compared the first two.

Q. Then you compared each of them to each other and found them to be similar in all respects, is that correct?

A. That's correct.

MR. FRANKS: Objection to all respects.

THE COURT: Overruled.

MS. KAWAMOTO:

Q. Did you then microscopically compare and examine People's Exhibit Number 68 A, B, C, D and E, the slide mailers prepared from the trace exhibits recovered from People's Exhibit Numbers 53 and 54, identified as the children's brown sandals and the five yellow and blue strips of cloth referred to in your report as S-3 and S-4?

A. Yes. I compared these also to the previous red acrylic fibers from the other three groups of exhibits.

Q. And what were your findings as to those comparisons?

A. They were also dissimilar, red in an acrylic fiber.

Q. Did you say dissimilar or similar?

A. Similar. I'm sorry.

Q. Were there any differences noted?

A. No.

Q. Did you microscopically examine and compare People's Group Exhibit Number 78 A, B, C and D, four slide mailers taken from the trace materials from People's Exhibit Number 34 identified as defendant Bell's gym shoes and identified from your report as being B-1?

A. Yes. I examined and compared the red acrylic fibers from these -- this exhibit also to the previous exhibits.

Q. And what were your conclusions, sir?

A. That they were similar.

Q. Is that in each and every respect?

A. In that --

MR. FRANKS: Objection to that.

THE WITNESS: (continuing) -- they're red acrylic fibers.

THE COURT: Leading. Sustained.

MS. KAWAMOTO:

Q. In what ways were these similar?

A. The color and the type of fiber that they are.

Q. Which was what?

A. Red acrylic.

Q. Does that include morphological and optical properties?

A. Yes, morphological meaning referring to the color and optical properties referring to the type of fiber it is, which is an acrylic.

Q. Were there any differences in the red acrylic fibers that you saw in People's Exhibit Number 78 from the other exhibits that you microscopically examined?

A. No, they're all similar, red acrylic fibers.

Q. And did you have an occasion to examine and compare the red acrylic fiber noted in People's Exhibit Number 80 A and B previously identified as having come from the trace materials recovered from People's Exhibit Number 33 previously identified as defendant Bell's slacks and referred to in your report as B-2?

A. Yes. I examined them also in a similar manner microscopially and found that they were also similar to the others.

Q. By they, what do you mean, sir?

A. They're red acrylic fibers. I'm sorry. Also similar to the other red acrylic fibers in

the previous exhibits.

Q. Those being the exhibits from the victim's fingernails, the sheet, blouse and tube top from the victim, the light yellow towel and the children's sandals and the yellow and blue strips of cloth, is that correct?

A. I believe so, yes.

MR. FRANKS: I believe so was his answer?

THE WITNESS: Yes.

MS. KAWAMOTO:

Q. Is that a yes or a no, sir?

A. That's a yes.

THE COURT: Read back the last two questions.

(Record read.)

MS. KAWAMOTO:

Q. Did you have an opportunity to microscopically examine and compare the red acrylic fibers that you found in People's Exhibit Number 82 previously having been identified as having come from the trace materials from People's Exhibit Number 65, that being the blanket from the car of the victim and referred to in your report as F-4?

A. Yes. I also compared these fibers,

these red acrylic fibers that I found here in this exhibit with the rest of the previous exhibits that I found red acrylic fibers in.

Q. So that you compared these red acrylic fibers with each and every red acrylic fiber in the previously mentioned exhibit that contained red acrylic fibers, is that correct?

A. That's correct.

Q. And what were your conclusions, sir?

A. They are also similar, red acrylic fibers.

Q. And by similar, and referring to the red acrylic fibers that you found in People's Exhibit Number 82, Group Exhibit 80, Group Exhibit 78, Group Exhibit 68, Group Exhibit 76, Group Exhibit 73, and Exhibit 71, those then are similar in morphology and optical properties, is that correct?

A. Yes.

Q. Did you find any differences between any of those red acrylic fibers that you found and examined microscopically in any of those exhibits or slides?

A. No. They were all similar color red and

they were similar fibers, same fiber. They were acrylics.

Q. Were there any differences?

A. Only in lengths. Some might have been a little shorter or longer than the others. Other than that there was no other differences that I could find.

MS. KAWAMOTO: May I just have a moment to re-group, your Honor?

(Recess taken.)

THE COURT: Will this be a good time to break for lunch or do you have some other exhibits?

MR. LYKOWSKI: We have about a half an hour more on direct, your Honor, and then cross examination.

THE COURT: All right. Let's break for lunch at this point then for one hour until 1:30.

(Recess taken.)

STATE OF ILLINOIS )
) SS.
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE )
STATE OF ILLINOIS )
) No. 86-10969
VS )
) Before JUDGE KENNETH L.
) GILLIS
STEVEN BELL and )
MICHAEL TILLMAN )

Friday, December 5, 1986
1:30 P.M.

Court convened pursuant to recess

Present:

HONORABLE RICHARD M. DALEY,
State's Attorney of Cook County, by
MR. LAWRENCE LYKOWSKI and
MS. LYNNE KAWAMOTO,
Assistant State's Attorneys,
appeared for the People;

MR. DANIEL FRANKS,
appeared for Defendant Bell;

MR. WILLIAM O'NEAL,
appeared for Defendant Tillman.

- - - - - - - - - - - - - - - - - - - - - - - - - -

THE CLERK: Tillman and Bell.

THE COURT: Ready to resume?

MS. KAWAMOTO: Yes, your Honor.

THE COURT: Call your next witness.

MS. KAWAMOTO: We ask Mr. Ray Lenz to resume

the stand.

THE COURT: You may continue your direct examination.

MS. KAWAMOTO:

Q. Sir, you understand that you're still under oath as you were previously sworn?

A. Yes, I understand.

Q. Sir, calling your attention to People's Exhibit Number 73 consisting of six slide mailers labeled A through F that you identified earlier as being slides prepared from the trace materials coming from what was previously identified as People's Exhibit Numbers 4, 5 and 6 previously identified as being the sheet, blouse and tube top and referred to in your report as K-4, 5, and 6. Did you have an opportunity to examine People's Exhibit -- Group Exhibit 73 A for the presence of pink wool fibers?

A. Yes, I did.

Q. And did you also have an occasion to examine previously identified People's Exhibit Number 84 as being the slide prepared from the trace materials from People's Exhibit Number 10 identified as the left wrist ligature found on the

victim and referred to in your report as K-10? Did you find, I belief you testified, pink wool fibers in that slide also, is that correct?

A. Yes, it is.

Q. And were you able to microscopically compare and examine those wool fibers?

A. Yes, I was.

Q. And were you able to make any determinations upon your examination?

A. Yes. They were similar in morphology, meaning they were similar in color and they were the same types of fibers, which would be wool. I compared them side by side using the comparison microscope, as I testified to previously, and side by side and I superimposed one image on the other, and they were the same in diameter with a slight variation in diameter, as all hairs will be, and scale characteristics and similar in color.

Q. And you found them also to be similar in optical properties, is that correct?

A. Yes, that is, they are wool fibers, yes.

Q. And did you also have an occasion to compare and examine the wool fibers I believe you testified that were present in People's Exhibit

Number 68 which consists of five slide mailers labeled A through E, which were taken from the trace materials identified as People's Exhibit Numbers 53 and 54 which were the -- were the children's brown sandals and the yellow and blue ligatures or strips of cloth referred to in your report as S-3 and S-4?

A. Yes.

Q. And what did your microscopic examination and comparison reveal as to those fibers?

A. The were pink wool fibers that I found in trace materials similar to the previous two exhibits that I found pink wool fiber in also.

Q. And you compared the pink wool fibers from the -- in the last exhibit to both preceding exhibits, is that correct?

A. Yes, that's correct, and they were microscopically similar and the same as the other two.

Q. And did you also have an occasion to compare under the micrscope the pink wool fiber that you testified were found in People's Exhibit Number 86 A, B, C, the group exhibit, which were

the slide mailers made from the trace materials and from People's Exhibit Number 48, the victim's shorts, 49, the victim's sandals, 50, the victim's panties, and 51, a comb referred to in your report as S-7, 8, 9 and 10?

A. Yes, ma'am.

Q. And what conclusions did you arrive at concerning the comparison of those wool fibers?

A. They were also examined microscopically, comparison microscope to all three of these previous exhibits with the pink wool fibers and found to be similar pink wool fibers.

Q. In what respect, sir?

A. Their morphology and optical properties.

Q. And did you have an opportunity to inspect and examine and compare under the microscope the pink wool fibers that were found in People's Exhibit Number 88 A through C consisting of three slide mailers which were made from the trace samples and taken from People's Exhibit Number 57, Mr. Tillman's sweat pants, and People's Exhibit Number 58, Mr. Tillman's shorts referred to in your report as T-1 and T-2?

A. Yes, I did.

Q. And what -- what observation did you make?

A. I compared these in a like manner, basically comparison microscope, to the previous pink fibers in the other exhibits, the past four, and found them to be similar also in morphology and optical properties.

THE COURT: That's with the pink wool fibers?

THE WITNESS: Yes, your Honor.

MS. KAWAMOTO:

Q. And did you have an opportunity to microscopically compare and examine the pink wool fibers found on People's Exhibit Number 78 which consists of four slide mailers labeled A through D which were taken from the trace materials recovered from People's Exhibit Number 34 identified as defendant Bell's gym shoes and referred to in your report as B-1?

A. Yes.

Q. And what observations did you make?

A. That they were microscopically -- I examined them microscopically and found them to be similar in morphology and optical properties to the previous pink fibers that I found on the

others.

Q. That would be specifically to the pink fibers found on People's Exhibit Number 88, is that correct?

A. Yes. 88.

Q. And 86?

A. Yes.

Q. And 68?

A. Yes.

Q. And 84?

A. Yes.

Q. And 73, is that correct?

A. Yes, that's correct.

Q. And did you have an opportunity to have and compare microscopically the pink wool fibers found in People's Exhibit Number 80 consisting of two slide mailers marked A and B which were previous identified as having come from trace materials recovered from People's Exhibit Number 33 identified as defendant Bell's slacks and referred to in your report as B-2?

A. Yes, I did.

Q. And what observations did you make?

A. That they were also similar.

Q. By what --

A. The pink wool fibers -- excuse me -- were also similar in morphology and optical properties to the previous pink fibers I found in the other trace materials in these previous exhibits.

Q. And that would include specifically People's Exhibit 88, is that correct?

A. Yes.

Q. And 86?

A. Yes.

Q. And 68?

A. Yes.

Q. And 84 and 73, is that correct?

A. Yes.

Q. Did you note any differences in these pink wool fibers that you have identified as being morphologically and optically similar in each of these previously named exhibits?

A. The only difference would be in the length variation.

Q. Sir, are you familiar with Locard's exchange principle?

A. Yes.

Q. Would you please tell the Court what that is?

A. Simply stated, the principle states that whenever two things come in contact with one another there is an exchange of physical evidence of some sort.

Q. And is this principle applicable to the exchange of fibers?

A. Yes.

Q. And is that principle also applicable to the exchange of hairs?

A. Yes.

Q. And is this principle accepted in the field of forensic science?

A. Yes, I believe it is.

MS. KAWAMOTO: May I have a moment, your Honor?

(Recess taken.)

MS. KAWAMOTO: No further questions of the witness at this time.

THE COURT: Cross-examination.